1   DANIEL J. BERGESON, SBN 105439, dbergeson@be-law.com
    CAROLINE McINTYRE, SBN 159005, cmcintyre@be-law.com
2   JOHN D. PERNICK, SBN 155468, jpernick@be-law.com
    BERGESON, LLP
3   2033 Gateway Place, Suite 300
    San Jose, California  95110
4   Telephone:  (408) 291-6200
    Facsimile:   (408) 297-6000
5
6   GEORGE T. CONWAY III, appearance *pro hac vice*
    gtconway@wlrk.com
7   ADAM L. GOODMAN, appearance *pro hac vice*
    algoodman@wlrk.com
8   WACHTELL, LIPTON, ROSEN & KATZ
    51 West 52nd Street
9   New York, New York  10019
    Telephone:  (212) 403-1000
    Facsimile:   (212) 403-2000
10
11  *Attorneys for Defendants Hewlett-Packard Co.
      and Hewlett-Packard Mexico, S. de R.L. de C.V.*

12
13              **UNITED STATES DISTRICT COURT**

14             **NORTHERN DISTRICT OF CALIFORNIA**

15                  **SAN JOSE DIVISION**

16  PETRÓLEOS MEXICANOS, and PEMEX           )   Case No. CV–14–05292–BLF
    EXPLORACIÓN Y PRODUCCIÓN,                )
17                                           )
                             Plaintiffs,     )   **DEFENDANTS' NOTICE OF**
18                                           )   **MOTION AND MOTION TO**
    v.                                       )   **DISMISS COMPLAINT;**
19                                           )   **SUPPORTING MEMORANDUM**
    HEWLETT-PACKARD COMPANY,                 )
20  and HEWLETT-PACKARD MEXICO,              )
    S. DE R.L. DE C.V.,                      )   Date:        May 21, 2015
21                                           )   Time:        9:00 a.m.
                             Defendants.     )   Courtroom:   Courtroom 3, 5th Floor
22                                           )   Judge:       Hon. Beth Labson Freeman
                                             )
23
24
25
26
27
28
    DEFENDANTS' MOT. TO DISMISS
    COMPLAINT; SUPPORTING MEMO.
    CASE NO.:  CV–14–05292–BLF

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ............................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ......................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 2

INTRODUCTION .................................................................................................................... 2

STATEMENT OF FACTS ....................................................................................................... 4

ARGUMENT ........................................................................................................................... 6

I.   PLAINTIFFS' RICO CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL. .............. 7

     A.   There is a strong presumption that federal statutes do not apply extraterritorially. ...................................................................................................... 7

     B.   The Ninth Circuit has made clear that, under the presumption against extraterritoriality, RICO can apply only to domestic patterns of racketeering. ............ 9

     C.   The alleged pattern of racketeering activity here is extraterritorial and thus beyond the scope of RICO. ........................................................................................ 13

     D.   The alleged losses here are unquestionably extraterritorial and thus beyond the scope of RICO. ........................................................................................................ 16

II.   EVEN APART FROM EXTRATERRITORIALITY, PLAINTIFFS FAIL TO ALLEGE A PATTERN OF RACKETEERING ACTIVITY. ............................................. 18

III.   PLAINTIFFS' RICO CLAIMS ARE TIME-BARRED. ..................................................... 21

IV.   PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED. ................................. 24

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adhikari* v. *Daoud & Partners*,
  No. 09–cv–1237, 2013 WL 4511354
  (S.D. Tex. Aug. 23, 2013).................................................................................................... 12

*Agency Holding Corp.* v. *Malley-Duff & Assocs.*,
  483 U.S. 143 (1987) ..................................................................................... 3, 10, 21–22

*Alda* v. *SBMC Mortg.*,
  No. 11–cv–00678–LHK,
  2012 WL 10589 (N.D. Cal. Jan. 3, 2012) ........................................................................ 24

*Allegro Consultants, Inc.* v. *Wellington
  Techs., Inc.*, No. 13–cv–02204–BLF,
  2014 WL 7204970 (N.D. Cal. Dec. 17, 2014) ................................................................... 6

*Asadi* v. *G.E. Energy (USA), LLC*,
  No. 4:12–345, 2012 WL 2522599
  (S.D. Tex. June 28, 2012), *aff'd*,
  720 F.3d 620 (5th Cir. 2013)............................................................................................ 12

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................... 6

*Bell Atl. Corp.* v. *Twombly*,
  550 U.S. 544 (2007) ........................................................................................................... 6

*Beneficial Standard Life Ins. Co.* v. *Madariaga*,
  851 F.2d 271 (9th Cir. 1988)............................................................................................ 22

*Blankenship* v. *Medtronic, Inc.*,
  No. cv 12–7884 BRO, 2013 WL 3322031
  (C.D. Cal. June 7, 2013)............................................................................................ 25 n.16

*Carnegie-Mellon Univ.* v. *Cohill*,
  484 U.S. 343 (1988) ......................................................................................................... 24

*Castro* v. *Budget Rent-A-Car Sys., Inc.*,
  154 Cal. App. 4th 1162 (Cal. Ct. App. 2007) ............................................................ 25 n.16

*Cedeño* v. *Castillo*,
  457 F. App'x 35 (2d Cir. 2012).......................................................................................... 10 n.3

*Cement & Concrete Workers Dist. Council
  Pension Fund* v. *Hewlett Packard Co.*,
  964 F. Supp. 2d 1128 (N.D. Cal. 2013) ........................................................................... 23

1

## TABLE OF AUTHORITIES
(continued)

2

**Page(s)**

3

*CGC Holding Co.* v. *Broad and Cassel*,
  773 F.3d 1076 (10th Cir. 2014).............................................................. 10

4

*Comm. to Defend U.S. Constitution* v. *Moon*,
  776 F. Supp. 568 (D.D.C. 1991) ...................................................... 20 n.13

5

6

*Corrie* v. *Caterpillar, Inc.*,
  403 F. Supp. 2d 1019 (W.D. Wash. 2005)........................................ 20 n.13

7

*Doan* v. *Singh*,
  No. 13–cv–531–LJO, 2013 WL 4648554
  (E.D. Cal. Aug. 29, 2013) ........................................................................ 2

8

9

*EEOC* v. *Arabian Am. Oil Co.*,
  499 U.S. 244 (1991) .................................................................. 7, 8, 9, 17

10

*European Cmty.* v. *RJR Nabisco, Inc.*,
  764 F.3d 129 (2d Cir. 2014)......................................... 10 n.3, 18 n.9

11

12

*Goodwin* v. *Bruggeman-Hatch*,
  No. 13–cv–02973–REB, 2014 WL 3882183
  (D. Colo. Aug. 7, 2014) ........................................................................ 11

13

14

*Grimmett* v. *Brown*,
  75 F.3d 506 (9th Cir. 1996)........................................................ 22 & n.15

15

*Gustafson* v. *BAC Home Loans Servicing, LP*,
  No. CV 11–915–JST, 2012 WL 4761733
  (C.D. Cal. Apr. 12, 2012)........................................................................ 25

16

17

*H.J. Inc.* v. *Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989) ......................................................................... *passim*

18

19

*Hardisty* v. *Moore*,
  No. 11–cv–1591 AJB, 2012 WL 1564533
  (S.D. Cal. May 2, 2012) ................................................................... 21 n.14

20

21

*Hourani* v. *Mirtchev*,
  943 F. Supp. 2d 159 (D.D.C. 2013) .................................. 10 n.4, 12, 15, 16

22

*Howard* v. *Am. Online, Inc.*,
  208 F.3d 741 (9th Cir. 2000)................................................................ 21

23

24

*Howard* v. *Maximus, Inc.*,
  No. 3:13–cv–01111–ST, 2014 WL 3859973 (D. Or. May 6, 2014),
  *report and recommendation adopted*,
  2014 WL 3866419 (D. Or. Aug. 6, 2014)..................................... 13, 16

25

26

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*,
  794 F. Supp. 1424 (D. Ariz. 1992).................................................... 23

27

28

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Just Film, Inc.* v. *Merch. Servs., Inc.*,
No. C 10–1993 CW, 2010 WL 4923146
(N.D. Cal. Nov. 29, 2010) ........................................................................... 22 n.15

*Kiobel* v. *Royal Dutch Petroleum Co.*,
133 S. Ct. 1659 (2013) ....................................................................... 2, 7, 8, 17

*Klehr* v. *A.O. Smith Corp.*,
521 U.S. 179 (1997) ........................................................................................ 24

*Lancaster Cmty. Hosp.* v. *Antelope Valley Hosp. Dist.*,
940 F.2d 397 (9th Cir. 1991) ........................................................................... 7

*Loginovskaya* v. *Batratchenko*,
764 F.3d 266 (2d Cir. 2014) ..................................................................... 17, 18

*Microsoft Corp.* v. *AT&T Corp.*,
550 U.S. 437 (2007) ...................................................................................... 7, 8

*Mitsui O.S.K. Lines, Ltd.* v. *Seamaster Logistics, Inc.*,
871 F. Supp. 2d 933 (N.D. Cal. 2012) ................................................... 3, 11, 15

*Mohebbi* v. *Khazen*,
No. 13–cv–03044–BLF, 2014 WL 2861146
(N.D. Cal. June 23, 2014) ........................................................................... 7, 21

*Montazer* v. *SM Stoller, Inc.*,
363 F. App'x 460 (9th Cir. 2010) ................................................................... 24

*Moore* v. *Phillips*,
1 Cal. Rptr. 508 (Cal. Dist. Ct. App. 1959) ................................................... 22

*Morrison* v. *Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010) ................................................................................ *passim*

*Norex Petroleum Ltd.* v. *Access Indus., Inc.*,
631 F.3d 29 (2d Cir. 2010) ......................................................................... 10 n.3

*Ove* v. *Gwinn*,
264 F.3d 817 (9th Cir. 2001) ..................................................................... 18 n.11

*Paracor Fin., Inc.* v. *Gen. Elec. Capital Corp.*,
96 F.3d 1151 (9th Cir. 1996) ..................................................................... 25 n.16

*Perkumpulan Investor Crisis Ctr. Dressel–WBG* v. *Wong*,
No. C09–1786–JCC, 2014 WL 1047946
(W.D. Wash. Mar. 14, 2014) ................................................................ 11, 12, 15

