1   Melinda M. Morton, SBN 209373
    mindy.morton@procopio.com
2   PROCOPIO, CORY, HARGREAVES AND SAVITCH LLP
    1020 Marsh Road, Suite 200
3   Menlo Park, CA  94025
    Telephone:  650.645.9000
4   Facsimile:   650.566.1061

5   Richard D. Bernstein, *pro hac vice*
    Frank M. Scaduto, SBN 271451
6   WILLKIE FARR & GALLAGHER LLP
    1875 K Street, NW
7   Washington, DC  20006
    Telephone:  202.303.1000
8   Facsimile:  202.303.2000

9   *Attorneys for Plaintiffs*
    PETRÓLEOS MEXICANOS, and
10  PEMEX EXPLORACIÓN Y PRODUCCIÓN

11              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
12                  **SAN JOSE DIVISION**

13  PETRÓLEOS MEXICANOS, and PEMEX
    EXPLORACIÓN Y PRODUCCIÓN              Case No. CV14-05292 BLF (NC)
14
                    Plaintiffs,           **PLAINTIFFS' OPPOSITION**
15                                        **TO DEFENDANTS' MOTION**
          v.                              **TO DISMISS COMPLAINT**
16
    HEWLETT-PACKARD COMPANY,              Date:         June 25, 2015
17  and HEWLETT-PACKARD MEXICO,           Time:         9:00 a.m.
    S. DE R.L. DE C.V.                    Courtroom:    Courtroom 3, 5th Floor
18                                        Judge:        Hon. Beth Labson Freeman
                    Defendants.
19                                        Complaint Filed:  December 2, 2014
                                          Trial Date:  None set
20

21

22

23

24

25

26

27

28

---

**TABLE OF CONTENTS**

STATEMENT OF ISSUES TO BE DECIDED ........................................................... 1

INTRODUCTION ................................................................................................ 1

FACTS ............................................................................................................... 3

ARGUMENT ...................................................................................................... 6

   I.    THE COMPLAINT SUFFICIENTLY ALLEGES RICO CLAIMS ................................. 7

     A.   The Complaint Sufficiently Alleges A Domestic Pattern Of Predicate Acts ................ 7

     B.   Plaintiffs Have Sufficiently Alleged A "Pattern" Of Racketeering Activity................ 16

     C.   The Complaint Sufficiently Alleges Timely RICO Claims ......................................... 20

   II.   THE COMPLAINT SUFFICIENTLY ALLEGES CALIFORNIA LAW CLAIMS. ....... 22

CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Adhikari v. Daoud & Partners*, Civil Action No. 09-cv-1237, 2013 WL 4511354
(S.D. Tex. Aug. 23, 2013)................................................................................................15

*Adobe Sys. Inc. v. My Choice Software, LLC*, Case No. 14-cv-02150-BLF, 2014 WL
6346776 (N.D. Cal. Nov. 14, 2014)...................................................................................6

*Allwaste, Inc. v. Hecht*, 65 F.3d 1523 (9th Cir. 1995) ......................................................17, 18

*Aluminum Bahrain B.S.C. v. Alcoa Inc.*, Civil Action No. 8-299, 2012 WL 2093997
(W.D. Pa. June 11, 2012).................................................................................................13

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424
(D. Ariz. 1992)..............................................................................................................20, 21

*Asadi v. G.E. Energy (USA), LLC*, Civil Action No. 4:12-345, 2012 WL 2522599
(S.D. Tex. June 28, 2012)..................................................................................................15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................................11

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 134 S. Ct. 568 (2013) .................23

*Axess Int'l, Ltd. v. Intercargo Ins. Co.*, 183 F.3d 935 (9th Cir. 1999)..........................................23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................................................6

*Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271 (9th Cir. 1988)..........................22

*Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2006 WL 2455761
(N.D. Cal. Aug. 22, 2006).................................................................................................24

*Cal. Pharmacy Mgmt., LLC v. Zenith Ins. Co.*, 669 F. Supp. 2d 1152 (C.D. Cal. 2009) ..............17

*In re Cal. TD Invs. LLC*, 489 B.R. 124 (Bankr. C.D. Cal. 2013) ..................................................21

*Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216 (9th Cir. 2011)....................................23

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010) ..............6

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
964 F. Supp. 2d 1128 (N.D. Cal. 2013) ........................................................................20, 21

*In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009)....................................6

*Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. 2012)................................................14

*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014)..........................................13, 15

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499 (9th Cir. 1988) ...............................22

*Ehret v. Uber Techs., Inc.*, No. C-14-0113 EMC, 2014 WL 4640170
(N.D. Cal. Sept. 17, 2014)................................................................................................24

ii

*Estrella v. Freedom Fin. Network, LLC*, No. C 09-03156 SI, 2010 WL 2231790
   (N.D. Cal. June 2, 2010) ...........................................................................................23, 24

*European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 149 (2d Cir. 2014)........................................16

*European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014)..................................8, 9, 10

*FDIC v. O'Melveny & Myers*, 969 F.2d 744 (9th Cir. 1992) ....................................................21

*Farberware, Inc. v. Groben*, 764 F. Supp. 296 (S.D.N.Y 1991) ...................................................17

*Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300 (S.D.N.Y. 2009).........................6

*Goodwin v. Bruggeman-Hatch*, Civil Action No. 13-cv-02973-REB-MEH,
   2014 WL 3882183 (D. Colo. Aug. 7, 2014) ..........................................................................10

*Grimmett v. Brown*, 75 F.3d 506 (9th Cir. 1996).....................................................................20

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989)................................................... *passim*

*Hana Fin., Inc. v. Hana Bank*, 135 S. Ct. 907 (2015) ...............................................................15

*Hourani v. Mirtchev*, 943 F. Supp. 2d 159 (D.D.C. 2013) ..........................................................10

*Howard v. Maximus, Inc.*, No. 3:13-cv-01111-ST, 2014 WL 3859973
   (D. Or. May 6, 2014) ...............................................................................................................10

*In re iPhone 4S Consumer Litig.*, No. C 12-1127 CW, 2013 WL 3829653
   (N.D. Cal. July 23, 2013).........................................................................................................24

*Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914 (Cal. 2006)..........................................23

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) .......................................24

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353 (9th Cir. 2005) ..............2, 7

*Loginovskaya v. Batratchenko*, 764 F.3d 266 (2d Cir. 2014) .......................................................16

*Low v. Altus Fin. S.A.*, 136 F. Supp. 2d 1113 (C.D. Cal. 2001) ..................................................22

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933
   (N.D. Cal. 2012).......................................................................................................10, 14, 16

*Milyakov v. JP Morgan Chase, N.A.*, No. C 11-2066 WHA, 2011 WL 6012928 (N.D.
   Cal. Dec. 1, 2011) ....................................................................................................................23

*Mohebbi v. Khazen*, Case No. 13-cv-03044-BLF, 2014 WL 2861146
   (N.D. Cal. June 23, 2014) ........................................................................................................25

*Norwest Mortg., Inc. v. Superior Ct.*, 72 Cal. App. 4th 214 (1999) ...........................................24

*People v. Park*, 87 Cal. App. 3d 550 (1978).............................................................................21

*Perkumpulan Investor Crisis Ctr. Dressel-WBG v. Wong*, No. C09-1786-JCC,
   2014 WL 1047946 (W.D. Wash. Mar. 14, 2014) ...................................................................10

iii

*Petróleos Mexicanos v. SK Eng'g & Constr. Co.*, 572 F. App'x 60 (2d Cir. 2014) ....................10

*Reich v. Lopez*, 38 F. Supp. 3d 436 (S.D.N.Y. 2014) ........................................................10, 13, 14

*Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364 (9th Cir. 1992) ............................................17

*Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517 (S.D.N.Y. 2013), *aff'd* 768 F.3d 145
    (2d Cir. 2014), *petition for cert. filed* (Mar. 5, 2015) ............................................................10

*Rush v. Nutrex Research, Inc.*, No. C 12-01060 LB, 2012 WL 2196144
    (N.D. Cal. June 13, 2012) ........................................................................................................15

*Sowinski v. Wells Fargo Bank, N.A.*, No. 11-6431-SC, 2013 WL 2436229
    (N.D. Cal. June 4, 2013) ..........................................................................................................9

*Tanedo v. East Baton Rouge Parish Sch. Bd.*, No. SA CV10-01172 JAK,
    2012 WL 5378742 (C.D. Cal. Aug. 27, 2012) ........................................................................8

*Ticor Title Ins. Co. v. Florida*, 937 F.2d 447 (9th Cir. 1991) .....................................................18

*Turner v. Cook*, 362 F.3d 1219 (9th Cir. 2004) .........................................................................17

*United States v. Busacca*, 936 F.2d 232 (6th Cir. 1991) .............................................................18

*United States v. Carson*, No. SACR 09-00077-JVS, 2011 WL 7416975
    (C.D. Cal. Sept. 20, 2011) ........................................................................................................9

*United States v. Chao Fan Xu*, 706 F.3d 965 (9th Cir. 2013).............................................. *passim*

*United States v. Philip Morris USA, Inc.*, 783 F. Supp. 2d 23 (D.D.C. 2011) ............................10

*United States v. Renzi*, No. CR 08-00212-TUC-DCB (BPV), 2009 WL 5872905
    (D. Ariz. Sept. 21, 2009)..........................................................................................................20

*United States v. Thomas*, No. 2:12-CR-004-APG-GWF, 2014 WL 1763766
    (D. Nev. May 1, 2014) ..............................................................................................................8

## STATUTES AND CODES

84 Stat. 947, § 904 (Oct. 15, 1970)................................................................................................8

15 U.S.C. § 78aa(a)..........................................................................................................................6

15 U.S.C. § 78dd-1 *et seq.* ..............................................................................................................9

18 U.S.C. § 1961(1) .......................................................................................................................16

18 U.S.C. § 1961(5)..........................................................................................................................2

18 U.S.C. § 1962(c) .........................................................................................................................8

Cal. Penal Code § 641.3....................................................................................................................9

Plaintiffs, Petróleos Mexicanos ("Petróleos Mexicanos") and Pemex Exploración y Producción ("PEP") (collectively, "Pemex" or "Plaintiffs"), respectfully submit this opposition to the motion to dismiss the Complaint ("Compl.") filed February 9, 2015 ("Motion" or "Mot.") of Defendants Hewlett-Packard Company ("HP") and Hewlett-Packard Mexico, S. de R.L. de C.V. ("HP Mexico") (collectively, "Defendants").