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Petróleos Mexicanos* v. *SK Eng'g & Constr. Co.*,
  No. 12 Civ. 9070 LLS, 2013 WL 3936191
  (S.D.N.Y. July 30, 2013), *aff'd*,
  572 F. App'x 60 (2d Cir. 2014)................................................................ 12 n.5, 15, 16

*Pincay* v. *Andrews*,
  238 F.3d 1106 (9th Cir. 2001)................................................................ 3, 22, 23, 24

*Quach* v. *Cross*,
  No. CV 03–9627 GAF, 2004 WL 2860346
  (C.D. Cal. June 10, 2004)................................................................................... 2

*Religious Tech. Ctr.* v. *Wollersheim*,
  971 F.2d 364 (9th Cir. 1992)............................................................................ 19

*Republic of Iraq* v. *ABB AG*,
  920 F. Supp. 2d 517 (S.D.N.Y. 2013),
  *aff'd*, 768 F.3d 145 (2d Cir. 2014) ....................................... 12 n.5, 15, 16, 18 n.10

*Rupert* v. *Bond*,
  No. 12–cv–05292–BLF, 2014 WL 4775375
  (N.D. Cal. Sept. 22, 2014)................................................................................. 7

*Smith* v. *Cnty. of Santa Cruz*,
  No. 13–cv–00595–LHK, 2013 WL 6185238
  (N.D. Cal. Nov. 26, 2013)................................................................................ 25

*Smith* v. *United States*,
  507 U.S. 197 (1993)........................................................................................ 8

*Stitt* v. *Citibank, N.A.*,
  No. 12–cv–03892–YGR, 2015 WL 75237
  (N.D. Cal. Jan. 6, 2015) ............................................................................... 7 n.2

*Straightshot Commc'ns* v. *Telekenex, Inc.*,
  No. C10–268Z, 2011 WL 1770935
  (W.D. Wash. May 9, 2011)........................................................................ 21 n.14

*Sullivan* v. *Oracle Corp.*,
  254 P.3d 237 (Cal. 2011) ................................................................................ 25

*Tapang* v. *Wells Fargo Bank, N.A.*,
  No. cv–12–02183–LHK, 2012 WL 3778965
  (N.D. Cal. Aug. 30, 2012)............................................................................ 6–7

*Town of Poughkeepsie* v. *Espie*,
  402 F. Supp. 2d 443 (S.D.N.Y. 2005)............................................................. 24

*Turner* v. *Cook*,
  362 F.3d 1219 (9th Cir. 2004)........................................................................ 20

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States* v. *Chao Fan Xu*,
   706 F.3d 965 (9th Cir. 2013) .................................................................... *passim*

*United States* v. *Chao Fan Xu*,
   No. 2:02–cr–00674–PMP, 2008 WL 1315632
   (D. Nev. Apr. 10, 2008) ........................................................................ 13

*United States* v. *Philip Morris USA, Inc.*,
   783 F. Supp. 2d 23 (D.D.C. 2011) .............................................. 11, 12, 15

*USACM Liquidating Trust* v. *Deloitte & Touche LLP*,
   764 F. Supp. 2d 1210 (D. Nev. 2011) ........................................ 23

*Vess* v. *Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ....................................................... 7 n.2

## Statutes and Rules

FED. R. CIV. P. 9(b) ......................................................................... *passim*

FED. R. CIV. P. 12(b)(6) ................................................................... 1, 6

7 U.S.C. § 6*o* ................................................................................... 18

7 U.S.C. § 25 ................................................................................... 17

18 U.S.C. § 1956(c) ......................................................................... 13

18 U.S.C. § 1956(h) ......................................................................... 13

18 U.S.C. § 1961(1) ......................................................................... 9

18 U.S.C. § 1961(5) ......................................................................... 9, 19

18 U.S.C. § 1962(c) ......................................................................... *passim*

18 U.S.C. § 1962(d) ................................................................... 12, 16, 17

18 U.S.C. § 1964(c) ......................................................................... *passim*

28 U.S.C. § 1367(c)(3) ................................................................... 3, 24

CAL. BUS. & PROF. CODE § 17200 (West) .................................... 25

CAL. CIV. CODE § 2332 (West) ..................................................... 22

## Other Authorities

3 BERNARD E. WITKIN, SUMMARY OF CALIFORNIA LAW
   *Agency* § 156(2) (10th ed. 2010) .............................................. 23

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

Organized Crime Control Act of 1970, Statement of Findings
and Purpose, Pub. L. No. 91–452, 84 Stat. 922 (1970),
4      *reprinted in* 1970 U.S. CODE CONG. & ADMIN. NEWS 1073 ................................................. 10 n.4

5   RESTATEMENT (SECOND) OF AGENCY § 282 (1958) ....................................................................... 23

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 21, 2015 at 9:00 a.m. or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Beth Labson Freeman, United States District Judge for the Northern District of California, located at the United States Courthouse, 280 South 1st Street, San Jose, California 95113, defendants Hewlett-Packard Company and Hewlett-Packard Mexico, S. de R.L. de C.V., will and hereby do move this Court for an order dismissing this action with prejudice.  Defendants bring this motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure on the ground that plaintiffs' complaint fails to state a claim upon which relief may be granted.  Defendants base their motion on this notice of motion and motion to dismiss this action; the supporting memorandum of points and authorities; the pleadings, records, and papers filed in this action; and such other arguments as defendants may present at oral argument.

## STATEMENT OF ISSUES TO BE DECIDED

1.  Do schemes perpetrated by foreign entities against foreign victims, where the alleged misconduct occurred virtually entirely outside the United States resulting in alleged injury outside the United States, plead extraterritorial RICO claims?

2.  Do RICO claims that allege predicate acts that occurred from December 2008 through March 2009 plead a pattern of racketeering activity under 18 U.S.C. § 1962(c)?

3.  Do RICO claims that allege three entirely separate schemes perpetrated by different entities against different victims in different countries, with no particularized allegation that these entities communicated with one another or knew of one another's schemes, plead a pattern of racketeering activity under 18 U.S.C. § 1962(c)?

4.  Are RICO claims time-barred under RICO's four-year statute of limitations where plaintiffs' senior officers, and thus plaintiffs, were on notice of plaintiffs' alleged injury in 2008 and 2009, more than five years before the complaint was filed?

5.  Should the Court decline to exercise supplemental jurisdiction over plaintiffs' state law claims if the Court has dismissed all claims over which it has original jurisdiction?

6.  Have plaintiffs alleged an illegal act within California under California's Unfair Com-

1    petition Law?

2                   **MEMORANDUM OF POINTS AND AUTHORITIES**

3                                    **INTRODUCTION**

4          With its promise of treble damages and attorneys' fees, "[c]ivil RICO is an unusually po-

5    tent weapon—the litigation equivalent of a thermonuclear device." *Quach* v. *Cross*, No. CV 03–

6    9627 GAF, 2004 WL 2860346, at *4 (C.D. Cal. June 10, 2004) (internal quotation marks and ci-

7    tation omitted).  Its powerful remedies tempt plaintiffs to plead "racketeering" where none oc-

8    curred.  And "[b]ecause the 'mere assertion of a RICO claim … has an almost inevitable stigma-

9    tizing effect on those named as defendants, … courts should strive to flush out frivolous RICO

10   allegations at an early stage of the litigation.'" *Doan* v. *Singh*, No. 13–cv–531–LJO, 2013 WL

11   4648554, at *6 (E.D. Cal. Aug. 29, 2013) (citation omitted).

12         This litigation is an example of a civil RICO case that should never have been brought.

13   Indeed, it is a case that does not belong in any court of the United States at all.  The RICO claims

14   here assert that, some six years ago, Mexican employees of a Mexican company, HP Mexico,

15   through the use of Mexican intermediaries, bribed Mexican officials of Pemex, Mexico's state oil

16   company, in Mexico City to win Mexican contracts to deliver products and perform services in

17   Mexico, with the award of the tainted contracts supposedly causing harm, in Mexico, to the Mex-

18   ican oil company.  The claims have little, if anything, to do with the United States.

19         They thus run headlong into the presumption against extraterritoriality.  The Supreme

20   Court in recent years has repeatedly and emphatically enforced the age-old rule that "'[w]hen a

21   statute gives no clear indication of an extraterritorial application, it has none.'" *Kiobel* v. *Royal*

22   *Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013) (quoting *Morrison* v. *Nat'l Austl. Bank Ltd.*,

23   561 U.S. 247, 255 (2010)).  And because "RICO is silent as to its extraterritorial application," and

24   thus "'gives no clear indication'" of extraterritorial scope, courts have virtually "uniformly held

25   that RICO does not apply extraterritorially." *United States* v. *Chao Fan Xu*, 706 F.3d 965, 974

26   (9th Cir. 2013) (quoting *Morrison*, 561 U.S. at 255).  As a result, in the Ninth Circuit, "RICO

27   does not apply extraterritorially in a civil or criminal context." *Id*. at 974–75.

28         That holding is fatal to Pemex's claims here.  The complaint's tenuous allegations of ties

to the United States cannot overcome the presumption against extraterritoriality. The presumption is not a "timid" and "craven watchdog [that] retreat[s] to its kennel whenever *some* domestic activity is involved in the case." *Morrison*, 561 U.S. at 266. As a result, "[p]ost-*Morrison* courts have had no difficulty concluding that far-flung foreign schemes conducted by foreign actors and implicating only incidental conduct are fundamentally extraterritorial and thus beyond the reach of RICO." *Mitsui O.S.K. Lines, Ltd.* v. *Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933, 938 (N.D. Cal. 2012). That is the case here. *See* Argument, Point I.

But even if the extraterritoriality problem could be ignored, the RICO claims must still fail. RICO is about *racketeering*—"long-term criminal conduct," not isolated misdeeds. *H.J. Inc.* v. *Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989). The statute thus requires the threat of *continuing* racketeering activity, which the Supreme Court has held to be either activity that "extend[s] over a substantial period of time," or "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241–42. Pemex has not even come close to pleading this element of RICO "continuity": the events that matter here involved the award of a single group of closely related Pemex contracts, and all took place in a span of three months. The Supreme Court has held that racketeering "acts extending over a few weeks or months … do not satisfy" RICO's continuity requirement, *id.* at 242, yet that is all that Pemex musters here. *See* Argument, Point II.