## STATEMENT OF ISSUES TO BE DECIDED

1.      Does the Complaint sufficiently allege a domestic pattern of predicate acts under *United States v. Chao Fan Xu*, 706 F.3d 965 (9th Cir. 2013)?  Yes.

2.      Does the Complaint sufficiently allege a pattern of racketeering activity under RICO?  Yes.

3.      Does the Complaint sufficiently allege that Plaintiffs' RICO claims were timely brought?  Yes.

4.      *If* the Court dismisses the RICO claims, should the Court exercise supplemental jurisdiction over Plaintiffs' state law claims?  Yes.

5.      Does the Complaint sufficiently allege California conduct and thus state a claim under the California Business & Professions Code § 17200?  Yes.

## INTRODUCTION

Defendants agreed in April 2014 with the United States government that Defendants are responsible for bribes paid to employees of Plaintiffs that resulted in Plaintiffs entering contracts at exorbitant prices.  The illicit money originated in, and the profits were sent to, the United States.  In between, all of the following occurred *in the United States*:  payments from a bank account, approvals, lavish trips, wire communications, deficient internal controls, and false books and records.  Despite this, Defendants protest that "this case does not belong in any court of the United States at all."  (Mot. at 2.)  But all of their arguments are predicated on improperly contradicting the Complaint's well-pleaded factual allegations.

RICO Applies:  Defendants primarily argue that Plaintiffs seek an extraterritorial application of RICO.  (Mot. at 2-3, 7-18.)  But the Complaint pleads more than sufficient domestic conduct.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT          CV14-05292 BLF (NC)

1    HP authorized the payment of bribes *from the United States*.  HP and HP Mexico, acting

2    as co-conspirators, then paid for these bribes from a bank account *in the United States*.  As a

3    further *quid pro quo*, Defendants also arranged for at least nine lavish trips for a Pemex official

4    *to the United States*.  HP illegally recorded its corrupt payments as legitimate commissions and

5    expenses in its books and records *in the United States*.  HP engaged in wire communications

6    controlled and directed the enterprise *from the United States*.  HP also promulgated its own

7    deficient internal controls *from the United States* and violated those controls *from the United*

8    *States*.  Indeed, Defendants' illegal conduct came to light because of an investigation and

9    findings made by the U.S. Attorney's Office *for the Northern District of California*.

10   The Complaint shows at least 16 violations *in the United States* of the statutory predicates

11   for RICO.  This pattern of at least 16 domestic predicate acts is a pattern of domestic

12   racketeering activity.  *See* 18 U.S.C. § 1961(5); *Living Designs, Inc. v. E.I. DuPont de Nemours*

13   *& Co.*, 431 F.3d 353, 361 (9th Cir. 2005) ("racketeering activity" is also "known as 'predicate

14   acts'").  RICO applies to this pattern of domestic predicate acts, even though the enterprise

15   engaged in other corrupt acts abroad.  Indeed, *United States v. Chao Fan Xu*, 706 F.3d 965 (9th

16   Cir. 2013), held that RICO applied to "a pattern of" domestic immigration racketeering activity,

17   even though that activity was "conjoined" with a foreign bank fraud that did not involve

18   domestic predicate acts.  *Id*. at 978-79.  Contrary to Defendants' Motion, *Chao Fan Xu* did not

19   weigh the domestic conduct against the foreign.  No authority supports immunizing a pattern of

20   domestic predicate acts under RICO merely because additional foreign misconduct was

21   supposedly even worse.

22   HP also improperly contradicts the Complaint by portraying this case as involving only

23   rogue foreign subsidiaries operating solely abroad.  (Mot. at 14.)  To start, as the Complaint

24   alleges, HP, HP Mexico, and others were co-conspirators and enterprise members and thus all

25   are responsible for each other's conduct.  HP Mexico agreed with the United States Attorney *for*

26   *this District* to enter into a Non-Prosecution Agreement (the "NPA"), where HP Mexico

27   admitted to making bribe payments *from the United States*.  (Compl. ¶ 17.)  *HP's* Senior Vice

28   President and Deputy General Counsel, Bruce Ives, signed the NPA on behalf of HP Mexico.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT          CV14-05292 BLF (NC)

1  (*Id*.)   Moreover, far from absolving HP, federal prosecutors found that Defendants' illegal

2  practices, including its scheme against Pemex, constituted "a global labyrinth of complex

3  financial transactions used *by HP* to facilitate bribes to foreign officials."  (Compl. ¶¶  18-19

4  (emphasis added).)   The Securities and Exchange Commission (the "SEC") issued an Order

5  Imposing a Cease-and-Desist Order (the "SEC Order") against *HP*.  The SEC Order ruled that

6  *HP* violated the Foreign Corrupt Practices Act ("FCPA") by falsely recording bribes in its United

7  States books and records and by failing to maintain proper internal controls in this country.  (*Id*.)

8       <u>Patterns</u>:  In arguing that their crimes were too short and too disconnected to support a

9  pattern of racketeering activity, Defendants again contradict the Complaint's detailed allegations.

10 First, the Pemex Scheme (Counts I and III) consists of interconnected and continuous illegal

11 activity for at least fourteen months.  This persistent illegal activity constituted at least two

12 instances of money laundering (Compl. ¶¶ 134-136), four instances of wire fraud (Compl.

13 ¶¶ 138(a)-(f)), and 16 violations of the Travel Act.  (Compl. ¶¶ 137(a)-(e).)  The frequency of

14 these predicate acts shows that HP and its enterprise members have regularly conducted business

15 in illegal ways, as recognized by prosecutors in finding a "global labyrinth . . . used by HP."

16 Second, the Global Scheme (Counts II and IV) consists of an even longer period of violations

17 that have had strikingly similar purposes, participants, methods, and results.

18      <u>Other Arguments</u>:  Plaintiffs rebut Defendants' other, back-of-the-brief arguments *infra*,

19 at 20-25.

20                                **FACTS**

21      Beginning no later than January 2008, Defendants illegally pursued contracts to sell HP

22 business technology optimization ("BTO") software, hardware, and licenses to Plaintiffs.

23 (Compl. ¶ 21.)  Defendants decided to make corrupt payments to Intellego, S.C. ("Intellego"), a

24 Mexican company with U.S. offices, in order to obtain the BTO business from Plaintiffs.

25 (Compl. ¶¶ 28, 33.)  Pemex's Chief Operating Officer (the "COO") was a former principal of

26 Intellego, the COO supervised Pemex's Chief Information Officer, Manuel Reynaud Aveleyra

27 ("Reynaud"), and a portion of the payments to Intellego would be funneled as bribes to the COO

28 and Reynaud.  (Compl. ¶¶ 28-29, 49-50.)  Defendants consequently agreed to pay Intellego an

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT                    CV14-05292 BLF (NC)

1   "influencer fee" equal to 25% of the licensing and supporting components of the BTO contracts.

2   (Compl. ¶¶ 30, 33.)

3   Intellego, however, was not a pre-approved channel partner.  Accordingly, Defendants

4   brought in another entity (the "Pass-Through Partner"), which was already an approved channel

5   partner, to join the enterprise to conceal the bribery scheme.  As found by the United States

6   Department of Justice (the "DOJ"), "HP agreed to pay a $1.41 million 'commission' to

7   [Intellego] and hid the payments by inserting into the deal structure another third party, which

8   had been approved by HP."  (Compl. ¶ 33.)   The Pass-Through Partner passed on the bribe

9   payments to Intellego.  (Compl. ¶ 34.)  On December 12, 2008, HP Mexico executives sent an

10  e-mail request to HP officials located *in the United States* requesting permission to increase the

11  influencer fee from 25% to 26.5%—the extra 1.5% being for the phony Pass-Through Partner.

12  (Compl. ¶¶ 35, 36.)  Consistent with HP's global practice of bribery, these HP officials approved

13  the increased influencer fee *from the United States* on the same day they received the request,

14  with not even the facade of real due diligence, thereby enabling the bribes.  (Compl. ¶¶ 31, 37.)