In addition, the RICO claims fail because they are plainly time-barred. The statute of limitations is four years, *Agency Holding Corp.* v. *Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987), and "begins to run when a plaintiff knows or should know of the injury" underlying the claims, *Pincay* v. *Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001) (citation omitted). The alleged wrongs here took place almost *six* years after the complaint was filed, and the complaint itself establishes that Pemex knew or should have known of them when they occurred. *See* Argument, Point III.

For these and other reasons set out below, including that the Court should not exercise supplemental jurisdiction over the non-federal claims under 28 U.S.C. § 1367(c)(3), and that the California-law claims are just as impermissibly extraterritorial as the federal RICO claims, *see* Argument, Point IV, the complaint should be dismissed in its entirety.

1

### STATEMENT OF FACTS

2          This case is about a $6 million deal between two Mexican corporations for products to be

3    provided and services to be performed in Mexico.  In 2008, defendant Hewlett-Packard Mexico

4    (the Mexico City-headquartered Mexican subsidiary of defendant Hewlett-Packard) agreed to

5    provide Petróleos Mexicanos (Mexico's state-owned oil company, headquartered in Mexico City)

6    and its subsidiary Pemex Exploración y Producción (together, Pemex) with business technology

7    optimization (BTO) software, hardware, services, and licenses.  Compl. ¶¶ 9–12, 21.  The parent

8    HP's internal policies "prohibited corruption, self-dealing, and other misconduct" by its subsidiar-

9    ies and specified rules governing the accurate preparation of books and records, contracts, and the

10   engagement of third parties.  *Id.* Ex. 1, at A2.  HP Mexico employees received mandatory annual

11   training on these policies.  *Id.*  The policies permitted legitimate commission payments to pre-

12   approved third parties ("channel partners") who were "subjected to due diligence, and registered

13   in HP Co.'s partner system."  *Id.* at A2–3.  The complaint pleads that, despite these policies, HP

14   Mexico "circumvent[ed] … HP Co.'s internal accounting controls" in connection with the BTO

15   contracts, resulting in "the falsification of HP's books and records."  Compl. ¶ 112; *id.* Ex. 1, at

16   A3.  That circumvention forms the basis of plaintiffs' claims.

17         Virtually every relevant event pleaded in the complaint regarding the BTO deal occurred

18   in Mexico and involved Mexican companies and their Mexican officers.  In 2008, HP Mexico

19   "began presales activities and discussions" with Pemex on the BTO contracts.  Compl. Ex. 1, at

20   A3; Compl. ¶¶ 21–27.  The complaint pleads that HP Mexico sales managers decided to retain

21   Intellego, S.C., a Mexican information-technology consulting company that was experienced with

22   Pemex's IT systems, and which had connections to senior Pemex officials, including Pemex's

23   Chief Information Officer, Manuel Reynaud Aveleyra.  Compl. ¶¶ 28–29; *id.* Ex. 1, at A4.  HP

24   Mexico agreed to pay Intellego a deal commission "equal to 25% of the licensing and support

25   components of the BTO Deal."  Compl. Ex. 1, at A4; Compl. ¶ 30.

26         The complaint pleads that because Intellego was not a pre-approved channel partner under

27   HP's internal policies, HP Mexico executives decided to circumvent those policies.  Compl. ¶ 33.

28   They arranged for another entity—which the complaint calls the "Pass-Through Partner"—that

had been previously approved as a channel partner to be recorded as the deal partner in HP Mexico's tracking system. *Id.*; *id.* Ex. 1, at A4. The complaint pleads that "HP Mexico executives falsely recorded the Pass-Through Partner as the deal partner on the BTO contracts in HP's internal tracking system." Compl. ¶ 34. It also pleads that, because of HP's "inadequate internal controls from California," "HP officials in California" approved an increased deal commission "'[w]ith little or no additional review.'" *Id.* ¶¶ 31, 37.

Intellego's chief executive met with Reynaud frequently throughout the fall and winter of 2008 in connection with the deal negotiations. *Id.* ¶ 29. On or about December 22, 2008, HP Mexico and Pemex agreed on terms and signed the BTO contracts, with Reynaud, among others, signing for Pemex, and Luis Barazza, a software sales manager for HP Mexico, signing for HP Mexico. *Id.* ¶ 38. HP, the U.S. parent, was neither a signatory to the contracts nor involved in the negotiation or performance of the contacts. In late January and early February 2009, the Pass-Through Partner submitted two invoices to HP Mexico for the deal commission, in the combined amount of approximately $1.66 million. *Id.* ¶¶ 42–43, 45; *id.* Ex. 1, at A5. HP Mexico paid these invoices in mid-February 2009. Compl. ¶¶ 42–43; *id.* Ex. 1, at A5. The Pass-Through Partner then transferred approximately $1.41 million to Intellego. Compl. Ex. 1, at A6. Shortly thereafter, in March 2009, Intellego made four cash payments to an entity controlled by Reynaud in the combined amount of approximately $125,000. *Id.* at A6. Reynaud resigned from Pemex in June 2009, when it was publicly reported that he accepted bribes in exchange for awarding a software contract to SAP, a German multinational software company, in December 2008.[1]

On April 9, 2014, HP Mexico entered into a non-prosecution agreement with the U.S. Department of Justice relating to violations of the Foreign Corrupt Practices Act. *See* Compl. Ex. 1. On the same day, HP consented to a cease-and-desist order in which the SEC found that HP "fail[ed] to devise and maintain sufficient accounting controls to detect and prevent the making of

---

[1] *SAP Denies Wrongdoing in Pemex Official's Monte Carlo Trip*, BNAMERICAS (June 8, 2009), http://goo.gl/ppA7qA; *see also Delighted with the Monaco Grand Prix Formula One, But Lost His Place in Pemex*, TERRA (June 8, 2009) (Google Translate translation), http://goo.gl/TkcWxG.

1   improper payments" by three of its subsidiaries "to foreign officials."  Compl. Ex. 2, at 12.  HP,

2   the U.S. parent company, is not a party to any criminal resolution, and neither the DOJ nor the

3   SEC allege that any HP employees engaged in misconduct or were aware of the isolated instances

4   of misconduct that occurred at the three foreign subsidiaries years ago.

5        Both the non-prosecution agreement and the SEC order contained factual recitations about

6   the HP Mexico-Pemex BTO contracts.  The SEC order also addressed matters having *nothing* to

7   do with Pemex, HP Mexico, or the BTO contracts—matters that Pemex has nonetheless inserted

8   wholesale into the complaint.  And so Pemex pleads that HP *Russia* used a *German* agent to bribe

9   *Russian* officials to secure a contract with the Prosecutor General of *Russia*.  *See* Compl. ¶¶ 65–

10  83.  Pemex also pleads that HP *Poland* made improper payments to a *Polish* government official

11  to get contracts with the *Polish* national police agency.  *Id.* ¶¶ 87–95.  But Pemex makes no non-

12  conclusory allegation of any connection between it, HP Mexico, and the BTO contracts, on the

13  one hand, and the events in Russia and Poland, other than that they involved subsidiaries of HP.

14                                **ARGUMENT**

15       To survive a Rule 12(b)(6) motion, a complaint must allege "sufficient factual matter, ac-

16  cepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S.

17  662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  That "requires

18  more than labels and conclusions," and more than "a formulaic recitation of the elements of a

19  cause of action."  *Twombly*, 550 U.S. at 555.  Thus, the court must reject "allegations that are

20  merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Allegro Con-

21  sultants, Inc.* v. *Wellington Techs., Inc.*, No. 13–cv–02204–BLF, 2014 WL 7204970, at *2 (N.D.

22  Cal. Dec. 17, 2014) (internal quotation marks and citation omitted).

23       Beyond that, plaintiffs here claim fraud—that "[d]efendants devised and knowingly par-

24  ticipated in a scheme to defraud Plaintiffs," Compl. ¶¶ 138, 150—and thus trigger the heightened

25  requirements of Rule 9(b).  "[T]he Ninth Circuit applies Rule 9(b) pleading standards to RICO

26  claims alleging a predicate of fraud," like those alleged here, "as it does with other claims sound-

27  ing in fraud."  *Tapang* v. *Wells Fargo Bank, N.A.*, No. cv–12–02183–LHK, 2012 WL 3778965, at

28

*3 (N.D. Cal. Aug. 30, 2012).[2]  Plaintiffs are thus required to detail "with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme." *Mohebbi* v. *Khazen*, No. 13–cv–03044-BLF, 2014 WL 2861146, at *13 (N.D. Cal. June 23, 2014) (emphasis omitted) (quoting *Lancaster Cmty. Hosp.* v. *Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991)); *see also Rupert* v. *Bond*, No. 12–cv–05292–BLF, 2014 WL 4775375, at *11–12 (N.D. Cal. Sept. 22, 2014) (dismissing RICO claim in part for failure to satisfy Rule 9(b)).

## I.     PLAINTIFFS' RICO CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL.

Plaintiffs' RICO claims (Counts One through Four) are impermissibly extraterritorial for two independent reasons:  *first*, plaintiffs fail to plead a domestic *pattern* of racketeering activity as required under governing precedent; and *second*, plaintiffs fail to plead a domestic *injury*.

### A.     There is a strong presumption that federal statutes do not apply extraterritorially.

"It is a 'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"  *Morrison* v. *Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) (quoting *EEOC* v. *Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*") (internal quotation marks and citation omitted)).  "[K]nown as the presumption against extraterritorial application," this fundamental "canon of statutory interpretation … provides that '[w]hen a statute gives no clear indication of an extraterritorial application, it has none.'"  *Kiobel* v. *Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013) (quoting *Morrison*, 561 U.S. at 255).