15  Because of the bribery scheme, Pemex paid Defendants exorbitant prices—approximately $6

16  million—for the BTO contracts, providing Defendants with net profits of $2,527,750, which is

17  over 42% of the contract price.  (Compl. ¶¶ 2, 21.)  HP Mexico sent the ill-gotten $2,527,750 to

18  HP in the United States.  (Compl. ¶ 56.)

19  With HP's exorbitant profits secured, HP funded multiple bribe payments *from the*

20  *United States*.  Between February 10 and 12, 2009, Defendants paid a total of $1,663,503 to the

21  Pass-Through Partner.  (Compl. ¶¶ 5, 45.)  These bribe payments were made via wire transfers *in*

22  *U.S. dollars* from a bank account *controlled by HP* and *located in California*.  (Compl. ¶¶ 5, 42-

23  44, 138(f).)   From February 11 to 23, 2009, the Pass-Through Partner engaged in a series of

24  transactions to transfer approximately $1.41 million of the illegal funds to Intellego, while

25  keeping the remaining $250,000 as its payoff.  (Compl. ¶¶ 46-47.)  Between March 2 and 30,

26  2009, pursuant to Defendants' scheme and with their knowledge, Intellego made four cash

27  payments that totaled approximately $125,000 to an entity controlled by Reynaud.  (Compl.

28  ¶¶ 49-50, 135.)  These amounts were falsely and unlawfully recorded as legitimate fees *in HP's*

*books and records in California.*[1]  (Compl. ¶¶ 5, 15, 57.)

HP and HP Mexico also arranged for Reynaud to enjoy luxury trips to the United States, to locations such as San Francisco, Orlando, Las Vegas, and Miami.  (Compl. ¶¶ 24-27, 48, 54-55.)  Defendants offered Reynaud extravagant travel, accommodations, and entertainment as part of the illegal *quid pro quo* for Defendants' exorbitant profits on the Pemex contracts.  (Compl. ¶ 136.)  In particular, Defendants arranged for at least nine purported meetings *in the United States* between HP and Reynaud.  (Compl. ¶¶ 24-27, 48, 54-55.)  At least two of these visits were scheduled *in California* near the time of Defendants' illegal wire transfers.  (Compl. ¶¶ 25, 48, 136.)  The last three- and four-day trips to Chicago and Las Vegas were arranged for June 2009, with HP again to pay for Reynaud's hotel expenses and arrange for him to meet a professional race car driver.  (Compl. ¶¶ 54-55.)

HP devised, promulgated, implemented, but then subverted its system of deficient internal controls from *California*, where HP is headquartered.  (Compl. ¶¶ 5, 31, 109-110.)  As the SEC found, HP's internal controls were inadequate, unlawfully deficient, and caused and enabled the payment of bribes to Plaintiffs' officials.  (Compl. ¶¶ 16, 18, 31, 59, 111-112.)  In particular, the Defendants' internal controls deficiencies enabled the approval of outsized commissions without proper due diligence, the offering of lavish and improper travel and entertainment, and bribery.  (Compl. ¶¶ 37, 113, 137(b)(viii)-(ix).)

HP and its fellow enterprise members engaged in not only the Pemex Scheme but also a Global Scheme.  As federal prosecutors found, "a global labyrinth of complex financial transactions [was] used *by HP* to facilitate bribes to foreign officials" to secure technology contracts for HP worth many millions of dollars in HP profits.  (Compl. ¶ 19 (emphasis added).)  ZAO Hewlett-Packard A.O. ("HP Russia") employed a slush fund to pay large bribes to officials with Russia's Office of the Prosecutor General (the "GPO").  (Compl. ¶¶ 65, 76-78.)  Enterprise members, including officials from HP, HP Russia, and an intermediary shell company met *at*

---

[1] Defendants' books and records also falsely recorded the Pass-Through Partner as the deal partner, failed to record $1.41 million in payments to Intellego, and failed to record any bribes to Reynaud.  (Compl. ¶¶ 34, 58, 137(b)(xii), 180.)

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT          CV14-05292 BLF (NC)

1    *HP's offices in Rockville, Maryland* to facilitate the illegal GPO deal.  (Compl. ¶¶ 67, 72.)

2    Similarly, Hewlett-Packard Polska, Sp. Z o.o. ("HP Poland") gave an official with the Polish

3    national police agency "bags" containing hundreds of thousands of dollars of cash and provided

4    him personally with free HP desktop and laptop computers and other products.  (Compl. ¶¶ 92-

5    94.)  Enterprise members also corrupted this official with lavish trips to *San Francisco and Las*

6    *Vegas*, which included drinks, dining, entertainment, and a "private tour flight" over *the Grand*

7    *Canyon*.  (*See* Compl. ¶¶ 89-90.)  At all times HP Mexico, HP Russia and HP Poland acted as the

8    co-conspirators and agents (or alter egos) of HP.  (Compl. ¶¶ 6, 146.)  HP Russia entered a Plea

9    Agreement and HP Poland entered a Deferred Prosecution Agreement, which were both filed *in*

10   *the Northern District of California*.  (Compl. ¶¶ 84-85, 100-101.)  Under the FCPA's venue

11   provision, each filing is an admission that this is "the district *wherein any act or transaction*

12   *constituting the violation occurred*."  15 U.S.C. § 78aa(a) (emphasis added).

## ARGUMENT

14   Questions of fact are "inappropriate for resolution at the motion-to-dismiss stage."  *In re*

15   *Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1025 (N.D. Cal. 2010).  The

16   Court is readily familiar with the plausibility standard that governs factual allegations.  *See, e.g.*,

17   *Adobe Sys. Inc. v. My Choice Software, LLC*, Case No. 14-cv-02150-BLF, 2014 WL 6346776, at

18   *2 (N.D. Cal. Nov. 14, 2014).  The plausibility standard "simply calls for enough fact[s] to raise

19   a reasonable expectation that discovery will reveal evidence" supporting the claim.  *Bell Atl.*

20   *Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

21   Defendants contend that the heightened standards of Fed. R. Civ. P. 9(b) also apply.

22   (Mot. at 6-7.)  However, in a RICO action, "[t]he pleading of bribery is governed by the more

23   lenient pleading standard of Rule 8(a)."  *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp.

24   2d 300, 311 (S.D.N.Y. 2009).  Rule 9(b) applies only to Plaintiffs' specific and highly particular

25   allegations unique to the unchallenged mail and wire fraud predicate acts (Compl. ¶¶ 138, 150)

26   and the unchallenged California fraudulent concealment claim (Compl. ¶¶ 186-194).  *See In re*

27   *Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 545 (N.D. Cal. 2009) ("[A] plaintiff may

28   choose . . . to allege some fraudulent and some non-fraudulent conduct" as the basis of a claim,

---

6

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT          CV14-05292 BLF (NC)

and "[i]n such cases, only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements.").

As demonstrated below, Plaintiffs' claims satisfy the applicable pleading standards.

## I.     THE COMPLAINT SUFFICIENTLY ALLEGES RICO CLAIMS

### A.     The Complaint Sufficiently Alleges A Domestic Pattern Of Predicate Acts

Defendants argue that Plaintiffs' RICO claims are extraterritorial.  (Mot. at 7-18.)  The DOJ and the SEC found, and the Defendants agreed, that Defendants' domestic conduct warranted applying the U.S. FCPA statute and U.S. securities laws.   We show below that Defendants' domestic conduct also provides facts sufficient to plead RICO claims.

1.     <u>Each of the RICO Schemes Sufficiently Alleges A Domestic Pattern</u>

In RICO, "racketeering activity" is also "known as 'predicate acts.'"  *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).  *United States v. Chao Fan Xu*, 706 F.3d 965 (9th Cir. 2013), held that the commission of a pattern of multiple domestic predicate acts is sufficient to state a non-extraterritorial claim for a RICO violation—even if additional lawbreaking occurred abroad.  *See id.* at 978-79.  In *Chao Fan Xu*, a single count challenged "[t]he dual parts of the Defendants' enterprise [that] were necessarily conjoined in pursuit of" one goal.  *Id.*  The "first part" of the defendants' enterprise activities—stealing large sums of money—occurred entirely in China, but the "second part" of the scheme—immigration violations "to get away with it"—"*involved* racketeering activities conducted within the United States *including the commission of RICO* predicate crimes based on violations of United States immigration laws."  *Id.* (emphasis added).  *Chao Fan Xu* held that this second part sufficiently "bound the Defendants' enterprise to the territorial United States" so that RICO applied to the immigration pattern.  *Id.* at 978.  Rather than assess whether the foreign thefts outweighed the domestic immigration violations, the court ruled "we must determine whether under the circumstances of this case RICO can be lawfully applied to *any*, or all, of Defendants' conduct—foreign or domestic."  *Id.* at 975 (emphasis added).  The court held that it was sufficient that there was "*a* pattern of racketeering activities that were conducted by the Defendants in the territorial United States."  *Id.* at 979 (emphasis added).  Although "Defendants' pattern of

racketeering activity may have been conceived and planned overseas, . . . it was executed and perpetuated in the United States," and thus "Defendants' criminal plan, which *included* violation of United States immigration laws while the Defendants were in the United States, falls within the ambit of the [RICO] statute." *Id.* (emphasis added).