The extraterritoriality canon thus "reflects the 'presumption that United States law governs domestically but does not rule the world.'"  *Id.* (quoting *Microsoft Corp.* v. *AT&T Corp.*, 550 U.S. 437, 454 (2007)).  The rule "'serves to protect against unintended clashes between our laws and those of other nations which could result in international discord.'"  *Id.* (quoting *Aramco*, 499

---

[2] *Accord*, *e.g.*, *Vess* v. *Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003) (where plaintiffs allege a "unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim," complaint must satisfy Rule 9(b)); *see also Stitt* v. *Citibank, N.A.*, No. 12–cv–03892–YGR, 2015 WL 75237, at *5 n.5 (N.D. Cal. Jan. 6, 2015) ("Because the [RICO claims] allege[] that the enterprise members associated for a common fraudulent purpose, plaintiffs must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b).").

1    U.S. at 248).  But the rule also "rests on the perception that Congress ordinarily legislates with

2    respect to domestic, not foreign matters."  *Morrison*, 561 U.S. at 255.  As a result, to "preserv[e] a

3    stable background against which Congress can legislate with predictable effects," courts "apply

4    the presumption in *all* cases," *id.* at 261 (emphasis added)—"regardless of whether there is a risk

5    of conflict between the American statute and a foreign law," *id.* at 255.

6           The presumption is a powerful one.  It demands "the affirmative intention of the Congress

7    clearly expressed to give a statute extraterritorial effect."  *Id.* at 255 (quoting *Aramco*, 499 U.S. at

8    248) (internal quotation mark omitted).  If a federal law reflects no such clearly expressed, af-

9    firmative intention, then courts "must presume 'it is primarily concerned with domestic condi-

10   tions.'"  *Id.* (quoting *Aramco*, 499 U.S. at 248).  "[T]o rebut the presumption, [statutes] need to

11   evince a 'clear indication of extraterritoriality,'" *Kiobel*, 133 S. Ct. at 1665 (quoting *Morrison*,

12   561 U.S. at 265); "uncertain indications do not suffice," *Morrison*, 561 U.S. at 265.

13          So strong is the presumption that it controls even when a statute does contain some extra-

14   territorial reach.  As the Supreme Court has repeatedly held, "'the presumption is not defeated …

15   just because [a statute] specifically addresses [an] issue of extraterritorial application'; it remains

16   instructive in determining the *extent* of the statutory exception."  *Microsoft*, 550 U.S. at 455–56

17   (quoting *Smith* v. *United States*, 507 U.S. 197, 204 (1993)).  As a result, even "'[w]hen a statute

18   provides for *some* extraterritorial application, the presumption against extraterritoriality operates

19   to limit that provision to its terms.'"  *Kiobel*, 133 S. Ct. at 1667 (quoting *Morrison*, 561 U.S. at

20   265; emphasis added).

21          So, too, the presumption applies even when there is domestic conduct at issue in a case.

22   "For it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territo-

23   ry of the United States."  *Morrison*, 561 U.S. at 266.  As a result, "the presumption against extra-

24   territorial application would be a craven watchdog indeed if it retreated to its kennel whenever

25   *some* domestic activity is involved in the case."  *Id.*  The Supreme Court's cases do not counte-

26   nance "such a timid sentinel."  *Id.*

27

28

DEFENDANTS' MOT. TO DISMISS
COMPLAINT; SUPPORTING MEMO.                    8
CASE NO.:  CV–14–05292–BLF

1
2

**B.      The Ninth Circuit has made clear that, under the
                presumption against extraterritoriality, RICO
                can apply only to domestic patterns of racketeering.**

3
4
5
6
7
8
9

Applying *Morrison*, the Ninth Circuit—along with virtually every other court to address the issue—has squarely held that RICO has *no* extraterritorial application.  In *United States* v. *Chao Fan Xu*, 706 F.3d 965 (9th Cir. 2013), the Court of Appeals reaffirmed its pre-*Morrison* holding "that RICO is silent as to its extraterritorial application," and observed that "[o]ther courts that have addressed the issue have uniformly held that RICO does not apply extraterritorially." *Id.* at 974.  As a result, any analysis of a RICO complaint in this Circuit must assume "that RICO does not apply extraterritorially in a civil or criminal context." *Id.* at 974–75.

10
11
12
13
14
15
16
17
18

The Ninth Circuit in *Chao Fan Xu* also addressed the question of how to determine whether a particular application of RICO is domestic or extraterritorial under *Morrison*.  After observing that the extraterritoriality canon does not "retreat[] to its kennel whenever *some* domestic activity is involved in the case," *Morrison*, 561 U.S. at 266, the *Morrison* Court explained that courts must look to "the 'focus' of congressional concern" to determine whether a particular application of a law is domestic, *id.* (quoting *Aramco*, 499 U.S. at 255).  The Supreme Court concluded that the "focus" of Section 10(b) of the Securities Exchange Act of 1934, the statute at issue there, was "purchases and sales of securities in the United States"—and that, as a result, Section 10(b) applies only to such transactions.  *Id.* at 266, 267.

19
20
21
22
23
24
25
26
27
28

The Ninth Circuit in *Chao Fan Xu* applied *Morrison*'s "focus" analysis to RICO.  It recognized that "[t]he inquiry into RICO's focus is far from clear-cut." *Chao Fan Xu*, 706 F.3d at 975.  The statute's multilayered structure shows why.  RICO prohibits "participat[ion] … in the conduct of [an] *enterprise*'s affairs through a *pattern* of racketeering activity."  18 U.S.C. § 1962(c) (emphasis added); *see Chao Fan Xu*, 706 F.3d at 977–78.  And it defines a "pattern of racketeering activity" as "requir[ing] at least two acts of racketeering activity" committed within a ten-year span, 18 U.S.C. § 1961(5)—acts that courts call "predicate racketeering act[s]," *H.J. Inc.* v. *Nw. Bell Tel. Co.*, 492 U.S. 229, 236 (1989), and that are in turn defined as any of a long list of crimes (some potentially extraterritorial in scope, but most not) set forth in 18 U.S.C. § 1961(1).  These elements of a RICO violation apply equally to civil and criminal cases.  *See* 18

1   U.S.C. § 1964(c) (creating private right for "a violation of section 1962 of this chapter").

2       As *Chao Fan Xu* explains, the statute's references to both "enterprise" and "pattern" has

3   led to a division of authority over RICO's *Morrison* "focus," with "[c]ourts … fall[ing] essential-

4   ly into two camps."  706 F.3d at 975.  "One camp asserts that RICO's focus is on the enterprise,"

5   and "[t]he other camp asserts that RICO's focus is on the pattern of racketeering activity."  *Id.*

6   (citing cases); *see also CGC Holding Co.* v. *Broad and Cassel*, 773 F.3d 1076, 1097 (10th Cir.

7   2014) (describing decisional split).[3]

8       *Chao Fan Xu* resolved the question for the Ninth Circuit by unreservedly joining the "pat-

9   tern" camp.  It held that, "for purposes of analyzing extraterritorial application of the statute,"

10  "RICO's focus is on the pattern of racketeering activity"—and that, as a result, "to determine

11  whether [claims] are within RICO's ambit," courts must "look at the pattern of Defendants' rack-

12  eteering activity *taken as a whole*."  *Chao Fan Xu*, 706 F.3d at 977, 978 (emphasis added).  In

13  reaching this holding, the Ninth Circuit relied on the Supreme Court's repeated statements that

14  "the heart of any RICO complaint is the allegation of a *pattern* of racketeering."  *Agency Holding*

15  *Corp.* v. *Malley-Duff & Assocs.*, 483 U.S. 143, 154 (1987), *quoted in Chao Fan Xu*, 706 F.3d at

16  977.  Equally importantly, the Court of Appeals invoked Congress's "express legislative intent to

17  punish patterns of *organized criminal activity in the United States*."  *Chao Fan Xu*, 706 F.3d at

18  978 (emphasis added).[4]  That legislative history, the court explained, made it "highly unlikely that

19

20      [3] Adding to the confusion, one court of appeals has since rejected both approaches.  Contra-
    dicting virtually every other decision on RICO's territorial scope—including its *own* prior deci-
21  sions—the Second Circuit recently held that RICO does apply extraterritorially, at least to the ex-
    tent that the statute's individual predicate offenses apply extraterritorially.  *European Cmty.* v.
22  *RJR Nabisco, Inc.*, 764 F.3d 129, 136 (2d Cir. 2014); *but see Norex Petroleum Ltd.* v. *Access In-
    dus., Inc.*, 631 F.3d 29, 33 (2d Cir. 2010) (holding that "*Morrison* similarly forecloses Norex's
23  argument that because a number of RICO's predicate acts possess an extraterritorial reach, RICO
    itself possesses an extraterritorial reach"); *Cedeño* v. *Castillo*, 457 F. App'x 35, 38 (2d Cir. 2012)
24  (holding that *Norex* "declined to link the extraterritorial application of RICO to the scope of its
    predicate offenses").  Needless to say, the Second Circuit's new approach cannot be squared with
25  *Chao Fan Xu*.  A petition for rehearing en banc in *European Community* has been pending for
    several months.  *See* Petition for Rehearing En Banc, *European Cmty.* v. *RJR Nabisco, Inc.*, No.
26  11–2475–cv (2d Cir. Sept. 3, 2014), ECF No. 164.

27      [4] "RICO's legislative history shows that the statute was enacted to promote 'the eradication of
    organized crime in the United States … by providing enhanced sanctions and new remedies to
28  deal with the unlawful activities of those engaged in organized crime.'"  *Chao Fan Xu*, 706 F.3d
    at 978 (emphasis omitted) (quoting Organized Crime Control Act of 1970, Statement of Findings

DEFENDANTS' MOT. TO DISMISS
COMPLAINT; SUPPORTING MEMO.          10
CASE NO.:  CV–14–05292–BLF

1    Congress was unconcerned with the actions of foreign enterprises where those actions violated

2    the laws of this country *while the defendants were in this country*." *Id.* (emphasis added).