Other district courts in this Circuit have reached similar conclusions.  In *Tanedo v. East Baton Rouge Parish School Board*, although "certain elements of the trafficking scheme occurred abroad . . . other steps of Defendants' alleged plan occurred within the United States," namely domestic Trafficking Victims Protection Act ("TVPA") violations. No. SA CV10-01172 JAK, 2012 WL 5378742, at *7 (C.D. Cal. Aug. 27, 2012).  The court held that "making these domestic TVPA violations the predicate acts of a RICO claim is not an extraterritorial application of RICO."  *Id.* at *9.  Likewise, *United States v. Thomas* applied *Chao Fan Xu* to deny a motion to dismiss RICO claims as extraterritorial where "the RICO counts are based upon violations of federal law for offenses that occurred in the United States," despite additional allegations of foreign illegal sales through a website purportedly hosted in Russia. No. 2:12-CR-004-APG-GWF, 2014 WL 1763766, at *3 (D. Nev. May 1, 2014).

The Second Circuit also has adopted an approach that, it held, "accords with" the result in *Chao Fan Xu.   European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 139 n.6 (2d Cir. 2014). *European Community* held that when "domestic conduct satisfies every essential element to prove violation of" RICO's predicate acts of wire fraud and Travel Act violations, RICO applies "even if some further conduct contributing to the violation occurred outside the United States." *Id.* at 142.  The court reasoned that "if an enterprise formed in another nation sent emissaries to the United States to engage in domestic murders, kidnappings, and violations of the various RICO predicate statutes," it cannot be that "its participants would be immune from RICO liability merely because the crimes committed in the United States were done in conjunction with a foreign enterprise."  *Id.* at 138.  This reasoning makes particular sense as the statute commands that RICO "shall be liberally construed to effectuate its remedial purposes," 84 Stat. 947, § 904 (Oct. 15, 1970), and shall apply to "activities of which affect . . . interstate or foreign commerce," 18 U.S.C. § 1962(c).

1    For each of the RICO schemes here, the Complaint alleges a pattern of multiple domestic

2    predicate acts sufficient to plead a claim under *Chao Fan Xu* and similar cases.

3    <u>The Pemex Scheme</u> (Counts I and III).   Defendants' Motion does *not* dispute that the

4    Complaint adequately alleges multiple domestic predicate acts, nor could it.   The Complaint

5    describes a litany of corrupt acts *in the United States* by *both* HP and HP Mexico (HP's co-

6    conspirator and agent (or alter ego)).   In particular, the Complaint shows how domestic conduct

7    constituted at least two bribe payments constituting money laundering, in violation of 18 U.S.C.

8    § 1956(a)(2) (Compl. ¶¶ 134-136), four wire fraud communications involving those two

9    payments and in obtaining HP approvals, constituting violations of 18 U.S.C. § 1343 (Compl.

10   ¶¶ 138(a)-(f)), and 16 violations of the Travel Act, under 18 U.S.C. § 1952 (Compl. ¶¶ 136-137).

11   Defendants' Travel Act predicates include violations of the anti-bribery provisions of the FCPA

12   (Compl. ¶¶ 136-137, 137(b)(i)-(vi)), the accounting provisions of the FCPA (Compl. ¶¶ 136-137,

13   137(b)(vii)-(xii)), and California's commercial bribery statute (Compl. ¶¶ 136-137, 137(a)), *see*

14   15 U.S.C. § 78dd-1 *et seq.*; Cal. Penal Code § 641.3.[2]

15   *Nowhere* does Defendants' Motion dispute that the Complaint's allegations of domestic

16   misconduct satisfy the elements of these predicate acts.   Defendants cannot raise any such

17   argument in their reply brief.   *See Sowinski v. Wells Fargo Bank, N.A.*, No. 11-6431-SC, 2013

18   WL 2436229, at *3 n.3 (N.D. Cal. June 4, 2013) ("Defendant raises a number of other arguments

19   for the first time in its reply brief.   As Plaintiff was not provided an opportunity to respond to

20   _____

    [2]   The 16 domestic Travel Act predicates include: (1-2) two bribe payments, (3-11)
21   arranging for nine U.S. trips, (12-13) falsely recording the two bribe payments, and (14-16) three
    internal controls violations for approving the Pass-Through Partner, approving the increased
22   influencer fee, and promulgating and implementing deficient internal controls.   (Compl. ¶¶ 134-
    138.)   Acts committed in the United States or in crossing the U.S. border constitute domestic
23   RICO predicate acts.   For money laundering in violation of § 1956(a)(2), "[r]egulation of
    conduct in crossing the United States borders is not regulation of extraterritorial conduct."
24   *European Cmty.*, 764 F.3d at 140 n.7.   Similarly, Travel Act and mail and wire fraud violations
    can occur in the United States, or while crossing U.S. borders.   *See id.* at 141-42 (payments,
25   communications, and travel between the domestic parent and its foreign subsidiaries and
    wholesalers); *United States v. Carson*, No. SACR 09-00077-JVS, 2011 WL 7416975, at *4 (C.D.
26   Cal. Sept. 20, 2011) ("Defendants allegedly acted in California and directed commercial bribery
    payments to foreign individuals.   All the elements under the Travel Act were allegedly satisfied
27   in California even if the target of Defendants' commercial bribery scheme was overseas . . .
    because Defendants, acting in California, presumably used some instrumentality in interstate or
28   foreign commerce *to set those payments in motion*.") (emphasis added).

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT                    CV14-05292 BLF (NC)

1    these arguments, the Court does not consider them.").

2          Defendants instead argue that the domestic conduct alleged in the Complaint was "too

3    isolated."  (Mot. at 15 (quotation omitted).)  Defendants rely on no case that rejected a pattern of

4    *multiple* domestic predicate acts as being "too isolated."  Instead, they cite cases that use

5    "isolated" (or an equivalent) to describe no, or at most one, domestic predicate act.[3]

6          To argue that domestic conduct in the Pemex Scheme here was "isolated," Defendants'

7    Motion violates the basic rules of motions to dismiss by hypothesizing a version of events that

8    contradicts the Complaint.  *See Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F.

9    Supp. 2d 933, 943 (N.D. Cal. 2012) ("As MOL points out, [defendant] essentially ignores

10   MOL's allegations of U.S. conduct.").  Defendants will have later opportunities, based on a full

11   record, in "motions for (partial) summary judgment" and at trial, to provide facts to argue that

12   the "pattern of conduct of certain Defendants or certain schemes" was only "extraterritorial."

13   *European Cmty.*, 764 F.3d at 143.  But a motion to dismiss based on extraterritoriality cannot go

14   outside "the Complaint."  *Id.* at 142; *accord Reich v. Lopez*, 38 F. Supp. 3d 436, 448 (S.D.N.Y.

15   2014).  The Complaint here contains well-supported allegations, drawn from facts found by the

16   DOJ and SEC, that the Pemex Scheme involved a pattern of *multiple domestic* predicate acts that

17   _____

18          [3]  *See Goodwin v. Bruggeman-Hatch*, Civil Action No. 13-cv-02973-REB-MEH, 2014
     WL 3882183, at *10 (D. Colo. Aug. 7, 2014) ("Plaintiff does not allege that the Belfast
19   Defendants engaged in domestic racketeering activity."); *Howard v. Maximus, Inc.*, No. 3:13-cv-
     01111-ST, 2014 WL 3859973, at *5 (D. Or. May 6, 2014) (RICO claim was "premised only on
20   extraterritorial racketeering activity"); *Perkumpulan Investor Crisis Ctr. Dressel-WBG v. Wong*,
     No. C09-1786-JCC, 2014 WL 1047946 at *10 (W.D. Wash. Mar. 14, 2014) (discussing
21   extraterritoriality in *dicta*, as the court held that the PSLRA precludes securities fraud as a RICO
     predicate); *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 168 (D.D.C. 2013) (finding the predicate
22   acts and "'challenged conduct' took place entirely abroad"); *United States v. Philip Morris USA,
     Inc.*, 783 F. Supp. 2d 23, 29 (D.D.C. 2011) ("[D]omestic conduct was not the basis for its RICO
23   liability in this case.  At trial the Government never argued that BATCo's domestic activity
     provided an adequate basis for RICO liability.").  Defendants' citations relegated to a footnote
24   are also unpersuasive.  In *Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 544-46 (S.D.N.Y.
     2013), the only alleged connection to the United States was through the United Nations, which
25   although situated in New York, is "functionally distinct from the natural territory of the United
     States."  This case also was decided before the Second Circuit issued its opinion in *European
26   Community* and *Republic of Iraq* was affirmed solely on grounds *apart from* extraterritoriality.
     *See* 768 F.3d 145, 160 (2d Cir. 2014), *petition for cert. filed* (Mar. 5, 2015).  Similarly, in
27   *Petróleos Mexicanos v. SK Engineering & Construction Co.*, 572 F. App'x 60 (2d Cir. 2014), the
     court did not find domestic predicate acts because, unlike here, that complaint "relie[d]
28   exclusively on the wire fraud statute," and there the false invoices were made and approved
     abroad and bribe money was paid abroad.  *Id.* at 61.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT                CV14-05292 BLF (NC)

1  were far from "isolated." [4]

2      First, HP took the critical step in the United States of authorizing the bribe payments.

3  (Compl. ¶¶ 5, 31.)  As the DOJ described, "*HP agreed to pay a $1.41 million 'commission' to*

4  [Intellego] and hid the payments by inserting into the deal structure another third party, which

5  had been approved by HP." (Compl. ¶ 33 (emphasis added).)  HP Mexico executives had sent an

6  e-mail to HP officials in the United States requesting permission to increase the size of this

7  payment.  (Compl. ¶ 35.)  HP officials in the United States "approved the increased influencer

8  fee on the same day they received the request, thereby approving the Pass-Through Partner's

9  share of the scheme's illicit proceeds and its role in the enterprise." (Compl. ¶ 37.)