3            As a result, under *Chao Fan Xu* and similar "pattern"-camp cases, the dispositive question

4    becomes where the defendants engaged in the alleged racketeering activity. If, "taken as a

5    whole," the defendants' conduct "violated the laws of this country while the defendants were in

6    this country," then the defendants have engaged in the sort of "pattern[] of organized criminal ac-

7    tivity in the United States" that may constitute a domestic application of RICO. *Id.* at 978. Con-

8    versely, if the defendants' alleged racketeering activity, taken as a whole, occurred outside the

9    United States, then the application of RICO is extraterritorial and impermissible.

10           That is so even if the pattern allegedly includes domestic conduct. Given that the extrater-

11   ritoriality canon is not "a timid sentinel," *Morrison*, 561 U.S. at 266, "isolated domestic conduct

12   does not permit RICO to apply to what is essentially foreign activity." *United States* v. *Philip*

13   *Morris USA, Inc.*, 783 F. Supp. 2d 23, 29 (D.D.C. 2011); *accord, e.g.*, *Goodwin* v. *Bruggeman-*

14   *Hatch*, No. 13–cv–02973–REB, 2014 WL 3882183, at *1 (D. Colo. Aug. 7, 2014). "Post-

15   *Morrison* courts have [thus] had no difficulty concluding that far-flung foreign schemes conduct-

16   ed by foreign actors and implicating only incidental U.S. conduct are fundamentally extraterrito-

17   rial and thus beyond the reach of RICO." *Mitsui O.S.K. Lines, Ltd.* v. *Seamaster Logistics, Inc.*,

18   871 F. Supp. 2d 933, 938 (N.D. Cal. 2012). And so the fact that foreign racketeering activity may

19   be linked to domestic financial transactions does not make a RICO claim domestic: a foreign

20   scheme remains "beyond the reach of RICO even if the … fraud resulted in some of the money

21   reaching the United States." *Chao Fan Xu*, 706 F.3d at 978; *accord Perkumpulan Investor Crisis*

22   *Ctr. Dressel–WBG* v. *Wong*, No. C09–1786–JCC, 2014 WL 1047946, at *9 n.8 (W.D. Wash.

23   Mar. 14, 2014) (same, citing *Chao Fan Xu*). Likewise, "[p]ost-extortion money laundering be-

24   tween U.S. and foreign bank accounts is not sufficient" and "'too peripheral'" to support a do-

25   mestic RICO claim, as it "cannot change the 'essentially foreign' nature of the racketeering ac-

26

27   and Purpose, Pub. L. No. 91–452, 84 Stat. 922 (1970), *reprinted in* 1970 U.S. CODE CONG. &

28   ADMIN. NEWS 1073); *accord Hourani* v. *Mirtchev*, 943 F. Supp. 2d 159, 165 (D.D.C. 2013).

tivity in this case." *Hourani* v. *Mirtchev*, 943 F. Supp. 2d 159, 165 n.9, 167 (D.D.C. 2013).[5]

Correlatively, the fact that particular predicate acts may fall within the territorial scope of an underlying predicate-act statute—like mail fraud, which has no extraterritorial reach, or money laundering, which does—does not suffice to turn predominantly foreign activity into a domestic RICO pattern. "'[I]n the RICO context, multiple courts have held that predicate acts in foreign countries in violation of statutes with extraterritorial reach are insufficient to rebut the presumption against extraterritoriality of the encompassing statute," RICO. *Adhikari* v. *Daoud & Partners*, No. 09–cv–1237, 2013 WL 4511354, at \*7 (S.D. Tex. Aug. 23, 2013) (quoting *Asadi* v. *G.E. Energy (USA), LLC*, No. 4:12–345, 2012 WL 2522599, at \*5 (S.D. Tex. June 28, 2012), *aff'd*, 720 F.3d 620 (5th Cir. 2013)). Put another way, analysis of the location of "the *pattern* of racketeering activity … is in direct contrast to the analysis of whether the predicate acts themselves are extraterritorial in nature." *Perkumpulan*, 2014 WL 1047946, at \*9 n.8. The reason is plain: "whether or not a criminal enterprise committed a predicate act with extraterritorial scope … , there is no evidence that Congress intended to criminalize foreign racketeering activities under RICO." *Philip Morris*, 783 F. Supp. 2d at 29. And that is why the Ninth Circuit held that courts must "look at the pattern of Defendants' racketeering activity *taken as a whole*." *Chao Fan Xu*, 706 F.3d at 978 (emphasis added).

*Chao Fan Xu* illustrates these points. A jury convicted the defendants of RICO conspiracy under 18 U.S.C. § 1962(d). 706 F.3d at 973–74. The defendants' scheme consisted of two parts: "One part consisted of racketeering activities conducted predominantly in China, and one part consisted of racketeering activities in the United States." *Id.* at 978. The first part consisted of "a scheme to steal funds from the Bank of China." *Id.* at 972. The RICO predicate acts for that part of the scheme included the laundering of stolen funds in the United States, for which the

---

[5] *See also*, *e.g.*, *Petróleos Mexicanos* v. *SK Eng'g & Constr. Co.*, No. 12 Civ. 9070 LLS, 2013 WL 3936191, at \*3 (S.D.N.Y. July 30, 2013) (fact that fraudulent payments were made from and sent to banks in the United States "fail[ed] to shift the weight of the fraudulent scheme away from Mexico" and was held insufficient to state domestic RICO claim), *aff'd*, 572 F. App'x 60 (2d Cir. 2014); *Republic of Iraq* v. *ABB AG*, 920 F. Supp. 2d 517, 543 (S.D.N.Y. 2013) ("[P]eripheral contacts with the United States—up to and including the use of a domestic bank account—do not bring an otherwise foreign scheme within the reach of the RICO statutes."), *aff'd*, 768 F.3d 145 (2d Cir. 2014).

defendants were also convicted under 18 U.S.C. § 1956(h), a money laundering conspiracy law that covers money stolen from foreign banks, *see id.* § 1956(c)(6)(B), (7)(B)(iii).  *Chao Fan Xu*, 706 F.3d at 973–74.  The Court of Appeals held that only the scheme's "second part … bound the Defendants' enterprise to the United States."  *Id.* at 978.  To escape Chinese law enforcement, the defendants absconded to America "using fraudulent visas and passports," thus engaging in "racketeering activities conducted within the United States"—namely, "immigration fraud."  *Id.*

Though it upheld the convictions because "the error was harmless beyond a reasonable doubt," *id.* at 979 n.2,[6] the Ninth Circuit squarely held that the first, extraterritorial part of the scheme should never have gone to the jury.  "It was constitutional error for the jury to be instructed on the first part of the … indictment, to the extent that this part of the indictment was predicated on extraterritorial activity that is not a basis for RICO liability."  *Id.*  It made no difference that this extraterritorial part of the scheme involved money laundering and transporting stolen money in the United States, *see United States* v. *Chao Fan Xu*, No. 2:02–cr–00674–PMP, 2008 WL 1315632, at *1–2 (D. Nev. Apr. 10, 2008), for which the defendants were separately convicted, *see* 706 F.3d at 979–82.  For "to the extent it was predicated on extraterritorial activity," the first part of the case—"the Bank of China fraud"—was "beyond the reach of RICO even if the bank fraud resulted in some of the money reaching the United States."  *Chao Fan Xu*, 706 F.3d at 978.

### C.   The alleged pattern of racketeering activity here is extraterritorial and thus beyond the scope of RICO.

*Chao Fan Xu* and the other "pattern"-camp cases make clear that Pemex's claims exceed the territorial scope of civil RICO.  *Howard* v. *Maximus, Inc.*, No. 3:13–cv–01111–ST, 2014 WL 3859973, at *5 (D. Or. May 6, 2014) (applying *Chao Fan Xu* to civil RICO), *report and recommendation adopted*, 2014 WL 3866419 (D. Or. Aug. 6, 2014).  Here, in Counts One and Three of their complaint, Mexican plaintiffs allege that a Mexican defendant, in Mexico, bribed the Mexican plaintiffs' Mexican officers through the use of Mexican intermediaries, to win contracts executed and performed in Mexico, all supposedly injuring the Mexican plaintiffs in Mexico.

---

[6] The court found that "the 'evidence was overwhelming' as to the second part of the … indictment," the domestic immigration-fraud piece of the case, and held that "the jury would have convicted on the basis of that evidence alone."  *Id.* (citation omitted).

1    Again and again, the complaint emphasizes how Mexicans bribed Mexicans through other

2    Mexicans in Mexico to get Mexican business:  "*HP Mexico sales managers* decided to make

3    payments to a *Mexican* information-technology consulting company [Intellego] … in order to ob-

4    tain the BTO business."  Compl. ¶ 28 (emphasis added).  "*HP Mexico* agreed to pay Intellego an

5    'influencer fee.'"  *Id.* ¶ 30 (emphasis added).  Because Intellego was not a pre-approved channel

6    partner, "*HP Mexico executives* also arranged for another entity … , [one that] was already an ap-

7    proved Mexico channel partner, to join the enterprise."  *Id.* ¶ 33 (emphasis added).  "*HP Mexico*

8    signed the contracts with Pemex …."  *Id.* ¶ 38 (emphasis added).  *HP Mexico* received and paid

9    invoices from the Pass-Through Partner.  *Id.* ¶¶ 39–43. "*HP Mexico* transferred these funds to the

10   Pass-Through Partner with the intent and knowledge that the Pass-Through Partner would, and

11   indeed, did, transfer funds to Intellego for the purpose of making payments to an entity controlled

12   by Reynaud Aveleyra, a [*Mexican*] public official, *for his use and benefit in Mexico*," all as "a

13   *quid pro quo* for awarding *HP Mexico* the BTO contracts."  *Id.* ¶¶ 134, 135 (emphasis added).  In

14   short, "*HP Mexico* … implemented [the alleged] pattern of bribery, kickbacks, and corruption."

15   *Id.* ¶ 112 (emphasis added).

16   Even more extraterritorial are Counts Two and Four.  Those claims toss in allegations

17   about alleged bribery in *Russia* and *Poland*, allegations that have nothing to do with Pemex, and

18   that couldn't possibly have caused Pemex, in Mexico, any harm at all.  And so Pemex pleads that

19   "*HP Russia*" "paid bribes to government officials *in Russia* … to secure a government tender …

20   [from] the Office of the Prosecutor General of *Russia*."  *Id.* ¶ 65 (emphasis added).  One interme-

21   diary was "located in *Germany*"—and aptly named "the '*German Agent*.'"  *Id.* ¶ 76 (emphasis

22   added).  Other go-betweens included "a *Swiss* company" and a "shell compan[y] … registered *in*

23   *the United Kingdom*."  *Id.* ¶¶ 71, 74 (emphasis added).  The German Agent wired euros "to the

24   *Latvian* and *Lithuanian* accounts of other shell companies" controlled by the Russians.  *Id.* Ex. 2,

25   at 6–7 (emphasis added).  The whirlwind European tour concludes with a separate set of allega-

26   tions about "*HP Poland*," which is alleged to have "made unlawful payments to a … '*Polish* gov-

27   ernment official'" in order "to secure and maintain lucrative contacts with the *Polish* national po-

28   lice agency."  Compl. ¶¶ 87–88 (emphasis added).