10     Second, Defendants did not merely pay "some invoices" in the United States.  (Mot. at

11  15.)  Defendants originated and paid the bribe money with U.S. dollars from a bank account in

12  the United States.  (Compl. ¶ 5.)  The Pass-Through Partner was sent two different payments, on

13  two separate days, which totaled $1,663,503, from an account controlled by HP and *located in*

14  *the United States*.  (Compl. ¶¶ 42-45, 138(f).)  Incredibly, Defendants' Motion fails to address

15  this admitted fact.

16     Third, it is a "reasonable inference," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), that

17  portions of the bribes paid to Reynaud and Intellego were also received in the United States.

18  Defendants were careful not to mention the location of bribe payments in their Motion, (Mot. at

19  2, 5, 25), because Reynaud maintains a personal bank account in California near HP's

20  headquarters and Intellego has offices in the United States (Compl ¶¶ 28, 51).  The conclusory

21  assertion in Defendants' Motion, that "the conduct and injury occurred in Mexico," (Mot. at 25

22  n.16), is improper in that it goes outside the Complaint.  Moreover, it contradicts Defendants'

23  responses to Plaintiffs' Requests for Admissions.  Despite Defendants' stonewall of objections,

24  Defendants state that they are *unable to deny* that payments to Reynaud, Intellego, and the Pass-

---

25  [4] Defendants do not challenge the allegations that HP, HP Mexico, Intellego, the Pass-
26  Through Partner, Reynaud, and the COO were co-conspirators, enterprise members, or both.
    (Compl. ¶¶ 29, 64.)  Defendants also do not challenge that HP, HP Mexico, HP Russia, HP
27  Poland, and their associated intermediaries and agents, were co-conspirators and enterprise
    members in the Global Scheme.  (Compl. ¶¶ 103-105.)  Not even Defendants argue that it
28  matters to "extraterritoriality" which enterprise member committed domestic predicate acts.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT        CV14-05292 BLF (NC)

1   Through Partner were received in the United States and, indeed, in California.  (March 26, 2015

2   Declaration of Melinda M. Morton ("Morton Decl.") Exhibit 2 (Excerpt of HP's Responses and

3   Objections to Plaintiffs' First Set of Requests for Admission) at 11-18.)

4          Fourth, HP and HP Mexico each "coordinated and participated in" Reynaud's travel to

5   the United States on multiple occasions.  (Compl. ¶ 136.)  Between 2008 and 2009, Defendants

6   arranged for at least nine trips to the United States for Reynaud to locations such as San

7   Francisco, Orlando, Las Vegas, and Miami.  (Compl. ¶¶ 23-27, 48, 54-55.)  Most prominently, in

8   the midst of the bribe payments, HP invited Reynaud to San Francisco purportedly to meet HP

9   executives, and a short time later, Defendants invited Reynaud to a separate meeting in

10  Cupertino, California.  (Compl. ¶ 48.)  Defendants assert that all these arrangements were

11  "peripheral" and not "criminal."  (Mot. at 15.)  Once again, Defendants contradict the

12  Complaint's allegations.  Defendants arranged for these lavish trips for Reynaud both "in

13  connection with a *quid pro quo* arrangement," and "with the intent to induce him to award

14  Pemex contracts to HP Mexico for HP's benefit."  (Compl. ¶¶ 136, 137(b)(iii), (v).)

15         Fifth, although Defendants brazenly portray HP as the victim of HP's own deficient

16  internal controls (Mot. at 15), HP ignores that the Complaint alleges that HP's deficient internal

17  controls in the United States victimized Pemex.  In the United States, HP devised and

18  implemented an inadequate and unlawful system of internal controls, which enabled and caused

19  the bribes paid to Reynaud so that HP could make exorbitant profits of $2.53 million.  (Compl.

20  ¶¶ 5, 16, 31, 59, 123.)  HP also deliberately circumvented its own inadequate internal controls in

21  the United States.   (Compl. ¶ 113.)   In particular, in the United States, HP "knowingly

22  approv[ed] the increased commission paid to the Pass-Through Partner, with little or no due

23  diligence" (Compl. ¶ 137(b)(viii)), and also eschewed the completion of a written channel

24  partner agreement for Intellego (Compl. ¶ 113).  HP's complicity was recognized by the SEC

25  Order *against HP*, which specifically describes how "*HP* . . . violated Section 13(b)(2)(B) of the

26  Securities Exchange Act by failing to devise and maintain sufficient accounting controls."

27  (Compl. Ex. 2 (SEC Order) at 12 (emphasis added).)

28         Sixth, as the SEC found, the corrupt payments were falsely recorded in HP's books and

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT          CV14-05292 BLF (NC)

1   records in the United States as legitimate consulting contracts, commissions, and expenses, and

2   the Pass-Through Partner was falsely recorded as the deal partner in HP's books.  (Compl. ¶¶ 15,

3   34, 58.)  Moreover, based on those deficient records, HP made false reports to the SEC and other

4   U.S. government agencies in its consolidated financial statements.  (Compl. ¶¶ 5, 57, 118.)

5          Seventh, HP directed and knowingly participated in the enterprise from the United States.

6   (Compl. ¶¶ 132, 150, 161, 175.)  Federal prosecutors did not absolve HP.  To the contrary, they

7   found that the Pemex Scheme was part of a "global labyrinth . . . used by *HP*."  (Compl. ¶ 19

8   (emphases added).)  As the U.S. Attorney for this District stated:  "The United States Attorney's

9   Office . . . will vigorously police any efforts *by companies in our district* to illegally sell products

10  to foreign governments using bribes or kickbacks in violation of the FCPA . . . .  Today's

11  resolution with *HP* reinforces the fact that there is no double standard:  *U.S. businesses* must

12  respect the same ethics and compliance standards whether they are selling products to foreign

13  governments or the United States government."  (Morton Decl. Ex. 1 (Apr. 9, 2014 DOJ Press

14  Release) at 1-2 (emphasis added).)  In light of these findings and all the domestic activities, it is

15  more than a reasonable inference that HP's corruption radiated outwards from the United States.

16         Based on the Complaint's allegations, the multiple acts in the United States were far from

17  isolated and more than sufficient to plead a domestic RICO claim.  *See Chao Fan Xu*, 706 F.3d

18  at 979 ("Without the [U.S.] immigration fraud, the bank fraud would have been a dangerous

19  failure."); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 574 (S.D.N.Y. 2014) ("Absent the

20  U.S. activity, there would have been no scheme."); *Aluminum Bahrain B.S.C. v. Alcoa Inc.*, Civil

21  Action No. 8-299, 2012 WL 2093997, at *3 (W.D. Pa. June 11, 2012) (denying motion to

22  dismiss complaint where bribery took place at an Australian subsidiary but "the decision-making

23  vital to the sustainability of the enterprise, came from Pittsburgh").  Here, Defendants' scheme

24  could not have occurred without HP's approval of the bribes from the United States, payment of

25  the bribes from the United States, use of U.S. dollars, and lavish trips to the United States.

26         On extraterritoriality, the facts of this case are indistinguishable from *Reich*, 38 F. Supp.

27  3d 436.  *Reich* held that a scheme was "'domestic' enough to be actionable under RICO," where

28  enterprise members allegedly (1) engaged in bribery of foreign officials through funds

---

13

originating in the United States, (2) traveled to and from the United States, (3) "accepted and transmitted their ill-gotten gains to and from bank accounts in the United States," and (4) sent wire communications to and from the United States. *Id.* at 448. The Complaint alleges all four here. *See supra*, at 3-5, 11-13.

The Global Scheme (Counts II and IV). Independently, because the pattern of domestic predicate acts in the Pemex Scheme forms part of HP's Global Scheme, the Complaint sufficiently alleges a domestic pattern within HP's larger Global Scheme. *See, e.g.*, *Chao Fan Xu*, 706 F.3d at 979. Indeed, the Global Scheme has additional domestic conduct. HP, through HP Russia, entered into agreements with, and sent bribes through, United States companies and intermediaries. (Compl. ¶¶ 67-69.) HP and HP Russia also met together in the United States with these intermediaries on multiple occasions. (Compl. ¶ 72.) Similarly, HP, through HP Poland, bribed a public official by sponsoring a lavish trip to San Francisco and Las Vegas. (Compl. ¶¶ 89-90.) In addition, these acts of HP's global labyrinth were directed from the United States, enabled by inadequate controls promulgated from the United States, and resulted in false entries recorded and reported in the United States. (Compl. ¶¶ 81-82, 97-99.) Indeed, Defendants consented to government-imposed sanctions in the United States for the Pemex *and* Global Schemes. (Compl. ¶¶ 17-18, 84-85, 100-101.)