In contrast to these far-reaching allegations of foreign misconduct, the alleged schemes' connections to the United States are plainly too "isolated," *Philip Morris*, 783 F. Supp. 2d at 29, too "incidental," *Mitsui O.S.K. Lines*, 871 F. Supp. 2d at 938, and "'too peripheral,'" *Hourani*, 943 F. Supp. 2d at 167 (citation omitted), to support a RICO claim.  The complaint alleges that HP Mexico paid some invoices in dollars though a U.S. bank, Compl. ¶¶ 42–44; but the law is clear that a foreign scheme remains "beyond the reach of RICO even if … money reach[es] the United States." *Chao Fan Xu*, 706 F.3d at 978; *see, e.g.*, *Perkumpulan*, 2014 WL 1047946, at *9 n.8; *Hourani*, 943 F. Supp. 2d at 165 n.9, 167; *Petróleos Mexicanos* v. *SK Eng'g & Constr. Co.*, No. 12 Civ. 9070 LLS, 2013 WL 3936191, at *3 (S.D.N.Y. July 30, 2013); *Republic of Iraq*, 920 F. Supp. 2d at 543.  The complaint also alleges that the defendants invited Pemex's Reynaud to attend various marketing events in the United States.  Even if those alleged invitations could be characterized as criminal, these allegations scrape the bottom of the small domestic barrel:  the complaint makes no suggestion that the invitations had any connection to HP Mexico's and Pemex's entry into the BTO contracts; indeed, many of them were extended after the BTO contracts were signed in late December 2008, and after the last payments were made by Intellego in March 2009.  Compl. ¶¶ 48-50, 54, 55.  These minor, peripheral "contact[s] with the territory of the United States" plainly do not suffice to cause extraterritoriality's "watchdog [to] retreat[] to its kennel." *Morrison*, 561 U.S. at 266.

Nor are plaintiffs' RICO claims saved by their conclusory allegations that "HP officials located in California" somehow "approved the payment of an influencer fee to Intellego," and otherwise "directed the enterprise from the United States."  Compl. ¶¶ 31, 161.  Even if those flimsy assertions could be credited under *Twombly* and *Iqbal*, the complaint itself diminishes their importance:  it repeatedly asserts that HP Mexico personnel pulled the wool over HP's eyes, circumventing HP's internal controls, and misleading the Americans about the nature of the payments being made.[7]  Even leaving aside plaintiffs' blatant self-contradiction, "mere agreement

---

[7] *See, e.g.*, Compl. ¶ 112 (alleging "circumvention" of HP's internal controls); *id.* Ex. 2, at 11 (stating that HP Mexico "evade[d] HP's policies requiring pre-approval of channel partners" and obtained authorization for the increased deal commission "without describing the true reason for the increase"); *id.* Ex. 1, at A5 (stating that HP Mexico sent an email claiming that an increased

from the United States" to commit racketeering abroad "cannot paint over [a] foreign scheme with a domestic brush," because, "[a]s the Ninth Circuit stated in *Chao Fan Xu*, 'we look "not upon the place where the deception originated" but instead upon the connection of the challenged conduct to the proscription in the statute.'" *Hourani*, 943 F. Supp. 2d at 168 (quoting *Chao Fan Xu*, 706 F.3d at 979 (quoting *Morrison*, 561 U.S. at 266)). "The law in this circuit is clear:  RICO extends only to domestic perpetration of the racketeering activity, regardless of the … location in which the enterprise hatched," and so what matters is where the "racketeering activity" was "executed," not where it was "conceived and planned." *Howard*, 2014 WL 3859973, at *5.  Plaintiffs' unsupported, self-contradicted claims of control from California thus cannot rescue their case.

Given the pervasiveness of the foreign activity and the peripherality of the domestic conduct, Counts One through Four constitute "an improper extraterritorial application of RICO." *Chao Fan Xu*, 706 F.3d at 979.  A "look at the pattern of Defendants' racketeering activity taken as a whole" makes clear that those claims plead "racketeering activities conducted predominantly" abroad, and thus allege "extraterritorial activity [that] is beyond the reach of RICO"—not "patterns of organized criminal activity in the United States," or violations committed "while the defendants were in this country," as the presumption against extraterritoriality requires.  *Id.* at 978.  In short, as one district court observed in dismissing a similar RICO complaint brought by Pemex involving another of its bribery scandals:  "The defendants' [alleged] bribery of PEMEX officials … all occurred in Mexico.  Thus, 'it is implausible to accept that the thrust of the pattern of racketeering activity was directed at' the United States." *Petróleos Mexicanos*, 2013 WL 3936191, at *3 (quoting *Republic of Iraq*, 920 F. Supp. 2d at 546).

### D.    The alleged losses here are unquestionably extraterritorial and thus beyond the scope of RICO.

That suffices to dispose of Pemex's RICO claims as impermissibly extraterritorial, but there is a second, independent, and even simpler basis to reach that result as well.  Pemex asserts that defendants violated Sections 1962(c) and 1962(d), but those provisions are actually *not* the

commission was warranted because of "extra work" and the "successful[] manage[ment] [of] discounts with Pemex").

provisions upon which its private right of action is based.  Sections 1962(c) and 1962(d) define the alleged violations of law; but it is Section 1964(c) that gives a right to sue:  in pertinent part, Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 … may sue therefor … and shall recover threefold the damages he sustains …."  18 U.S.C. § 1964(c).  Needless to say, that language "gives no clear indication of an extra-territorial application." *Morrison*, 561 U.S. at 255.  Accordingly, "it has none." *Id.*

As a result, the question arises:  do plaintiffs here seek a domestic application of Section 1964(c), or an extraterritorial one?  To answer that question, *Morrison* requires the Court to determine what "the 'focus' of congressional concern" was in the enactment of Section 1964(c). *Morrison*, 561 U.S. at 266 (quoting *Aramco*, 499 U.S. at 255); *see also Kiobel*, 133 S. Ct. at 1670 (Alito, J., concurring).  The Court must look for "the objects of [Section 1964(c)'s] solicitude." *Morrison*, 561 U.S. at 267.  And in contrast to the search for the "focus" of Section 1962, with its references to "enterprise" and "pattern" and "racketeering," the focus of Section 1964(c), the object of its solicitude, is quite plain.  Section 1964(c) focuses on just one thing:  "damages," "injur[y] [to] business or property."  18 U.S.C § 1964(c).  As a result, just as Title VII was held in *Aramco* to apply only to "domestic employment," and just as Section 10(b) was held in *Morrison* to apply only to "purchases and sales of securities in the United States," Section 1964(c) can only be invoked to remedy *injury and damage to property in the United States*. *Morrison*, 561 U.S. at 266 (citing *Aramco*, 499 U.S. at 247, 255).

That is fatal to Pemex's RICO claims, because even Pemex does not contend that it suffered injury anywhere but Mexico.[8]  And it would be fatal even if it were assumed that the far-flung pattern of racketeering that Pemex alleges was somehow domestic, because the question of the territorial reach of a remedy provision is independent of the question of the territorial reach of an underlying statutory prohibition. *Loginovskaya* v. *Batratchenko*, 764 F.3d 266 (2d Cir. 2014), was a Commodity Exchange Act case in which a Russian plaintiff sued under the law's private-right provision, Section 22, 7 U.S.C. § 25, seeking recovery of losses from the American defend-

---

[8] *See*, *e.g.*, Compl. ¶ 141 (alleging "millions of dollars of harm from the acceptance of harmful contractual terms and the payment of significant cost overcharges"—in Mexico).

ant's alleged violations of a substantive provision, Section 4*o*, 7 U.S.C. § 6*o*.  764 F.3d at 268–69.  Examining the text of Section 22, the court concluded that its focus was on "transactions," and that, as a result, given the absence of any indication of extraterritorial reach, a suit under Section 22 "must be based on transactions occurring in the territory of the United States."  *Id.* at 272.  Affirming the dismissal of the complaint on this ground, the court saw no need to address the plaintiff's claim that Section 4*o* "reach[ed] more broadly" because its "'focus'" was "on domestic commodities market participants"—like the American defendant—and "not domestic transactions."  *Id.* at 275.  That argument, the court acknowledged, was "not without merit."  *Id.*  But meritorious or not, the argument could not change the outcome:  because the claim exceeded the territorial scope of the remedy provision, the dismissal had to stand, and "we do not have to decide how the presumption against extraterritorial effect defines the reach of § 4*o*." *Id.*[9]

So it is here.  The focus of Section 1964(c) is domestic injury to business or property.  Pemex has alleged none.  And so regardless of whether it has alleged a domestic pattern of racketeering under *Chao Fan Xu* (which it has not), Pemex's RICO claims must be dismissed.[10]

## II. EVEN APART FROM EXTRATERRITORIALITY, PLAINTIFFS FAIL TO ALLEGE A PATTERN OF RACKETEERING ACTIVITY.

Even apart from being impermissibly extraterritorial, plaintiffs' RICO claims also fail to allege with the requisite particularity an essential element of a RICO claim—a "pattern of racketeering activity."  18 U.S.C. § 1962(c).[11]  A "pattern" of racketeering activity requires the com-

_____

[9] It is true that, on panel rehearing in *European Community* v. *RJR Nabisco, Inc.*, the Second Circuit rejected the argument that Section 1964(c) imposes a domestic injury requirement.  764 F.3d 129, 151 (2d Cir. 2014) (per curiam).  But that holding was based upon the panel's earlier holding that RICO may be applied extraterritorially to the extent that violations of extraterritorial predicate-act statutes are at issue, *id.*—a dubious holding that contradicts not only *Chao Fan Xu*, but the Second Circuit's prior precedents, *see* n.3, above.  And quite obviously the holding on panel rehearing in *European Community* also cannot be reconciled with the court's treatment of the Commodity Exchange Act just two weeks later by the panel in *Loginovskaya*.  As noted above, a renewed petition for rehearing en banc remains pending in *European Community*.  *See* n.3, above.