### 2. Defendants' Weighing Argument Is Unprecedented

*Morrison v. Nat'l Austl. Bank Ltd.* does not hold "that *any* international activity will doom an otherwise domestic claim." *Mitsui*, 871 F. Supp. 2d at 943 (emphasis in original). Rather, as *Reich* held, "[a]s long as enough domestic conduct exists to fulfill the requirements of both the Travel Act and wire fraud, it is irrelevant that those statutes are further violated by conduct that is extraterritorial in nature." 38 F. Supp. 3d at 448. *See also Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 245 (S.D.N.Y. 2012) (bribery scheme carried out in part in Ecuador).

Defendants nonetheless assert that the commission of multiple domestic predicate acts will not suffice to support a domestic RICO pattern if there is more foreign conduct. (Mot. at 12.) To argue this, Defendants mischaracterize *Chao Fan Xu* by taking out of context the

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT          CV14-05292 BLF (NC)

statement that courts "look at the pattern of Defendants' racketeering activity taken as a whole." 706 F.3d at 978.  Defendants are wrong that this means *Chao Fan Xu* somehow weighed the foreign thefts against the domestic immigration violations.  (Mot. at 11-13.)  Quite the opposite, *Chao Fan Xu* "conclude[d] that Defendants' criminal plan, which *included* violation of United States immigration laws while the Defendants were in the United States, falls within the ambit of the statute"—even though the purpose of the immigration scheme was to escape with the proceeds of a "necessarily conjoined" scheme of foreign thefts to which RICO did not apply. 706 F.3d at 978-79 (emphasis added).  Thus, *Chao Fan Xu* "concluded that the conception and planning of the scheme overseas and the embezzlement in China as an integral part of the overall scheme did *not* foreclose application of RICO to the domestic pattern of racketeering activity." *Chevron Corp.*, 974 F. Supp. 2d at 547 (emphasis added).[5]

Defendants' weighing approach would lead to bizarre and unwanted results.  Defendants concede that RICO extraterritoriality applies equally in the civil and criminal contexts.  (Mot. at 9.)  Consequently, Defendants' argument would immunize criminals from RICO prosecutions for multiple predicate acts committed in the United States because they committed many *additional* crimes in foreign countries.  Such a result would create perverse incentives and devastate many federal prosecutions.

Moreover, even *assuming* the legal standard required weighing, dismissal is still inappropriate.  Fact-intensive weighing would undoubtedly be a question of fact.  *See Hana Fin., Inc. v. Hana Bank*, 135 S. Ct. 907, 911 (2015) ("the application-of-legal-standard-to-fact sort of question" is itself a question of fact) (quotations omitted); *Rush v. Nutrex Research, Inc.*, No. C 12-01060 LB, 2012 WL 2196144, at *8 (N.D. Cal. June 13, 2012) (an issue that requires "weighing of evidence from both sides" is a "question of fact").  As a question of fact, weighing

---

[5] Defendants also misread *Adhikari v. Daoud & Partners*, Civil Action No. 09-cv-1237, 2013 WL 4511354, at *8 (S.D. Tex. Aug. 23, 2013).  (Mot. at 12.)  In *Adhikari*, which was decided on summary judgment, not on a motion to dismiss, the alleged RICO predicates were solely extraterritorial—a Nepalese company transporting men from Nepal, through two Jordanian companies, to Iraq.  Moreover, the portion of that opinion quoted by Defendants cites only to precedent regarding Dodd-Frank anti-retaliation claims, *not* RICO.  *See id.*; *Asadi v. G.E. Energy (USA), LLC*, Civil Action No. 4:12-345, 2012 WL 2522599, at *5 (S.D. Tex. June 28, 2012).

is not resolvable on a motion to dismiss.  *See supra*, at 6.

Finally, Defendants assert that Plaintiffs' RICO claims fail because "Pemex does not contend that it suffered injury anywhere but Mexico."  (Mot. at 17.)  *Chao Fan Xu* is satisfied by "a pattern of racketeering *activities* that *were* conducted by the Defendants in the territorial United States."  706 F.3d at 979 (emphasis added).  RICO defines "racketeering activity" as "any act which is indictable under" various federal statutes and "any act or threat . . . which is chargeable" under various state laws.  18 U.S.C. § 1961(1).  It is these acts or threats—not injuries—that constitute racketeering activities.  Accordingly, in an opinion repeatedly cited by Defendants, a court in this District correctly held that "*Morrison*'s holding bars courts from refusing to apply RICO simply because the scheme's effects are felt abroad; it does not suggest that courts may *deny* relief for that reason."  *Mitsui*, 871 F. Supp. 2d at 944 (emphasis in original).  As the Second Circuit likewise held, there is "no reason to import a domestic injury requirement simply because the victim sought redress through the RICO statute."  *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 149, 151 (2d Cir. 2014).[6]

If Defendants were right, imagine a pattern of domestic predicate acts in a for-hire scheme to shoot U.S. citizens:  payments made, gunmen hired, bullets and guns obtained, even shots fired from the United States.  But the shots hit their victims just across the border in Mexico.  According to Defendants, the victims would have no RICO claim for the indisputable domestic pattern of predicate acts.  That would be nonsensical.

**B.     Plaintiffs Have Sufficiently Alleged A "Pattern" Of Racketeering Activity**

A RICO pattern is sufficiently alleged when the plaintiff plausibly alleges that that the predicate acts were "related" and "continuous."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  "Continuity" is present when there is "either . . . a closed period of repeated conduct *or* . . . *past* conduct that by its nature projects into the future with a threat of repetition."  *Id.* at 241 (emphasis added).

---

[6]   Defendants miscite *Loginovskaya v. Batratchenko*, 764 F.3d 266 (2d Cir. 2014), which only reads the language of a different statute, the Commodity Exchange Act, to require the occurrence of a "domestic [commodities] transaction."  *Id*. at 272-73.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT          CV14-05292 BLF (NC)

As detailed below, the Complaint amply alleges a pattern of racketeering activity of sufficient continuity and relationship for each of the Pemex Scheme and the Global Scheme.

The Pemex Scheme (Counts I and III).  Closed-ended continuity exists because the Pemex Scheme involved repeated misconduct over a "substantial period of time."  *H.J. Inc.*, 492 U.S. at 242.  The Supreme Court and Ninth Circuit have adopted a "fairly flexible concept" of what constitutes a "substantial period of time."  *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995) (quoting *H.J. Inc.*, 492 U.S. at 239).  Indeed the "[t]ime period over which the acts occurred . . . is not alone a dispositive factor in determining whether a pattern exists."  *Cal. Pharmacy Mgmt., LLC v. Zenith Ins. Co.*, 669 F. Supp. 2d 1152, 1163 (C.D. Cal. 2009).

Defendants assert that the Pemex Scheme "started in December 2008" and "continued until March 2009."  (Mot. at 19-20.)  Once again, Defendants improperly contradict the facts alleged in the Complaint.  The Pemex Scheme began no later than January 2008, when Defendants targeted Reynaud.  (Compl. ¶ 130.)  The first predicate act in the Pemex Scheme followed promptly, no later than April 21, 2008, when Defendants invited Reynaud to attend a conference and dinner in Orlando, Florida.[7]  (Compl. ¶ 23.)  This *quid pro quo* was a predicate act in violation of the Travel Act.  (Compl. ¶¶ 136-137.)  The predicate acts of the Pemex Scheme continued until at least June 15, 2009, when HP invited Reynaud to a four-day trip to the Venetian Hotel in Las Vegas, Nevada.  (Compl. ¶ 55.)  From April 2008 to June 2009, HP and HP Mexico engaged in at least two instances of money laundering, four instances of wire fraud, and 16 violations of the Travel Act.  *Supra*, at 9.  Accordingly, the Complaint sufficiently alleges the Pemex Scheme persisted through *14 months* of at least 16 predicate acts.  This is more than sufficient repeated conduct and duration.  *See Cal. Pharmacy Mgmt., LLC*, 669 F. Supp. 2d at 1163 (allegations of activity lasting for "at least one year" sufficient for pattern); *Allwaste, Inc.*, 65 F.3d at 1528 (13 months of racketeering activity constituted a "substantial period of time"); *Farberware, Inc. v. Groben,* 764 F. Supp. 296, 306 (S.D.N.Y 1991) ("[P]laintiff has pled the

---

[7] Thus, *Turner v. Cook*, 362 F.3d 1219, 1231 (9th Cir. 2004), is inapposite, as there, various communications were "a year" separated from the predicate acts.  (Mot. at 20.)

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT          CV14-05292 BLF (NC)

existence of a 'closed-ended' scheme of repeated conduct over a ten-month period.").[8]

Independently, the Complaint also plausibly alleges open-ended continuity for the Pemex Scheme.  As few as "three episodes" in a "13-month period" have been held to constitute "illegal conduct [a]s a 'regular way of conducting defendant's ongoing, legitimate business,'" and thus satisfy open-ended continuity.  *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 450 (9th Cir. 1991) (quoting *H.J. Inc.*, 492 U.S. at 243).  The Pemex Scheme had far more, regular illegal acts, creating a substantial threat of repetition.  (Compl. ¶ 139.)  To start, the Pemex Scheme involved at least eight illicit payments as part of the bribes to Pemex officials.  (Compl. ¶¶ 42-50.)  HP and HP Mexico also arranged for at least nine purported meetings in the United States between HP and Reynaud during the relevant period as part of and in furtherance of their illegal bribery and money laundering schemes.  (Compl. ¶¶ 24-27, 48, 54, 55.)  Further, HP maintained internal controls that were consistently and unlawfully deficient, and thus caused and enabled the payment of bribes to Pemex officials.  (Compl. ¶¶ 16, 18, 31, 59, 111-112.)  Defendants' internal controls deficiencies also repeatedly enabled the avoidance of channel partner controls, the approval and payment of over-large commissions without adequate due diligence, and the provision of extravagant travel and entertainment to public officials.  (*See* Compl. ¶¶ 37, 113, 137(b)(viii)-(ix), 178.)