[10] The RICO conspiracy counts (Counts Three and Four) are subject to dismissal for the same reasons as Counts One and Two.  *See, e.g.*, *Republic of Iraq*, 920 F. Supp. 2d at 529, 543–46 (applying same analysis to RICO and RICO conspiracy claims, and dismissing on same grounds).

[11] "[P]laintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiffs' 'business or property.'"  *Ove* v. *Gwinn*, 264 F.3d

mission of at least two instances of "predicate acts" within ten years of one another.  *See* 18 U.S.C. § 1961(5).  To establish the requisite "pattern" of activity, a plaintiff must show that the predicate acts amount to, or constitute a threat of, *continuing* racketeering activity.  *H.J. Inc.* v. *Nw. Bell Tel. Co.*, 492 U.S. 229, 241–42 (1989).  That continuity requirement demands either "a series of related predicates extending over a substantial period of time [*i.e.*, closed-ended continuity]," or "past conduct that by its nature projects into the future with a threat of repetition [*i.e.*, open-ended continuity]."  *Id.*  None of the RICO counts alleges conduct that presents a threat of repetition in the future sufficient to establish open-ended continuity, or the substantial pattern of related racketeering activity required to establish closed-ended continuity.

To begin with, as for open-ended continuity, the complaint itself describes each purported enterprise's activities in the *past* tense.[12]  Understandably so.  The last acts relating to alleged schemes purportedly took place in 2006 (Russia), 2009 (Mexico), and 2010 (Poland).  The complaint alleges nothing beyond that, nothing suggesting any threat of repetition in the future.  As such, plaintiffs fail to plead open-ended continuity with respect to any of their RICO counts.

As for closed-ended continuity, Pemex's stand-alone claims about HP Mexico—Counts One and Three—fail to establish it because the alleged racketeering activity did not occur over a substantial period of time.  "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the closed-ended continuity] requirement:  Congress was concerned in RICO with long-term criminal conduct."  *H.J.*, 492 U.S. at 242.  Indeed, as the Ninth Circuit has observed:  "We have found no case in which a court has held the requirement to be satisfied by a pattern of activity lasting less than a year."  *Religious Tech. Ctr.* v. *Wollersheim*, 971 F.2d 364, 366–67 (9th Cir. 1992).

All that Pemex manages to plead here, however, is a mere three months.  The complaint

---

817, 825 (9th Cir. 2001) (quoting 18 U.S.C. § 1964(c)).  Because the complaint pleads fraud, Rule 9(b) applies to plaintiffs' RICO claims.  *See* pp. 6–7, above.

[12] *E.g.*, Compl. ¶ 130 ("Defendants HP and HP Mexico along with Intellego and the Pass Through Partner *were* an association-in-fact 'enterprise.'" (emphasis added)); *id.* ¶ 144 ("Defendants HP and HP Mexico, along with HP Poland, HP Russia, and other partners who acted as intermediaries and agents, *were* an association-in-fact 'enterprise.'" (emphasis added)).

1   alleges predicate acts that started in December 2008, when HP Mexico signed the contracts with

2   Pemex, Compl. ¶ 38, and that continued until March 2009, when the final payments were alleged-

3   ly made by Intellego to Reynaud.  *Id.* ¶ 138.  Three months simply does not suffice.

4        And Pemex's artificial attempt to extend the alleged Mexican scheme back a few months

5   fails as a matter of law.  Pemex asserts that "[t]he enterprise functioned together from at least

6   January 2008 when members of the enterprise targeted Plaintiffs by beginning discussions with

7   Reynaud …."  *Id.* ¶ 130.  But that is a naked conclusion, insufficient to survive *Twombly* and *Iq-*

8   *bal*, let alone Rule 9(b).  And even if this raw conclusion could be credited, it merely alleges pre-

9   liminary discussions that are, at best, preparatory acts and not crimes, and thus cannot be consid-

10  ered part of a pattern of racketeering activity.[13]  In *Turner* v. *Cook*, 362 F.3d 1219 (9th Cir.

11  2004), the Ninth Circuit rejected a similar attempt to expand the duration of racketeering activity

12  with allegations of "sporadic[]" communications that occurred a year before the two-month peri-

13  od in which almost all of the alleged predicate acts occurred.  *Id.* at 1231.  This Court should do

14  the same and dismiss Counts One and Three.

15       Equally unavailing is plaintiffs' transparent effort in Counts Two and Four to create

16  closed-ended continuity by tacking on allegations about HP Russia and HP Poland.  Those allega-

17  tions have absolutely nothing to do with Pemex and the HP Mexico BTO contracts.  That proves

18  fatal to Counts Two and Four:  there must be a real connection between predicate acts in order to

19  establish a pattern.  "[T]he term 'pattern' itself requires the showing of a relationship between the

20  predicates," and "[i]t is this factor of continuity *plus relationship* which combines to produce a

21  pattern."  *H.J.*, 492 U.S. at 239 (quoting legislative history; emphasis and internal quotation

22  marks omitted in part).  As a result, a plaintiff "must show that the racketeering predicates are *re-*

23  *lated*."  *Id.* (emphasis added).  "'Related' conduct 'embraces criminal acts that have the same or

24  similar purposes, results, participants, victims, or methods of commission, or otherwise are inter-

25

26       [13] *See*, *e.g.*, *Corrie* v. *Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1028–29 (W.D. Wash. 2005)
    (preparatory acts that were not crimes could not be considered as part of the pattern of racketeer-
27  ing activity); *Comm. to Defend U.S. Constitution* v. *Moon*, 776 F. Supp. 568, 573 (D.D.C. 1991)
    (where defendants "allegedly performed a series of preparatory acts which culminated in a single
28  wrongful diversion of funds … the requisite continuity is absent").

1    related by distinguishing characteristics and are not isolated events.'" *Howard* v. *Am. Online,*

2    *Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (quoting *H.J.*, 492 U.S. at 239).

3          Counts Two and Four thus fail because they are based on three entirely separate and unre-

4    lated schemes.  There are no factual allegations establishing any relationship between the

5    schemes or that the participants made any attempt to work in any coordinated fashion toward a

6    common goal.  *See, e.g., Mohebbi* v. *Khazen*, No. 13–cv–03044–BLF, 2014 WL 2861146, at *13

7    (N.D. Cal. June 23, 2014) (dismissing RICO claim where complaint "g[ave] the Court no infor-

8    mation as to the form or structure of that enterprise, the ways in which decisions are made in the

9    enterprise, or even the hierarchy of the alleged actors in the enterprise").  Rather, there is only

10   Pemex's conclusory allegation that HP "directed the enterprise from its offices in the United

11   States and shared information and strategies between HP Russia, HP Poland, and HP Mexico."

12   Compl. ¶ 146.  Pemex does not allege what actions HP took to "direct" the purported enterprise

13   or what information and strategies was "shared."  Nor could it:  as the DOJ and SEC fact state-

14   ments incorporated into Pemex's complaint make clear, the U.S. parent HP did not know of the

15   isolated instances of misconduct at HP Russia, HP Poland, and HP Mexico.  *Id.* Exs. 1, 2.

16         Courts routinely reject such attempts to transform disparate schemes into a RICO pattern.

17   For example, in *Howard*, plaintiffs alleged that defendants engaged in a scheme of improperly

18   billing subscribers for services and also induced a supplier to expand its operations through false

19   representations.  *See Howard*, 208 F.3d at 746, 748–49.  The Ninth Circuit found that, even

20   though the same defendants were allegedly involved, the violations relating to the fraudulent in-

21   ducement of the supplier were not sufficiently related to the other alleged predicate acts to form a

22   RICO pattern.  *See id.* at 749.[14]  Counts Two and Four are equally flawed here.

### III.   PLAINTIFFS' RICO CLAIMS ARE TIME-BARRED.

24         Plaintiffs' RICO claims are governed by a four-year statute of limitations.  *Agency Hold-*

---

[14] *See also Straightshot Commc'ns* v. *Telekenex, Inc.*, No. C10–268Z, 2011 WL 1770935, at *5 (W.D. Wash. May 9, 2011) (schemes against third parties with "different participants," "different victims," "different results," and "different methods" were unrelated to scheme that allegedly injured plaintiffs and did not establish RICO pattern); *Hardisty* v. *Moore*, No. 11–cv–1591 AJB, 2012 WL 1564533, at *4–5 (S.D. Cal. May 2, 2012) (allegations of separate scheme conducted by same participants against third parties were not sufficiently related to plead pattern).

*ing Corp.* v. *Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987).  And under the Ninth Circuit's "injury discovery" rule, "'the civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action.'"  *Pincay* v. *Andrews*, 238 F.3d 1106, 1109 (quoting *Grimmett* v. *Brown*, 75 F.3d 506, 510 (9th Cir. 1996)).  "'The plaintiff is deemed to have had constructive knowledge [of its injury] if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud.'"  *Id.* at 1110 (quoting *Beneficial Standard Life Ins. Co.* v. *Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988)).  Here, plaintiffs filed their complaint on December 2, 2014.  If Pemex was on actual or constructive notice of its injury before December 2, 2010, its RICO claims are stale.