Defendants say the Pemex Scheme stopped because Reynaud left Pemex for unrelated reasons.  (Mot. at 5.)  Such a fortuitous interruption does nothing to undermine open-ended continuity.  *See Allwaste, Inc.*, 65 F.3d at 1529 (finding pattern even though an entity had ceased to exist, because there was "no evidence that [d]efendants would have halted the [illegal] scheme had they not been terminated"); *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991) (fortuitous interruption does not preclude a finding of open-ended continuity).

Indeed, because federal prosecutors recognized a significant, ongoing threat of repetition, both HP and HP Mexico represent in the NPA that they "will *continue* to implement a

---

[8] Defendants misplace reliance on *Religious Technology Center v. Wollersheim*, 971 F.2d 364 (9th Cir. 1992), where the alleged pattern "continued for only six months at most."  *Id.* at 366-67.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT        CV14-05292 BLF (NC)

compliance and ethics program designed to *prevent and detect* violations of the FCPA and other applicable anti-corruption laws *throughout their operations*, including those of their affiliates, agents, and joint ventures . . . whose responsibilities include interacting with foreign officials or other activities *carrying a high risk of corruption*."  (Compl. Ex. 1 (NPA) at 3 (emphasis added).)  Likewise, the SEC Order requires HP to report other "questionable or corrupt payments or questionable or corrupt transfers of property" and "related false books and records."  (Compl. Ex. 2 (SEC Order) at 14.)  HP "shall submit to the Commission staff a written report within one (1) year of the entry of this Order setting forth a complete description of its Foreign Corrupt Practices Act ("FCPA") and anti-corruption related remediation efforts to date."  (*Id.*)  HP also "shall report to the Commission staff periodically, at no less than twelve-month intervals during a three-year term, the status of its remediation and implementation of compliance measures." (*Id.*)

The Global Scheme (Counts II and IV).  Defendants do not challenge the closed-ended continuity of the ten-year Global Scheme.  (Compl. ¶ 144.)  Instead, Defendants argue that the predicate acts in the Global Scheme were not "related."  (Mot. at 21.)  The DOJ and SEC plainly believed to the contrary as they announced their findings, and Defendants accepted their sanctions, regarding Defendants' bribes in Mexico, Poland, and Russia, in one package deal. (*See* Morton Decl. Ex. 1 (Apr. 9, 2014 DOJ Press Release).)

Related conduct includes "criminal acts that have the same or similar purposes, results, participants, victims, *or* methods of commission, *or* otherwise are interrelated by distinguishing characteristics."  *H.J. Inc.*, 492 U.S. at 240 (emphasis added).  Defendants ignore the striking similarities amongst the various schemes of the "global labyrinth of complex financial transactions used by HP to facilitate bribes to foreign officials."  (Compl. ¶ 19.)  The DOJ found that the enterprise members "set up an intricate web of shell companies and bank accounts to launder money."  (Morton Decl. Ex. 1 (Apr. 9, 2014 DOJ Press Release); *see also* Compl. ¶¶ 21, 23-28, 33, 37-38, 44-50, 65, 67, 72-76, 87, 90-96.)  As the Complaint alleges, "[i]n Mexico, Russia, and Poland the scheme was the same.  HP, through its wholly-owned subsidiaries . . . channeled bribes through intermediaries and agents to government officials that could influence

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT          CV14-05292 BLF (NC)

the awarding of government contracts." (Compl. ¶ 14.) In all three countries, the schemes also involved travel to the United States and the use of an HP subsidiary as a conduit. *See supra* at 5-6, 14. Because each part of the Global Scheme had similar participants, purposes, methods of commission, *and* results, the "relatedness" requirement is satisfied. *See United States v. Renzi*, No. CR 08-00212-TUC-DCB (BPV), 2009 WL 5872905, at *6 (D. Ariz. Sept. 21, 2009) (relatedness satisfied by similar purpose, results, and methods, and a common participant).

Defendants' only other argument is that both the Pemex Scheme and the Global Scheme fail to allege open-ended continuity because the Complaint writes "in the *past* tense" about past acts. (Mot. at 19.) This is sophistry. As Justice Scalia has noted, "[v]irtually all allegations of racketeering activity, in both civil and criminal suits, will relate to past periods." *H.J. Inc.*, 492 U.S. at 253 (Scalia, J., concurring). Moreover, the Complaint seeks injunctive relief against future violations. (Compl. Prayer for Relief ¶ (c).)

**C.    The Complaint Sufficiently Alleges Timely RICO Claims**

Plaintiffs filed the Complaint on December 2, 2014. Defendants contend that the RICO claims are time-barred. (Mot. at 21-24.) "[T]he [four-year] civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action." *Grimmett v. Brown,* 75 F.3d 506, 510 (9th Cir. 1996) (internal quotation marks omitted). The Complaint sufficiently alleges that Plaintiffs neither knew nor should have known of the wrongdoing before April 9, 2014, when the DOJ and SEC revealed Defendants' corrupt conduct. (*E.g.*, Compl. ¶ 190.) Defendants nonetheless raise two fact-intensive arguments, but neither remotely warrants dismissal at the pleading stage.

First, Defendants attempt to impute the COO's and Reynaud's knowledge in 2009 of their being bribed to Pemex because, Defendants assert, the COO and Reynaud were not acting adversely to Pemex. (Mot. at 22-23.) Defendants do not cite a single case granting dismissal by resolving an adverse interest issue, much less where defendants bribed a plaintiff's employee. That is because, as Defendants' own cases recognize, adverse interest issues pose "questions of fact" that "[t]he Court will not resolve . . . on a motion to dismiss." *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1145 (N.D. Cal.

2013) (cited by Defendants, Mot. at 23); *see also In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1463 (D. Ariz. 1992) (adverse interest doctrine raises "genuine questions which preclude summary judgment") (cited by Defendants, Mot. at 23).  To start, "California courts and the Ninth Circuit do not appear to require" "'total' or 'complete' adversity for [purposes of] the 'adverse interest' exception to apply" to plaintiffs suing based on the wrongdoing of their former agents.  *In re Cal. TD Invs. LLC*, 489 B.R. 124, 130-31 (Bankr. C.D. Cal. 2013).  Thus, "[e]ven if the [plaintiff] corporation were somehow to benefit from the wrongdoing of insiders, the insiders' conduct is still not attributable to the corporation if a recovery by the plaintiff would serve the objectives of tort liability by properly compensating the victims of the wrongdoing and deterring future wrongdoing." *FDIC v. O'Melveny & Myers*, 969 F.2d 744, 750 (9th Cir. 1992) (applying and citing California law).[9]

Moreover, the Complaint alleges ample facts demonstrating that both the COO and Reynaud were acting adversely to Plaintiffs and solely for their own benefit.  (Compl. ¶¶ 21-29, 48-55, 60, 190, 196-199.)  Simply put, the COO and Reynaud stole from Pemex.  The corrupt conduct of the COO, Reynaud, and Defendants caused Plaintiffs to pay grossly inflated prices. The $2.53 million of inflated prices paid by Pemex yielded a 42% profit margin to Defendants, thus effectively financing over $1.6 million in corrupt payments to the enterprise members— including the COO and Reynaud.  (Compl. ¶ 124.)  Defendants cannot escape these facts by baldly asserting that Pemex received products and services from HP, no matter how inflated the prices.  *See FDIC*, 969 F.2d at 750 (adverse interest exists "even if the corporation were somehow to benefit from the wrongdoing of insiders"); *People v. Park*, 87 Cal. App. 3d 550, 566 (1978) (denying imputation of knowledge to plaintiffs based on "double agent" who placed an investment for them in order to secure lucrative finder's fees from defendants).