That is the case here.  The essence of the RICO claims is that defendants bribed Pemex officials to induce Pemex into entering into contracts with HP Mexico in December 2008.  Compl. ¶¶ 21–64.  Indeed, Pemex repeatedly articulates its injury as "the acceptance of harmful contractual terms and the payment of significant cost overcharges."  *E.g.*, *id.* ¶¶ 3, 141.  Fundamental to plaintiffs' theory is that their agents—their Chief Operating Officer and Reynaud—were *fully aware* of this supposed injury.  As such, their knowledge is imputed to Pemex.  *See*, *e.g.*, Cal. Civ. Code § 2332 (West) ("[B]oth principal and agent are deemed to have notice of whatever either has notice of …."); *Moore* v. *Phillips*, 1 Cal. Rptr. 508, 512 (Cal. Dist. Ct. App. 1959) ("That a corporation can have knowledge only through its officers and agents is elementary.'" (citation omitted)).  Because the last event alleged in the complaint having anything to do with HP Mexico and Pemex occurred in June 2009, Compl. ¶¶ 2, 55, 130, Pemex's RICO claims are time-barred.[15]

Aware of this fatal defect, plaintiffs apparently invoke the narrow exception to imputation known as the "adverse agent" doctrine.  They plead that the "Chief Operating Officer and Reynaud Aveleyra had abandoned their relationship with Pemex and were acting … directly adverse

---

[15] Plaintiffs plead that the HP Poland scheme at issue in Counts Two and Four continued through 2010, Compl. ¶ 87, but that has no bearing on the statute-of-limitations analysis here. Under the Ninth Circuit's "separate accrual rule," the four-year limitations period can only be reset if the new act "inflict[s] *'new and accumulating injury* on the plaintiff.'"  *Just Film, Inc.* v. *Merch. Servs., Inc.*, No. C 10–1993 CW, 2010 WL 4923146, at *15 (N.D. Cal. Nov. 29, 2010) (quoting *Grimmett*, 75 F.3d at 513).  Because HP Poland's conduct in Poland inflicted no "new and accumulating injury" on Pemex, there can be no claim that the statute of limitations began to run sometime in 2010.

to Pemex's interests." *Id.* ¶ 60.  Although knowledge acquired by an agent acting adversely to his principal is not imputed to the principal, "California courts have drawn a distinction between situations in which the agent acts in an adverse capacity and those in which the agent acts for the principal but has a personal adverse interest."  3 BERNARD E. WITKIN, SUMMARY OF CALIFORNIA LAW *Agency* § 156(2) (10th ed. 2010); *see also Pincay*, 238 F.3d at 1109 ("[C]onstructive notice begins to run the statute of limitations regardless of any fiduciary relationship between the injured and the injurer.").  And "[t]he adverse interest exception is narrow and generally requires 'an agent to *completely* abandon the principal's interests and act *entirely* for his own purposes.'" *Cement & Concrete Workers Dist. Council Pension Fund* v. *Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1144 (N.D. Cal. 2013) (quoting *USACM Liquidating Trust* v. *Deloitte & Touche LLP*, 764 F. Supp. 2d 1210, 1218 (D. Nev. 2011); emphasis added).

Plaintiffs' allegations of their own officials' involvement represent precisely the latter situation described by Witkin.  The only Pemex official alleged to have any involvement in the negotiations regarding the BTO contracts is Reynaud.  *See* Compl. ¶¶ 22–29.  Reynaud was a "key signatory on behalf of Pemex for the BTO Deal," *id.* Ex. 1, at A3, and had "significant responsibilities for the BTO contracts."  Compl. ¶ 29.  While plaintiffs offer the conclusory assertion that the COO and Reynaud "were acting solely for their own personal benefit and … directly adverse to Pemex's interests," *id.* ¶ 60, plaintiffs make *no* allegation that Pemex did not receive the full value of the products and services that they contracted for or that the products and services provided by HP Mexico were in any way defective.  Reynaud was plainly acting on behalf of Pemex in his capacity as CIO; he negotiated the BTO contracts and signed them on behalf of Pemex. The adverse agent doctrine "does not apply where a corporation benefits from the agent's conduct, even when the net result may be detrimental to the corporation's interest."  *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1463 (D. Ariz. 1992) (citing RESTATEMENT (SECOND) OF AGENCY § 282 (1958)).  As such, it does not apply here.

But even if the COO's and Reynaud's knowledge could not be imputed to Pemex, plaintiffs' allegations reveal that they had more than "enough information to warrant an investigation which, if reasonably diligent, would have led to discovery" of their alleged injury.  *Pincay*, 238

F.3d at 1110.  Pemex's COO was a "former principal of Intellego" and "HP Mexico retained In-tellego" because of its "connection" to Pemex's "Chief Operating Officer, Reynaud Aveleyra, and other Pemex officials."  Compl. ¶ 29.  Reynaud allegedly met and spoke with Intellego both before and after the signing of the BTO contracts, *see id.* ¶¶ 29, 53, and HP Mexico allegedly "of-fer[ed] him lavish trips, gifts, and entertainment, which continued through the performance of the BTO contracts."  *Id.* ¶ 130.  "The Supreme Court has deliberately emphasized that in the context of a civil RICO case, the bar is raised in terms of a Plaintiff's obligation to act swiftly and with diligence to ascertain and act on a RICO injury."  *Town of Poughkeepsie* v. *Espie*, 402 F. Supp. 2d 443, 456 (S.D.N.Y. 2005); *see Klehr* v. *A.O. Smith Corp.*, 521 U.S. 179, 195 (1997) (plaintiffs cannot rely on the "fraudulent concealment" doctrine absent "reasonable diligence").  Here, plain-tiffs do not plead that they undertook any acts to investigate any potential misconduct by their officers, Intellego, or HP Mexico.  Instead, they simply allege that they heard about the scheme when it was publicly announced by the United States government.  Compl. ¶ 120.  That is not re-motely sufficient.  Plaintiffs had substantial information to "warrant an investigation" into the ne-gotiation of the BTO contracts in 2008 and 2009.  *Pincay*, 238 F.3d at 1110.  Having sat idly by, they cannot now—almost six years later—complain of an alleged injury.

## IV.   PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED.

A court "may decline to exercise supplemental jurisdiction over a [state law] claim … if … the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  While the statute confers discretion, "[i]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent juris-diction doctrine—judicial economy, convenience, fairness, and comity—will point toward declin-ing to exercise jurisdiction over the remaining state-law claims."  *Alda* v. *SBMC Mortg.*, No. 11–cv–00678–LHK, 2012 WL 10589, at *5 (N.D. Cal. Jan. 3, 2012) (quoting *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 n.7 (1988)); *see also Montazer* v. *SM Stoller, Inc.*, 363 F. App'x 460, 462 (9th Cir. 2010) ("After dismissal of federal claims on the merits, the preferable course of ac-tion is dismissal of the remaining claims without prejudice.").

This case is no exception.  It is at the pleading stage, no discovery has been taken, and

1    "[j]udicial resources [would be] conserved by dismissing the case at this stage." *Smith* v. *Cnty. of*

2    *Santa Cruz*, No. 13–cv–00595–LHK, 2013 WL 6185238, at *7 (N.D. Cal. Nov. 26, 2013) (de-

3    clining to exercise supplemental jurisdiction over state law claims after dismissing RICO claim,

4    among other federal claims).  Moreover, "dismissal promotes comity as it [would] enable[] Cali-

5    fornia courts to interpret" the application of Section 17200 of the California Business and Profes-

6    sions Code, as called for by Counts Five and Six. *Id.*  The exercise of supplemental jurisdiction

7    would be particularly inapt here, where Mexican plaintiffs accuse Mexican entities of banding

8    together to bribe Mexican officials, resulting in alleged injury to them in Mexico, and requiring

9    the application and interpretation of Mexican law.[16]

10       Even if this Court were to reach the merits of plaintiffs' claim under California's Unfair

11   Competition Law (the "UCL"), that claim suffers from the same infirmity as plaintiffs' RICO

12   claims.  Like RICO, the UCL does not apply extraterritorially. *See Sullivan* v. *Oracle Corp.*, 254

13   P.3d 237, 248 (Cal. 2011).  To state a UCL claim, plaintiffs must allege an illegal act within Cali-

14   fornia. *See id.*  But plaintiffs make only vague and conclusory allegations that "HP directed the

15   affairs of the criminal enterprise from its offices in the United States," Compl. ¶ 175, and that HP

16   officials in California approved HP Mexico's requests for the deal commission. *Id.*  Such conclu-

17   sory allegations are insufficient. *See Gustafson* v. *BAC Home Loans Servicing, LP*, No. CV 11–

18   915–JST, 2012 WL 4761733, at *5-6 (C.D. Cal. Apr. 12, 2012) (conclusory allegation that

19   scheme was directed from defendants' offices in California was insufficient to apply UCL).

20                                    **CONCLUSION**

21       It is respectfully submitted that the complaint should be dismissed in its entirety.

22

23       [16] When a federal court exercises supplemental jurisdiction over state law claims, it applies
     the choice-of-law rules of the forum state. *Paracor Fin., Inc.* v. *Gen. Elec. Capital Corp.*, 96

24   F.3d 1151, 1164 (9th Cir. 1996).  Under California's choice-of-law rules, "[t]he state with the
     'predominant' interest in controlling conduct normally is the state in which such conduct occurs

25   and is most likely to cause injury." *Castro* v. *Budget Rent-A-Car Sys., Inc.*, 154 Cal. App. 4th
     1162, 1180 (Cal. Ct. App. 2007) (internal quotations marks and citation omitted); *Blankenship* v.

26   *Medtronic, Inc.*, No. cv 12–7884 BRO, 2013 WL 3322031, at *3 (C.D. Cal. June 7, 2013)
     ("[G]iven that this case is brought by a Missouri resident and the conduct at the heart of the case

27   … took place in Missouri, there is a 'strong possibility' that Missouri law will apply …." (citation
     omitted)).  Here, the conduct and injury occurred in Mexico and it is therefore highly likely that

28   Mexican law would apply to the common law claims.

DEFENDANTS' MOT. TO DISMISS
COMPLAINT; SUPPORTING MEMO.              25
CASE NO.:  CV–14–05292–BLF

1   WACHTELL, LIPTON, ROSEN & KATZ

2

3   By:  *George T. Conway III*          Dated:  February 9, 2015

4        George T. Conway III
         Adam L. Goodman

5        51 West 52nd Street
         New York, New York  10019

6        Telephone:  (212) 403-1000

7        Facsimile:  (212) 403-2000

8        BERGESON, LLP
         Daniel J. Bergeson

9        Caroline McIntyre
         John D. Pernick

10       2033 Gateway Place, Suite 300

11       San Jose, California  95110
         Telephone:  (408) 291-6200

12       Facsimile:   (408) 297-6000

13   *Attorneys for Defendants Hewlett-Packard Co.*

14     *and Hewlett-Packard Mexico, S. de R.L. de C.V.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28