Second, Defendants argue that Plaintiffs (a) should have investigated the bribery scheme earlier based on the COO's and Reynaud's relationships with Intellego and the lavishness of the

---

[9]   HP's cases are inapposite.  They address the standard for when a corporate *defendant* can avoid imputation of the scienter element of a federal securities fraud claim based on the alleged adversity of the *defendant's* employee. *See Cement & Concrete Workers*, 964 F. Supp. 2d at 1145; *In re Am. Cont'l Corp.*, 794 F. Supp. at 1463.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT                    CV14-05292 BLF (NC)

trips bestowed upon Reynaud and (b) by doing so, would have discovered their scheme by some unspecified time.  (Mot. at 23-24.)  Again, this is exactly the kind of factual issue that leads courts routinely to deny motions to dismiss on the basis of constructive notice.  *See Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988) ("Ordinarily, we leave the question of whether a plaintiff knew or should have become aware of a fraud to the jury"); *Low v. Altus Fin. S.A.*, 136 F. Supp. 2d 1113, 1118 (C.D. Cal. 2001) ("The issue of constructive notice is too fact-intensive to be decided against plaintiff at the pleading stage.")  As the DOJ and SEC found, Defendants specifically *hid* the connections and involvement of Intellego in the bribery scheme through the Pass-Through Partner, just as they concealed the bribes by using U.S. funding, false entries on HP's books and records, and purported business meetings to hide lavish travel.  (Compl. ¶¶ 33, 117-118.)  Defendants point to no fact in the Complaint whatsoever that suggests how Pemex would have, much less should have, discovered by December 1, 2010, bribes that Defendants painstakingly concealed.[10]

## II.   THE COMPLAINT SUFFICIENTLY ALLEGES CALIFORNIA LAW CLAIMS

The Complaint also states four causes of action under California law:  unfair competition under California Business & Professions Code § 17200 (the "UCL") (Count V); aiding and abetting unfair competition (Count VI); fraudulent concealment (Count VII); and tortious interference (Count VIII).

Defendants argue that *if* the Court dismisses the RICO claims, it should decline to exercise supplemental jurisdiction over the California law claims.  (Mot. at 24-25.)  But when a judge is "familiar with the facts and legal issues," even if no federal claim remains, the court's

---

[10] Defendants conflate tolling the statute of limitations under a "fraudulent concealment" theory with accrual under constructive notice in order to claim that the Complaint fails to allege any reasonable diligence to discover the RICO injury.  (Mot. at 24.)  However, even under a fraudulent concealment theory, Defendants' argument fails.  Investigation is required only when a plaintiff knows facts that would excite the inquiry of a reasonable person.  *See Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499 (9th Cir. 1988) (finding an issue of material fact as to whether the facts available were sufficient to excite inquiry).  Defendants note two facts:  the COO had worked for Intellego, and Reynaud received lavish trips, gifts, and entertainment.  (Mot. at 24.)  But nothing in the Complaint suggests that Pemex knew either fact.  Certainly the everyday occurrence that an employee had worked for another company would hardly lead a reasonable employer to investigate.

retention of similar state law claims serves the interests of "judicial economy and convenience." *See Milyakov v. JP Morgan Chase, N.A.*, No. C 11-2066 WHA, 2011 WL 6012928, at *2 (N.D. Cal. Dec. 1, 2011). Accordingly, the Court should retain Plaintiffs' state law claims.

Defendants' real argument—that this case belongs in Mexico—is wholly improper. (*See* Mot. at 2 ("it is a case that does not belong in any court of the United States"); 25 & n.25 ("[I]t is therefore highly likely that Mexican law would apply to the common law claims.")). As the U.S. Supreme Court held, "the appropriate way" to argue that a case should be adjudicated in a "foreign forum is through the doctrine of *forum non conveniens*." *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 134 S. Ct. 568, 580 (2013). But Defendants signed a Court-approved Stipulation stating: "Defendants confirm that they will *not* file a motion to dismiss based on . . . *forum non conveniens grounds*." (Morton Decl. Ex. 3 (Feb. 2, 2015 Stipulation and Order) (emphasis added).)[11]

In addition, Defendants cannot ask the Court to decline jurisdiction but nonetheless resolve choice-of-law or *forum non conveniens* issues under California law. *See Axess Int'l, Ltd. v. Intercargo Ins. Co.,* 183 F.3d 935, 943 (9th Cir. 1999) ("[O]nce the district court chose not to exercise supplemental jurisdiction over [plaintiff's] supplemental state law claims, it lacked the power to adjudicate the merits of these claims, including . . . the issue of choice of law.").

Rather, the Court should retain jurisdiction over the state law claims and at an appropriate subsequent stage rule that California law applies. To start, California courts apply the "governmental interest analysis" only if there is a "true conflict." *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 917 (Cal. 2006). "'[T]he foreign law proponent *must* identify the applicable rule of law in each potentially concerned [jurisdiction] and *must* show it materially differs from the law of California.'" *Estrella v. Freedom Fin. Network, LLC*, No. C 09-03156

---

[11] Even if the *forum non conveniens* argument had not been waived, it still would fail because Defendants' Motion did not meet their burden to demonstrate the adequacy of the alternative forum. Defendants did not, among other things, stipulate that HP is subject to jurisdiction in Mexico, explain how Mexico provides an adequate civil remedy, or show that most of the pertinent documents and witnesses reside in Mexico, especially when *HP* contends that *HP* was duped. *See Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224-25 (9th Cir. 2011).

---

23

1   SI, 2010 WL 2231790, at *6 (N.D. Cal. June 2, 2010) (citation omitted) (emphasis added).

2   Defendants' Motion did not even attempt to meet these burdens.

3       In addition, "[t]he choice of law analysis includes a presumption that California law

4   applies," and "the proponent of foreign law . . . bears the burden of showing that there is a

5   compelling reason to displace California law." *Bowoto v. Chevron Corp.*, No. C 99-02506 SI,

6   2006 WL 2455761, at *7 (N.D. Cal. Aug. 22, 2006).  California law applies here because of

7   California's overwhelming interest in "ensuring that its corporations behave in an appropriate

8   manner." *Id.* at *10.  Indeed, "'California has a . . . compelling interest in preserving a business

9   climate free of fraud and deceptive practices,'" and thus "'has a legitimate interest in extending

10  state-created remedies to out-of-state parties harmed by wrongful conduct occurring in

11  California.'" *Estrella*, 2010 WL 2231790, at *6 (citation omitted).

12      Finally, Defendants are wrong that the Complaint pleads an extraterritorial UCL claim.

13  (Mot. at 25.)  "California courts have concluded that 'state statutory remedies may be invoked by

14  out-of-state parties when they are harmed by wrongful conduct occurring in California.'"  *In re*

15  *iPhone 4S Consumer Litig.*, No. C 12-1127 CW, 2013 WL 3829653, at *7 (N.D. Cal. July 23,

16  2013) (quoting *Norwest Mortg., Inc. v. Superior Ct.*, 72 Cal. App. 4th 214, 224-25 (1999)).  That

17  is plainly satisfied where, as here, Defendants misconduct was "coordinated at, emanate[d] from

18  and . . . developed at [Defendants'] California headquarters."  *In re iPhone 4S Consumer Litig.*,

19  2013 WL 3829653, at *7.  "A rule permitting application of the UCL . . . where the alleged

20  fraudulent activity emanated from California is consistent with the California Supreme Court's

21  statement . . . that the UCL's focus is 'on the defendant's conduct, rather than the plaintiff's

22  damages, in service of the statute's larger purpose of protecting the general public against

23  unscrupulous business practices.'"  *Ehret v. Uber Techs., Inc.*, No. C-14-0113 EMC, 2014 WL

24  4640170, at *4 (N.D. Cal. Sept. 17, 2014) (citation omitted).

25      As a California Court of Appeals has held, a California corporation's violation of the

26  FCPA by itself states a UCL claim.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th

27  1134, 1143-44 & n.5 (2003) ("The Court of Appeal determined that a claim under the UCL may

28  be predicated on a violation of" the FCPA and "[t]he parties did not challenge this ruling").  The

1    SEC found that *HP* "violated" the FCPA by falsely recording the "corrupt payments" on *HP*'s

2    books and records and also by "failing to devise and maintain . . . internal . . . controls" to

3    "prevent the making of improper payments."   (Compl. Ex. 2 (SEC Order) at 12.)   As the

4    Complaint alleges, those false entries and failures occurred in California.  (Compl. ¶¶ 5, 15, 31,

5    34, 57-58, 109-110, 137, 180.)   And there is much more California conduct alleged here:   a

6    scheme *directed from California*, in which *bribes* in U.S. dollars emanated from, and *money* was

7    *laundered* from, *California*, by a *California* company and its co-conspirator and agent (or alter

8    ego).  (Compl. ¶¶ 5, 31-37, 42-50, 134-135, 138.)

9                                                      **CONCLUSION**

10          The Court should deny Defendants' Motion to Dismiss.  If the Court grants Defendants'

11   Motion, in whole or in part, it should give Plaintiffs leave to amend the Complaint.  *See, e.g.*,

12   *Mohebbi v. Khazen*, Case No. 13-cv-03044-BLF, 2014 WL 2861146, at *21-22 (N.D. Cal. June

13   23, 2014) (granting leave to file second amended complaint for RICO and UCL claims).

14

      DATED:  March 26, 2015

15

16                                                    /s/ *Melinda M. Morton*
                                                     Melinda M. Morton, SBN 209373
17                                                   PROCOPIO, CORY, HARGREAVES AND
                                                     SAVITCH LLP
18
                                                     Richard D. Bernstein, appearance *pro hac vice*
19                                                   Frank M. Scaduto, SBN 271451
                                                     WILLKIE FARR & GALLAGHER LLP
20                                                   1875 K Street, NW
                                                     Washington, DC  20006
21                                                   Telephone:  202.303.1000
                                                     Facsimile:   202.303.2000
22
                                                     *Attorneys for Plaintiffs*
23                                                   PETRÓLEOS MEXICANOS, and
                                                     PEMEX EXPLORACIÓN Y PRODUCCIÓN
24

25

26

27

28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT               CV14-05292 BLF (NC)