# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| PETROLEOS MEXICANOS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>HEWLETT-PACKARD COMPANY, et al.,<br><br>Defendants. | Case No.  14-cv-05292-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>[Re: ECF 31] |

Plaintiffs (collectively "Pemex") bring this action alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), California's Unfair Competition Law ("UCL"), and claims of common law fraudulent concealment and tortious interference with contract, against Defendants Hewlett-Packard Co. ("HP") and Hewlett-Packard Mexico ("HP Mexico"). Defendants move to dismiss the RICO and UCL claims under Federal Rule of Civil Procedure 12(b)(6), and further move the Court to decline to exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(c).

Having considered the briefing and oral argument of the parties, the Court GRANTS IN PART AND DENIES IN PART the motion to dismiss, but gives Plaintiffs leave to amend to cure the deficiencies discussed herein.

## I.    BACKGROUND

Pemex alleges that Defendants have engaged in a "pattern of bribery and other unlawful acts" arising from a scheme in 2008 and 2009 to secure contracts "to sell Plaintiffs business technology optimization ("BTO") products and services by causing the corruption of officials who worked for Pemex through payments of an 'influencer fee' to entities with ties to these officials," which resulted in over $2.5 million in net benefit to Defendants. *See* Compl. ¶¶ 1, 2.

A.     **General Factual Allegations**

1.     **Defendants' Alleged Conduct with Pemex Officials**

Pemex alleges that "beginning in 2003" HP engaged in bribery and corruption in various countries, including Mexico, Poland, and Russia, to obtain supply and services contracts, *see* Compl. ¶¶ 13, 14, and falsely recorded these bribes on its books as legitimate consulting contracts, commissions, or travel expenses. *See* Compl. ¶ 15.

With regard to the Mexico-related bribery allegations, Pemex claims that Defendants corrupted two Pemex officials in a number of ways. Beginning in 2008, HP, HP Mexico, and other enterprise members began discussions to secure contracts to sell BTO software, hardware, and licenses to Pemex, targeting Manuel Reynaud Aveleyra ("Reynaud") Pemex's Chief Information Officer, as well as Pemex's Chief Operating Officer ("COO"),[1] Reynaud's supervisor. Compl. ¶¶ 21-22, 29.

On April 21, 2008, HP Mexico invited Reynaud to conferences in Orlando, Florida and Monaco. Compl. ¶ 23. A number of additional travel invitations followed, including to meetings in Las Vegas, Nevada (invited June 6, 2008 and again on June 15, 2009), Miami, Florida (invited October 13, 2008 for a November 4, 2008 meeting), San Francisco, California (invited February 26, 2009), Cupertino, California (invited March 3, 2009), and Chicago, Illinois (invited June 3, 2009). *See* Compl. ¶¶ 24, 27-28, 48, 54, 55.[2]

Pemex alleges that Defendants made payments to an information technology consulting company called Intellego, S.C., a Mexican company with offices in Mexico as well as in the United States, to obtain the BTO business from Pemex. Compl. ¶ 28. HP Mexico knew that Pemex's COO was a former principal of Intellego. Compl. ¶ 29. Defendants are alleged to have worked closely with Intellego to insure that payments made by HP Mexico to Intellego, an "influencer fee," would be used to bribe Reynaud and the COO. *See* Compl. ¶¶ 30-32. Because

---

[1] The Complaint does not identify the COO by name.

[2] Plaintiff's Complaint often alleges only when these invitations were made, and not when the trips themselves were actually taken by Reynaud. *See, e.g.*, Compl. ¶ 137b(iii) ("HP Mexico also conferred a number of benefits to Reynaud[,] . . . including invitations to lavish trips in San Francisco, California, Orlando, Florida, Las Vegas, Nevada, and Miami, Florida.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Intellego was "not a pre-approved channel partner for HP Mexico," HP Mexico arranged for a

2  different entity, a "Pass-Through Partner," to join the enterprise. Compl. ¶ 33. This Pass-Through

3  Partner would receive funds from HP Mexico and "channel those funds to Intellego." *Id.* Pemex

4  alleges that this enterprise was "run from [HP's] headquarters in California." Compl. ¶ 31. On

5  Decmeber 21, 2008, HP approved an increase in the value of the influencer fee, from 25 percent to

6  26.5 percent of the licensing and support components of the BTO contracts, in order to provide the

7  Pass-Through Partner with a share of the scheme's proceeds. *See* Compl. ¶¶ 35-37. "On or about

8  December 22 and December 23, 2008," HP Mexico signed contracts with Pemex for the BTO

9  deal. Reynaud signed the agreements on behalf of Pemex. Compl. ¶ 38.

10      In January 2009, HP Mexico received a payment request from the Pass-Through Partner,

11  which HP Mexico approved. Compl. ¶¶ 39, 41. HP Mexico made this first influencer fee payment

12  through wire transfer on February 10, 2009. Compl. ¶ 42. A second payment was made on

13  February 12, 2009. These payments were made in U.S. dollars from a correspondent bank account

14  located in the United States, and totaled over $1.6 million. Compl. ¶¶ 42-45.  The Pass-Through

15  Partner then transferred approximately $1.4 million in these funds to Intellego, and kept $250,000

16  for itself as compensation for its participation in the scheme. Compl. ¶¶ 46-47. Around March 2,

17  2009, Intellego made a $30,000 payment to an entity controlled by Reynaud, and on March 30,

18  2009 made three additional payments to this entity totaling $95,000. *See* Compl. ¶¶ 49, 50.

19      During the time these payments were being made, Reynaud held several meetings with HP

20  Mexico officials. Compl. ¶¶ 49, 52. Pemex alleges that during "the entire time the BTO contracts

21  were being negotiated, the Chief Operating Officer and Reynaud [] had abandoned their

22  relationship with Pemex and were acting solely for their own personal benefit and the benefit of

23  the criminal enterprise . . . [and] were acting directly adverse to Pemex's interests." Compl. ¶ 60.

24      Pemex alleges that despite HP's internal accounting controls, HP and HP Mexico failed to

25  properly record these payments in their books and records. *See* Compl. ¶ 57-59. Pemex further

26  alleges that HP Mexico was HP's agent and/or alter ego, *see* Compl. ¶¶ 62, 63, and that all actors

27  within the enterprise, including HP, HP Mexico, Intellego, and the Pass-Through Partners, were

28  co-conspirators. *See* Compl. ¶ 64.

1      After federal prosecutors began an investigation of these practices, HP Mexico entered into

2   a Non-Prosecution Agreement ("NPA") with the United States Department of Justice in which it

3   admitted to making bribes. *See* Compl. ¶ 17; *see also id.* Exh. 1. Around that same time, the SEC

4   issued an Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the

5   Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order

6   ("SEC Order"), which stated, among other things, that HP had violated the Securities Exchange

7   Act through falsely recording bribes on its books and records, and that HP Mexico had made

8   illegal payments to obtain business from Pemex. *See* Compl. ¶ 18; *see also id.* Exh. 2. Defendants

9   agreed, under the NPA and SEC Order, to pay the United States $34 million to settle the

10  proceedings, and HP agreed to guarantee over $73 million in payments related to bribery

11  investigations of its subsidiary companies in Poland and Russia. *See* Compl. ¶ 20.

               **2.      Defendants' Alleged Conduct in Russia**

13     Pemex alleges the existence of a second HP government bribery enterprise where HP,

14  through its subsidiary HP Russia, "paid bribes to government officials in Russia" to secure a

15  contract from the Office of the Prosecutor General of Russia ("GPO") worth over €35 million.

16  Compl. ¶ 65. To this end, HP Russia partnered with intermediaries "having close ties to the

17  Russian government," which included making a payment of $1.2 million to the principal of a

18  "small U.S. company" that would be used as a subcontractor on the project. *See* Compl. ¶¶ 65, 67-

19  68. In 2001, an HP Russia director signed the GPO contract, and in 2003, "to avoid losing" the

20  GPO deal, HP Russia promised to make €2.8 million in bribe payments to a Russian government

21  official through a United Kingdom-based intermediary called Burwell Consulting. Compl. ¶¶ 71-

22  75. HP Russia then also set up a "slush fund . . . to make these illicit payments," and made over €8

23  million in bribe payments to shell companies through a German corporation which was also a

24  member of the enterprise. Compl. ¶ 78. HP received over $10.4 million in profits from the GPO

25  contract, which it failed to properly record in its books. Compl. ¶¶ 79-82. In 2014, HP Russia pled

26  guilty to felony violations of the Foreign Corrupt Practices Act for its role in this scheme. *See*

27  Compl. ¶ 84. Pemex alleges that HP Russia was the agent and/or alter ago of HP during this

28  scheme. Compl. ¶¶ 85, 86.

United States District Court
Northern District of California

### 3.    Defendants' Alleged Conduct in Poland

From 2006 to 2010, Plaintiffs allege the existence of a third HP bribery scheme, in which HP Poland made unlawful payments to a Polish government official to secure and maintain contracts with the Polish national police agency, the KGP. *See* Compl. ¶ 87. HP and HP Poland sponsored this official to attend a conference in San Francisco, California, and conferred on this official impermissible benefits "with the intent to induce him to award government contracts to HP." Compl. ¶ 89. These benefits included a trip to Las Vegas, Nevada, cash payments, and computers; later the official also received televisions, iPods, a home theater system, and other HP devices. Compl. ¶¶ 90-91. In early 2007, the Polish government official signed two contracts with HP Poland, valued at $10.1 million, and HP Poland made bribery payments to the official in the amount of 1.2 percent of HP Poland's net revenue on "any contract awarded by the KGP." Compl. ¶ 92. These payments including giving $100,000 in cash to the Polish government official in a Warsaw parking lot. Compl. ¶ 93. In March 2007, the official signed a second contract with HP Poland worth $15.8 million; in 2008, three more contracts were signed valued at approximately $32 million.  Compl. ¶¶ 93-94. As a result of the bribery, HP Poland was awarded over $60 million in contracts with the KGP from 2006 until 2010, which resulted in $16.1 million in profits that were not properly recorded in HP or HP Poland's books and records. Compl. ¶¶ 96-98.

In April 2014, HP Poland entered into a Deferred Prosecution Agreement ("DPA") with the Department of Justice, to avoid prosecution for FCPA violations in connection with its role in this scheme. It paid a penalty of over $15 million in connection with this settlement. Compl. ¶ 100. Pemex alleges that HP Poland was the agent and/or alter ego of HP during this scheme. Compl. ¶¶ 101-102. Pemex also alleges that "HP, HP Mexico, HP Poland, HP Russia, and the various partners . . . conspired together and agreed to conduct and participate in the affairs of a global criminal enterprise." Compl. ¶ 103.

Pemex alleges that HP's internal controls and anti-corruption policies – and by extension, the internal controls and policies at HP Mexico, HP Russia, and HP Poland – were inadequate, and enabled the payment of the bribes herein described. Compl. ¶¶ 106-116.

1

2          **4.      Pemex's Discovery of the Conduct and Injuries**

3          Pemex alleges that Defendants concealed their conduct, which could not have been

4    discovered in the exercise of due diligence, until Pemex discovered the illegal scheme "around

5    April 9, 2014," when the Department of Justice announced the NPA with HP Mexico and the SEC

6    issued its Order regarding HP. *See* Compl. ¶¶ 117-120.

7          As a result of Defendants' actions, Plaintiffs contend that Pemex entered into the BTO

8    contracts, paying HP Mexico approximately $6 million – of this, around $2.5 million was profit to

9    HP and HP Mexico. Compl. ¶¶ 122-124. Plaintiffs state that there is "no adequate recourse under

10   Mexican law to recover an adequate remedy for Defendants' bribery and other unlawful acts."

11   Compl. ¶ 125.

12       **B.      RICO Allegations**

13          **1.      HP and HP Mexico (the "Mexican Enterprise")**

14         Pemex alleges that the RICO enterprise of HP, HP Mexico, Intellego, and the Pass-

15   Through Partner, functioned together from January 2008 – when Reynaud was contacted

16   regarding the BTO contract – until mid-2009. *See* Compl. ¶130. While conducting the enterprise,

17   HP Mexico committed a number of acts of money laundering, including arranging to transfer $1.6

18   million from a United States bank account to the Pass-Through Partner on two separate occasions

19   around February 2009 with the intent that these funds would be transferred to Intellego and

20   Reynaud. These payments were a "*quid pro quo* for awarding HP Mexico the BTO contracts."

21   Compl. ¶ 134. HP committed money laundering by approving these payments knowing that the

22   Pass-Through Partner would transfer funds to Intellego for the purpose of paying Reynaud, "a

23   public official, for his use and benefit in Mexico." Compl. ¶ 135. Pemex alleges that HP is liable

24   for HP Mexico's money laundering because HP Mexico was its agent and/or alter ego. *See* Compl.

25   ¶¶ 135a—b.

26         Pemex further alleges that HP Mexico violated the Travel Act, 18 U.S.C. § 1952, through

27   wiring the $1.6 million from a United States bank account to Mexico, and by coordinating

28   Reynaud's travel to multiple United States destinations. Compl. ¶ 136. Pemex contends that HP

United States District Court
Northern District of California

also violated the Travel Act by "sen[ding] an e-mail approving wire transfers to be paid from a bank account under HP's control in the United States to the Pass-Through Partner on at least two separate occasions in 2009," Compl. ¶ 137a, and by coordinating Reynaud's travel "as a *quid pro quo* for awarding HP Mexico the BTO contracts." *Id.* Pemex also alleges that HP and HP Mexico independently violated the Travel Act by violating the FCPA's anti-bribery provisions and by falsely recording payments to Intellego and bribes to Pemex officials. *See* Compl. ¶¶ 137b(i)—(xii).

Pemex contends that the Defendants engaged in several acts of wire fraud in violation of 18 U.S.C. § 1343, while participating in a "scheme to defraud Plaintiffs" by making "statements [] regarding the BTO contracts [that] contained material omissions," including Defendants' relationship with Reynaud and Pemex's COO. Compl. ¶ 138. These acts included HP approving by email HP Mexico's request to increase the influencer fee from 25 to 26.5 percent, and wiring money through a correspondent bank account in the United States to the Pass-Through Partner. Compl. ¶¶ 138(a)—(f). Pemex contends that this behavior "has persisted or could continue into the future," Compl. ¶ 139, and that HP served as "the epicenter of the enterprise and conspiracy, direct[ing] this scheme from the United States." Compl. ¶ 156.

### 2. HP, HP Mexico, HP Poland, and HP Russia (the "Global Enterprise")

Pemex also alleges that an enterprise existed between HP and its subsidiaries in Mexico, Russia, and Poland (the "global enterprise" allegation), which began in 2000 when HP, HP Russia, and their agents began to make bribery payments to the Russian government official, and lasting until 2010 when HP, HP Poland, and their agents ceased making bribery payments to a Polish government official. *See* Compl. ¶ 144. HP allegedly directed this enterprise from the United States. *See* Compl. ¶ 146. Pemex alleges that HP and HP Russia violated the Travel Act by "engaging in foreign and domestic travel to attend a meeting in Maryland to discuss the [Russian] GPO deal," Compl. ¶ 149a, and that HP and HP Poland violated the Travel Act by "bringing a Polish IT Official to San Francisco and Nevada," *id.* Pemex further alleges that all four parties were co-conspirators of one another. *See* Compl. ¶¶ 149e, 160-164.

### C. State Law Allegations

United States District Court
Northern District of California

Pemex contends that Defendants' conduct violates the unlawful prong of California's UCL because "it violated the anti-bribery provisions of the FCPA," and because the Defendants "failed to devise and maintain a system of internal accounting controls . . . in violation of the accounting provisions of the FCPA." *See* Compl. ¶¶ 167, 168. Pemex also contends that HP Mexico, knowing "that the internal controls promulgated by HP were unlawfully deficient under the FCPA, . . . substantially assisted or encouraged HP in failing to devise or maintain a sufficient system of internal accounting controls." Compl. ¶¶ 178-179. HP Mexico further "substantially assisted or encouraged HP to create a false entry, or false entries, in its books and records." Compl. ¶ 181.

Pemex contends that Defendants "actively concealed from Plaintiffs that they had corrupted Reynaud [] and the Chief Operating Officer in order to secure the BTO contracts," which was a material fact "which Defendants were obligated to, and could have, disclosed to Plaintiffs throughout the negotiation and implementation of the BTO contracts." Compl. ¶¶ 187, 189. Pemex "reasonably relied upon Defendants' deception in the good faith belief that the BTO contracts had been properly negotiated." Compl. ¶ 193. Finally, Pemex alleges that Defendants induced the breach of Petroleos Mexicanos's contractual relationship"[3] with Reynaud and the COO through "corruption efforts." Compl. ¶ 198.

Consistent with these allegations, Plaintiffs seek restitution, damages (including treble damages under RICO), and injunctive relief.

## II.   LEGAL STANDARD

### A.   Rule 12(b)(6)

Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Any complaint that does not meet this requirement can be dismissed pursuant to Rule 12(b)(6). In interpreting Rule 8(a)'s "short and plain statement" requirement, the Supreme Court has held that a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), which

---

[3] This eighth cause of action is brought by Petroleos Mexicanos only, and not Pemex Exploracion Y Produccion. *See* Compl. at p. 48.

United States District Court
Northern District of California

1   requires that "the plaintiff plead factual content that allows the court to draw the reasonable

2   inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,

3   678 (2009).

4       This standard does not ask a plaintiff to plead facts that suggest it will probably prevail, but

5   rather "it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal

6   quotation marks omitted). The Court must "accept factual allegations in the complaint as true and

7   construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul*

8   *Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court is not, however, forced to

9   "assume the truth of legal conclusions merely because they are cast in the form of factual

10  allegations." *Kane v. Chobani, Inc.*, 973 F. Supp. 2d 1120, 1127 (N.D. Cal. 2014).

11      **B.      Rule 9(b)**

12      When a party pleads a cause of action for fraud or mistake, such claims are subject to the

13  heightened pleading requirements of Rule 9(b). "In alleging fraud or mistake, a party must state

14  with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) ("Malice,

15  intent, knowledge, and other conditions of a person's mind may be alleged generally."). Rule 9(b)

16  demands that the circumstances constituting any alleged fraud be plead "specific[ally] enough to

17  give defendants notice of the particular misconduct ... so that they can defend against the charge

18  and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120

19  (9th Cir. 2009) (citing *Bly–Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)) (emphasis

20  added). Claims of fraud must be "accompanied by the who, what, when, where, and how of the

21  misconduct alleged." *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir.1997).

22      Plaintiffs' mail fraud and wire fraud allegations, and their claim for fraudulent

23  concealment, are subject to the heightened pleading requirements of Rule 9(b). *See In re Charles*

24  *Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 545 (N.D. Cal. 2009). Further, "a plaintiff seeking to

25  plead a RICO claim based on a predicate act of fraud must comply with the pleading requirements

26  for fraud under Rule 9(b)." *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1253 (N.D. Cal. 2014)

27  (citing *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991)).

28  This rule notwithstanding, "[t]he pleading of bribery [under RICO] is governed by the more

United States District Court
Northern District of California

9

1    lenient pleading standard of Rule 8(a)." *Fuji Photo Film U.S.A. Inc. v. McNulty*, 640 F. Supp. 2d

2    300, 311 (S.D.N.Y. 2009).

3         **C.     Leave to Amend**

4         Under Rule 15(a), a court should grant leave to amend a complaint "when justice so

5    requires," because "the purpose of Rule 15 ... [is] to facilitate *decision on the merits*, rather than on

6    the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc)

7    (emphasis in original). The Court may deny leave to amend, however, for a number of reasons,

8    including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to

9    cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by

10   virtue of allowance of the amendment, [and] futility of amendment." *Eminence Capital, LLC v.*

11   *Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

12   **III.   DISCUSSION**

13        Defendants move to dismiss on six grounds: (1) that Counts I and III, Pemex's claims

14   against HP and HP Mexico's Mexican enterprise, and Counts II and IV, Pemex's claims regarding

15   the "global enterprise" of activity between HP, HP Mexico, HP Poland and HP Russia, are

16   impermissibly extraterritorial because they fail to allege a domestic pattern of racketeering

17   activity; (2) that the RICO claims fail to allege a continuous pattern of racketeering activity; (3)

18   that the RICO claims fail because Pemex has not alleged a domestic injury; (4) that the RICO

19   claims are time-barred by the four-year statute of limitations; (5) that the UCL claim (Count V)

20   should be dismissed because the UCL does not apply extraterritorially; and (6) that the Court

21   should decline to exercise supplemental jurisdiction over all of the pendant state law claims

22   (Counts V through VIII) under 28 U.S.C. § 1367(c).

23        The Court addresses each of these arguments in turn.

24        **A.     Domestic Pattern**

25        To state a claim under RICO, a plaintiff must plead five elements: "(1) conduct (2) of an

26   enterprise (3) through a pattern (4) of racketeering activity that [(5) causes] injury to the plaintiff's

27   business or property." *Chaset v. Fleer/Skybox Int'l LP*, 300 F.3d 1083, 1086 (citing 18 U.S.C. §§

28   1962(c), 1964(c)). Defendants' first challenge is to the third element, a "pattern" of activity. A

_United States District Court_
_Northern District of California_

10

pattern of activity under RICO "requires at least two acts of racketeering activity, . . . the last of which occurred within ten years [] after the commission of a prior act of racketeering activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237 (1989) ("Section 1961(5) concerns only the minimum number of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern beyond simply the number of acts involved.").

Defendants argue that RICO has no extraterritorial application and that the Ninth Circuit's recent ruling in *United States v. Chao Fan Xu (Chao Fan)*, 706 F.3d 965 (9th Cir. 2013), compels the Court to determine whether Defendants' alleged pattern of racketeering activity "as a whole" took place in the United States. *See* Mot. at 8-11. Defendants argue that Plaintiffs' allegations involve a pattern of *foreign* conduct – of "Mexican employees of a Mexican company . . . brib[ing] Mexican officials . . . to win Mexican contracts to deliver products and perform services in Mexico" – and cannot be rendered domestic just because it is linked to domestic financial transactions. *See* Mot. at 1, 11. Thus, Defendants ask the Court to dismiss the RICO claims because the pattern of Defendants' conduct, taken as a whole, was conducted predominantly outside the United States and its connection to the United States is "too isolated" to fall within RICO's ambit. Mot. at 15.

Plaintiffs respond by arguing that they need only plead that *a* pattern of racketeering activities was conducted by the Defendants in the United States. *See* Opp. at 14. Plaintiffs contend that they have pled eighteen independent domestic predicate acts which, taken together, are more than sufficient to plead a pattern of domestic racketeering activity. *See* Opp. at 15-16.

In order to determine the sufficiency of the pleading, the Court must apply the Supreme Court's articulation of the presumption against extraterritorial application of federal laws, and the Ninth Circuit's analysis of those decisions in the RICO context.

In *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), the Supreme Court considered whether Section 10(b) of the Securities and Exchange Act applied extraterritorially. There, Australian nationals had purchased stock in an Australian company that was listed on an Australian stock exchange, but alleged that officers of the bank's American subsidiary had, in the United States, made fraudulent statements that caused their purchases to lose value. *Id.* at 255. The

Court, in answering whether the Australian plaintiffs could state a cause of action, made clear that there is a presumption against extraterritoriality which is applicable to any statute and "reflects the presumption that United States law governs domestically but does not rule the world." *Id.* The Court in *Morrison* framed the extraterritoriality inquiry in terms of "the focus of congressional concern" in enacting the statute at issue. *See Morrison* at 266. The Court held that because Section 10(b) contained no "affirmative indication" of extraterritorial effect, it could not be applied extraterritorially. *See id.* at 265. The Supreme Court reaffirmed this decision several years later in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), stating that "when a statute gives no clear indication of an extraterritorial application, it has none." *Id.* at 1664 (citing *Morrison* at 254-55).

The Ninth Circuit applied *Morrison's* extraterritoriality presumption in *Chao Fan*, a criminal action in which four Chinese nationals were convicted under RICO for crimes committed as "part of a scheme to steal funds from the Bank of China, . . . and to escape prosecution and retain the proceeds by illegal transfers of funds and by immigration fraud." 706 F.3d at 972. The facts of *Chao Fan* are illustrative. Two of the Chinese nationals (who were each married to one of the other two nationals convicted), alongside a fifth, unindicted co-conspirator, were managers at a sub-branch of the Bank of China. There, the three managers engaged in foreign exchange speculation, made out-of-book loans, and falsified loans, resulting in losses to the Bank of China of over $400 million. *See id.* During a 1995 audit of the bank, the managers, in order to cover their tracks, instructed employees to falsify bank records. The four indicted Chinese nationals then entered into false marriages with spouses who held valid United States immigration status in order to gain residency in the United States and avoid Chinese law enforcement. The four nationals made gambling trips to various countries, funded with proceeds from the bank fraud, including trips to Las Vegas, Nevada using counterfeit visas and passports. In 2001, the Bank of China discovered the discrepancy in funds caused by the fraud, and the four nationals fled to the United States, where they were arrested and charged with RICO conspiracy and other crimes. *Id.* at 973. After a trial, the jury convicted the defendants, who appealed their RICO convictions on the ground that the charged conspiracy was extra-territorial and therefore outside RICO's reach.

United States District Court
Northern District of California

1    The Ninth Circuit, defining defendants' conduct as a "unified scheme" to seal money from

2    the Bank of China, transfer the funds out of China, escape to the United States by means of

3    immigration fraud, and then spend the money in American casinos, upheld the convictions. *Id.* at

4    974-75. Noting that "[i]n the wake of *Morrison*, this circuit has not considered whether RICO

5    applies extraterritorially," *id.* at 974, the court discussed the two prevailing schools of thought as

6    to "determine RICO's focus": "One camp asserts that RICO's focus is on the enterprise. . . . The

7    other camp asserts that RICO's focus is on the pattern of racketeering activity." *Id.* at 975.

8    Consistent with the Supreme Court's position in *Morrison*, the Ninth Circuit looked to Congress'

9    purpose in passing RICO, and concluded that:

10        Given th[e] express legislative intent to punish patterns of organized
          criminal activity in the United States, it is highly unlikely that
11        Congress was unconcerned with the actions of foreign enterprises
          where those actions violated the laws of this country while the
12        defendants were in this country. Thus, to determine whether
          Defendants' count one convictions [for fraud and money laundering
13        activities conducted primarily in China] are within RICO's ambit,
          *we look to the pattern of Defendants' racketeering activity taken as*
14        *a whole.*

15    *Id.* at 978 (emphasis added).

16        The court determined that, to the extent the Bank of China fraud "was predicated on

17    extraterritorial activity, it is beyond the reach of RICO even if the bank fraud resulted in some of

18    the money reaching the United States." *Id.* It found, however, that the second "part" of the

19    enterprise, "[e]nabling the members and associates through marriage, passport, and visa fraud, to

20    travel, among other countries, including the United States . . . in the event that the criminal activity

21    of the Enterprise was discovered," "bound the Defendants' enterprise to the territorial United

22    States." *Id.* The court decided that the defendants' violation of United States immigration laws

23    "fall[s] squarely within RICO's definition of racketeering activity," and though the "pattern of

24    racketeering activity may have been conceived and planned overseas, [] it was executed and

25    perpetuated in the United States," which fell "within the ambit of the statute." *Id.* at 979. In

26    summing up its decision, the court stated that:

27        Defendants' pattern of racketeering activity may have been
          conceived and planned overseas, but it was executed and
28        perpetuated in the United States. Under Morrison, we look 'not upon

13

the place where the deception originated,' but instead upon the connection of the challenged conduct to the proscription of the statute.

*See id.*

The Court then upheld the convictions because they were based on a "pattern of racketeering activities that were conducted by the Defendants in the territorial United States." *Id.*

Unlike in *Chao Fan*, where Ninth Circuit engaged in its analysis following a jury verdict in a criminal trial, the Court here is faced instead with determining whether the factual pleadings contained in Pemex's Complaint are sufficient to allege a domestic pattern of racketeering activity. Plaintiffs must only plead – not prove – that a pattern of Defendants' racketeering activity was domestic. *See Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32 (2d Cir. 2010) (dismissing a RICO claim that alleged only "slim contacts" with the United States); *cf. Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933, 943 (N.D. Cal. 2012). Plaintiffs must therefore allege a cohesive set of predicate acts, taking place in the United States, which show plausibly that the focus of their racketeering activity was domestic.

The Court looks first to Plaintiffs' Complaint to identify the racketeering activities alleged. Plaintiffs allege that Reynaud made four trips to the United States before the contract between HP Mexico and Pemex was signed, and had a dinner meeting in the United States with HP's Vice President and Managing Director, all alleged violations of the Travel Act. *See* Compl. ¶¶ 23-27. They allege wire fraud through two emails sent by HP regarding the fee increase paid to the Pass-Through Partner. *See* Compl. ¶¶ 138a-b.  They allege money laundering and wire fraud through two bribe payments made to the Pass-Through Partner from a United States bank account, and violations of the Travel Act through the false recording of these payments on HP's books due to HP's deficient internal controls. *See* Compl. ¶¶42-43, 58. They further allege four trips by Reynaud to the United States following the signing of the contract, and a meeting during one of those trips in the United States with an HP Vice President. *See* Compl. ¶¶ 48, 54-55. Plaintiffs contend that, taken together, "the multiple acts in the United States were far from isolated and more than sufficient to plead a domestic RICO claim." Opp. at 13.

Courts across the country have grappled with the question of *just how much* conduct is

necessary to show a domestic pattern under RICO. Four such cases are instructive here. In *Norex Petroleum Ltd. v. Access Industries*, the Second Circuit upheld a dismissal of a RICO action because it found the defendants' contacts with the United States to be "slim." 631 F.3d 29, 33 (2d Cir. 2010). In *Norex*, the defendants were alleged to have engaged in a "widespread racketeering and money laundering scheme" with the goal of seizing control over most of the Russian oil industry. *Id.* at 32. The Second Circuit described the conduct alleged as "numerous acts in the United States in furtherance of its scheme[,] . . . including mail and wire fraud, money laundering, Hobbs Act violations, Travel Act violations and bribery." 631 F.3d 29, 31 (2d Cir. 2010); *see also* 540 F. Supp. 2d 438, 443 (S.D.N.Y. 2007) (the district court's dismissal order in *Norex*, describing the acts as (1) money transfers through United States wires used to bribe Russian officials, (2) travel between the United States and Russia for purpose of effectuating the scheme, and (3) an extortion attempt made by a defendant while in San Francisco, California). Similarly, in *Hourani v. Mirtchev*, the District of the District of Columbia dismissed a RICO claim because "[t]he facts pled in the instant case do not establish a connection between the United States and the alleged racketeering activity that is sufficient." 943 F. Supp. 2d 159, 167 (D.D.C. 2013). There, the allegations included contentions that a defendant "approved [an] extortion scheme from Washington, D.C." and received money from United States bank accounts as compensation – the court found that "U.S. citizenship [on the part of the defendant,] the location of the enterprise, and laundering money through accounts in the United States cannot change the 'essentially foreign' nature of the racketeering activity" – a scheme to harass and extort money from plaintiffs' businesses in Kazakhstan and to launder that money through "various bank accounts." *Id.* at 164, 167-68. Additionally, in *United States v. Philip Morris USA, Inc.*, the District of the District of Columbia found that communications between American and foreign individuals, trips to the United States by actors in a scheme, and the use of a farm in North Carolina to further the scheme were "isolated domestic conduct" and did "not permit RICO to apply to what [was] essentially foreign activity." 783 F. Supp. 2d 23, 29 (D.D.C. 2011).

In contrast to those three cases, *Reich v. Lopez*, a case from the Southern District of New York, found RICO sufficiently pled where plaintiffs alleged that defendants: (1) bribed

1   Venezuelan officials through wire fraud originating in the United States, including using wire

2   communications to relay false information to an official and a Venezuelan bank, Banco

3   Venezolano; (2) traveled to and from the United States for the purpose of participating in the

4   scheme; (3) "accepted and transmitted their ill-gotten gains to and from bank accounts in the

5   United States;" and (4) "directed the day-to-day activities" of the scheme from the United States.

6   *See* 38 F. Supp. 3d 436, 448 (S.D.N.Y. 2014). The court stated that plaintiffs' allegations were

7   sufficient to show a domestic pattern of activity despite the fact some conduct took place abroad,

8   and noted that "[s]hould the pattern of conduct of certain Defendants or certain schemes prove to

9   be extraterritorial following discovery, the court may narrow the case accordingly, through either

10  motions for (partial) summary judgment or through carefully tailored jury instructions." *Id.* at 449.

11          Though Plaintiffs contend that "the facts of this case are indistinguishable from *Reich*,"

12  Opp. at 13, the Court determines that Plaintiffs have failed to sufficiently plead a cohesive series

13  of domestic acts that plausibly shows that the pattern of racketeering activity was domestic. The

14  Court recognizes that the facts of the Complaint, as pled, falls in between what was pled in *Norex*,

15  *Hourani*, and *Philip Morris*, which courts found insufficient, and the more substantial factual

16  pleadings in *Reich*, which survived a motion to dismiss. The Complaint pleads multiple acts of

17  travel to the United States by a member of the scheme,[4] money laundering, and two acts of wire

18  fraud. But unlike in *Reich*, the Complaint only cursorily alleges that HP "directed the scheme"

19  from the United States, and lacks the same widespread allegations of wrongdoing based in the

20  United States as the court found in *Reich*. *See, e.g.*, Compl. ¶ 132; *see also Reich* at 448-49.

21

22  _____

[4] The Court notes, in addition, that Plaintiffs have failed to plead sufficient facts to show that

23  several of Reynaud's trips suffice as predicate acts. For example, Plaintiffs plead that Reynaud
    was invited on a trip to Orlando on April 21, 2008, and then to Las Vegas in June 2008 and Miami

24  in October 2008. These trips took place before HP Mexico signed the Pemex contracts, and apart
    from the cursory pleading that "Defendants conferred a number of benefits on Reynaud [] with the

25  intent to induce him to award Pemex contracts to HP," Plaintiffs have not pled how these trips
    violated the Travel Act, or were otherwise quid pro quo for Reynaud's signing of the contracts.

26  Plaintiffs will have the opportunity to amend the Complaint to state facts to show how Reynaud's
    trips violated the Travel Act, and were not instead lawful preparatory acts that cannot be

27  considered part of a pattern of racketeering activity. *See Rewis v. United States*, 401 U.S. 808, 809
    (1971) (noting that the Travel Act only bars travel "in furtherance of certain criminal activity");

28  *see also Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1028-29 (W.D. Wash. 2005). Plaintiffs
    must plead, in more than a cursory fashion, *how* each of Reynaud's trips violated the Travel Act.

United States District Court
Northern District of California

1    Though the Court believes that the facts pled in the Complaint bear a closer resemblance to those

2    in *Reich* than what was pled in *Norex*, *Hourani*, and *Philip Morris*, it finds that Plaintiffs have not

3    yet pled sufficient facts to show plausibly that Defendants engaged in a domestic scheme rather

4    than just peripheral or isolated domestic acts. *See, e.g.*, *Hourani* at 167 (finding that the acts pled

5    in the Complaint must show more than "isolated" or "peripheral" contact with the United States in

6    order to plead a domestic pattern); *see also Twombly* at 570. As such, the Court GRANTS

7    Defendants' motion to dismiss on this ground, but provides Plaintiffs leave to amend to allege

8    additional facts to show that the pattern of activity in the alleged scheme was domestic.

9           **B.        Continuity and Relatedness**

10          Continuity "is both a closed- and open-ended concept, referring either to a closed period of

11   repeated conduct, or to past conduct that by its nature projects into the future with a threat of

12   repetition." *H.J. Inc.* at 241 (citing *Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d

13   36, 39 (3d Cir. 1987))."The term pattern itself requires the showing of a relationship between the

14   predicates, and of the threat of continuing activity. It is this factor of *continuity plus relationship*

15   which combines to produce a pattern." *H.J. Inc.* at 239 (internal citations omitted, emphasis in

16   original). As the Supreme Court went on to explain:

> A party alleging a RICO violation may demonstrate continuity over
> a closed period by proving a series of related predicates extending
> over a substantial period of time. Predicate acts extending over a
> few weeks or months and threatening no future criminal conduct do
> not satisfy this requirement: Congress was concerned in RICO with
> long-term criminal conduct. Often a RICO action will be brought
> before continuity can be established in this way. In such cases,
> liability depends on whether the threat of continuity is demonstrated.

22   *Id.* at 242 (citing Senate Report No. 91—617 at 518).

23          Defendants argue that Pemex's Complaint has failed to plead open-ended continuity

24   because it does not allege any facts that would indicate a "threat of repetition in the future," in part

25   because the most recent allegation in the Complaint is with regard to a bribe paid by HP Poland in

26   2010. *See* Mot. at 19. They further argue that Plaintiffs cannot plead closed-ended continuity in

27   two respects: first, with regard to Counts I and III because Pemex's Mexico-related RICO

28   allegations did not occur over a substantial enough period of time, and second, with regard to

United States District Court
Northern District of California

17

1    Counts II and IV, because Pemex's HP Poland and HP Russia allegations have "no real

2    connection" to the HP Mexico acts, and are thus not related to the HP Mexico acts for purposes of

3    continuity. *See id.* at 20.

4          Plaintiffs respond, with regard to closed-ended continuity, that the Mexico scheme

5    involved repeated acts over a period of fourteen months, which is a sufficient amount of time to

6    plead a pattern of activity. With regard to open-ended continuity, they make several arguments: (1)

7    the scheme as pled is sufficient to show a threat of open-ended continuity because it involved "at

8    least eight illicit payments as part of the bribes to Pemex officials," which creates a substantial

9    threat of repetition; (2) that Reynaud's departure from Pemex does not undermine their claim for

10   open-ended continuity; (3) that HP and HP Mexico's averments in the NPA and SEC Order that

11   they would "continue to implement compliance and ethics program designed to prevent and detect

12   violations of the FCPA" shows a risk of corruption; and (4) that the global scheme is sufficiently

13   related to the Mexico scheme because HP and its subsidiaries undertook, in each country, the same

14   plan – bribery of foreign officials to obtain contracts. *See* Opp. at 19-20.

15         For several reasons, the Court agrees with Defendants.

16         The Court begins with Plaintiffs' second and fourth causes of action, the "global scheme"

17   allegations. These claims fail because Plaintiffs have not shown that the HP Mexico, HP Russia,

18   and HP Poland schemes are sufficiently related to one another such that they could be considered

19   part of a single "global scheme." Plaintiffs allege that each of the HP subsidiaries bribed a public

20   official in order to receive government contracts, and that HP's defective internal controls enabled

21   such actions to occur. But the similarities, as far as the pleadings are concerned, end there – in

22   Mexico, HP Mexico is alleged to have bribed a rogue official of a state-owned company and

23   employed an elaborate payment system to pay off the official; in Russia, HP Russia bribed

24   undefined "government officials," including the director of a foreign trade agency, to secure a

25   series of contracts, with the hope of "unlock[ing] other business opportunities with Russian state

26   entities," Compl. ¶ 65, and created a slush fund for payments to multiple entities; in Poland, HP

27   Poland directly bribed a single government official through far less elaborate means – including

28   leaving bags of cash at the home of the official – to receive certain contracts with the KGP. *See*

Compl. ¶¶ 93-95. As pled in the Complaint, these look like three factually distinct bribery schemes that are not, as currently pled, sufficiently related for purposes of establishing a pattern. *See Howard v. America Online, Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (holding that "merely having the same participants is insufficient to establish relatedness," and finding schemes unrelated where the "purpose, result, victim, and method . . . [were] different"). Plaintiffs have not sufficiently pled how the HP Poland and HP Russia schemes, which underlie the "global conspiracy" allegations, are similar to the HP Mexico scheme. That each involved, years apart from one another, bribes to a foreign official which resulted in a contract being awarded to an HP subsidiary is not sufficient to show relatedness. *Cf. H.J. Inc.* at 242.; *see also Howard* at 749 (stating the plaintiff must plead facts to show that the schemes are "related by distinguishing characteristics").

Turning to the Plaintiffs' first and third causes of action regarding the Mexican enterprise claims, the Court finds for several reasons that Plaintiffs have failed to sufficiently plead either open- or closed-ended continuity.

Plaintiffs' open-ended continuity claims fail because they have not pled facts to suggest that similar conduct will occur in the future. In *Ticor Tile Insurance Co. v. Florida*, on which Plaintiffs rely, the Ninth Circuit found that three forgeries, undertaken with "similar purposes and [by] identical methods" over a period of thirteen months, were sufficient to pose a threat of continued continuity because they "suggest[ed] that this practice had become a regular way of conducting business." 937 F.2d 447, 450 (9th Cir. 1991). Here, though Plaintiffs show multiple acts taking place over a similar period of time, the acts in the Complaint involved one discreet group of individuals and companies, and the majority of acts involved travel by, or payments to, Reynaud – who Plaintiffs plead is a "former Pemex official[]." Compl. ¶ 60. This case is not like *Ticor*, where a single individual forged multiple documents for multiple third parties, evidencing a way of doing business, or even *Allwaste, Inc. v. Hecht*, on which Plaintiffs also rely, in which the plaintiffs alleged a pattern of extorting kickbacks from four different entities. *See Allwaste*, 65 F.3d 1523, 1529 (9th Cir. 1995). Here, in contrast, Plaintiffs allege a series of events that were undertaken to effectuate a single scheme, with two individuals – the COO and Reynaud – at its center. Because those individuals are no longer employed by Pemex, Plaintiffs have not pled a

19

1    threat of continued illegal activity from the predicate acts involved in the Mexico scheme.

2           Plaintiffs' closed-ended continuity claims similarly fail. Plaintiffs' earliest alleged

3    predicate act is the April 21, 2008 invitation for Reynaud to attend a conference and dinner in

4    Orlando, Florida. *See* Compl. ¶ 23. The most recent alleged act is a June 15, 2009 trip by Reynaud

5    to Las Vegas, Nevada, with HP executives. Compl. ¶ 55. Nine of the predicate acts, however, took

6    place during a three-month period between December 2008 and February 2009. The Ninth Circuit

7    has established a "flexible concept" of what constitutes a substantial period of time, *see Allwaste*

8    at 1528, and has rejected the idea that a pattern must last for a minimum period of time, such as

9    one year, before a scheme shows closed-ended continuity. *But see Religious Tech. Cntr. v.*

10   *Wollersheim*, 971 F.2d 364, 366-67 (9th Cir. 1992) ("We have found no case in which a court has

11   held the requirement to be satisfied by a pattern of activity lasting less than a year"). There is

12   substantial disagreement among the district courts about whether a period of time of one year to

13   fourteen months – the amount of time in which Defendants' alleged predicate acts took place – is

14   sufficient for purposes of pleading closed-ended continuity. *See Pier Connection, Inc. v. Lakhani*,

15   907 F. Supp. 72, 77-78 (S.D.N.Y. 1995) (compiling cases).

16          As the Court noted above, Plaintiffs have failed to sufficiently plead how several of the

17   purported predicate acts – namely, the pre-contract travel by Reynaud to the United States –

18   violated the Travel Act. As such, Plaintiffs have not alleged sufficient facts to support the

19   existence of a fourteen-month enterprise, which would arguably be long enough to make out a

20   claim for closed-ended continuity, *see Metcalf v. Death Row Records, Inc.*, 2003 WL 22097336, at

21   *3 (N.D. Cal. Sept. 4, 2003) ("A thirteen-month period presumably represents a sufficiently

22   substantial length of time for continuity purposes."). Even giving the Plaintiffs the benefit of all

23   doubts, and considering that every trip taken by Reynaud *after* the contract was signed in

24   December 2009 was a *quid pro quo* for signing the Pemex contracts and suffices as a predicate act,

25   *see, e.g.*, Compl. ¶ 136 ("The travel was provided in connection with a *quid pro quo* arrangement

26   for awarding HP Mexico the BTO contracts."), Plaintiffs have pled only a seven month period,

27   from December 2008 until June 2009 during which these activities took place. *See* Compl. ¶ 138a

28   (the December 12, 2008 email from HP authorizing an increase of the fee to be paid to the Pass-

20

United States District Court
Northern District of California

1  Through Partner); Compl. ¶ 55 (June 15, 2009 Reynaud trip to Las Vegas, Nevada). Even under

2  the Ninth Circuit's flexible standard, the activities that took place over seven months as pled in the

3  Complaint are insufficient for purposes of closed-ended continuity. *See Allwaste* at 1529; *see also*

4  *H.J. Inc.* at 241-42. Plaintiffs will be given leave to amend to plead sufficient facts to show either

5  closed- or open-ended continuity, and to plead that the HP Russia, HP Poland, and HP Mexico

6  schemes were sufficiently related to form a global pattern.

7  **C.   Domestic Injury**

8      Defendants contend in their third argument in support of the motion to dismiss that

9  Plaintiffs have not pled that they suffered a domestic injury.

10      Defendants argue that the Court must apply *Morrison's* "focus of congressional concern"

11  inquiry to Section 1964(c) – which confers upon Plaintiffs a private right of action under the

12  RICO statute for "any person injured in his business or property by reason of a violation of

13  Section 1962" – and should determine that "Section 1964(c) can only be invoked to remedy injury

14  and damage to property in the United States." *See* Mot. at 17-18 ("The focus of Section 1964(c) is

15  domestic injury to business or property. Pemex has alleged none.").

16      Plaintiffs, in response, argue that RICO does not require a domestic injury, and that the

17  Ninth Circuit's RICO pleading test under *Chao Fan* is "satisfied by a pattern of racketeering

18  activities that were conducted by the Defendants in the territorial United States," regardless of the

19  location of the actual injury. *See* Opp. at 16. Additionally, at oral argument, Plaintiffs indicated

20  that they could amend the Complaint to allege a domestic injury. *See* Hearing Tr. at 32:22-25.

21      Section 1964(c) permits "[a]ny person injured in his business or property by reason of a

22  violation of section 1962 [to] sue therefor in any appropriate United States district court and shall

23  recover threefold the damages he sustains." Defendants ask the Court to apply *Morrison's*

24  presumption against extraterritoriality to this provision standing alone, and hold that parties can

25  *only* assert a RICO claim when they plead an injury to business or property that occurs in the

26  United States. They argues that the Supreme Court's decisions in *Morrison*, applying Section

27  10(b) to "purchases and sales of securities in the United States," and *EEOC v. Arabian American*

28  *Oil Co. (Aramco)*, which held that Title VII applied only to discriminatory employment practices

21

United States District Court
Northern District of California

1   which took place in the United States, compels this Court to hold that Section 1964(c) applies only

2   when a party is injured in the United States.

3          Defendants' argument, which they assert is based on a plain reading of *Morrison*, while

4   facially appealing is ultimately unpersuasive.  Although Section 1964(c)'s focus is clearly on

5   injury to business and property, and the section does not include any explicit language which

6   would extend its ambit extraterritorially, nothing in the RICO statute or the cases cited suggests

7   isolating the analysis of Section 1964(c) from the remainder of the RICO statute. Moreover,

8   Defendants point to no case, throughout RICO's lengthy history, which has held that a party must

9   plead a domestic injury in order to seek redress under RICO's private right of action. A review of

10  the case law finds a number of cases from across the country that in fact suggest otherwise. *See,*

11  *e.g.*, *Mitsui* at 944 ("*Morrison's* holding bars courts from refusing to apply RICO simply because

12  the scheme's effects are felt abroad"); *see also Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479,

13  488 (1985) (holding, in a lengthy discussion of Section 1964(c)'s injury requirement in a case

14  brought by a Belgian corporation, that: "If the defendant engages in a pattern of racketeering

15  activity in a manner forbidden by [Section 1962], and the racketeering activities injure the plaintiff

16  in his business or property, the plaintiff has a claim under § 1964(c)."); *Rep. of the Philippines v.*

17  *Marcos*, 862 F.2d 1355, 1358 (9th Cir. 1988) (en banc) (finding a RICO claim sufficiently alleged

18  where the plaintiff pled as its injury the theft of state-owned property belonging to the Philippines

19  which was transported by defendants into the United States to use for a fraudulent purpose).[5]

20         This Court finds the dearth of authority in support of Defendants' argument, and the

21  number of cases requiring no domestic injury where the racketeering activity was itself

22  sufficiently domestic, to augur against dismissing Plaintiffs' Complaint.[6]

23  _____

24  [5] In *Chao Fan*, the Ninth Circuit expressly noted that "[i]n the wake of *Morrison*, this circuit has
    not considered whether RICO applies extraterritorially," and, because the suit was a criminal
25  action that did not implicate Section 1964(c), was silent as to whether the injury requirement
    necessitated a domestic injury. *See Chao Fan* at 974.

26  [6] Plaintiffs contended at oral argument that such a domestic injury requirement would eviscerate
27  RICO, and noted in their opposition that this interpretation would render an injury suffered
    directly across the United States border by a racketeering scheme that took place wholly in the
28  United States incapable of redress under the statute. Opp. at 16. The Court in *Morrison* discussed
    similar fears in the securities context, when rejecting the Solicitor General's invitation to create a

22

1    Additionally, Plaintiffs have indicated that they can, if granted leave to amend, allege that

2    Pemex suffered a domestic injury – namely, the value of Reynaud's services on behalf of the

3    company while he was in the United States. *See* Hearing Tr. at 32:22—33:3 ("Now, we could

4    amend because [part] of the injury was in the United States. [During] Mr. Reynaud's trips to the

5    United States, Pemex was being robbed of his faithful and honorable services . . . . So that injury

6    happened in the United States. It would be a smaller injury, but it would give the Court

7    jurisdiction."). The Court therefore denies Defendants' motion to dismiss on this ground, but

8    nonetheless grants Plaintiffs leave to amend in order to allege additional facts that would show a

9    domestic injury.

10        **D.      Statute of Limitations**

11        RICO is governed by a four-year statute of limitations. *See, e.g.*, *Agency Holdings Corp. v.*

12   *Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987). The Ninth Circuit has set forth an "injury

13   discovery" rule to determine when the statute of limitations begins to run – this happens "when a

14   plaintiff knows or should know of the injury that underlies his cause of action." *Pincay v.*

15   *Andrews*, 238 F.3d 1106, 1109 (9th Cir. 1996). A plaintiff has "constructive knowledge if it had

16   enough information to warrant an investigation which, if reasonably diligent, would have led to

17   discovery of the fraud." *Id.* at 1110. Dismissal of a Complaint on statute of limitations grounds is

18   appropriate where "failure to comply with the applicable statute of limitations is evidence from the

19   allegations of the Complaint." *Yamauchi v. Cotterman*, 2015 WL 134885, at *4 (N.D. Cal. Mar.

20   24, 2015).

21        Here, suit was filed more than four years after the final predicate act Plaintiffs claim as part

22

23   _____

24   "significant and material conduct" test, noting that "[w]hile there is no reason to believe that the
     United States has become the Barbary Coast for those perpetrating frauds on foreign securities
25   markets, some fear that it has become the Shangri-La of class-action litigation for lawyers
     representing those allegedly cheated in foreign securities markets." *Morrison* at 271. In affirming
26   the dismissal of petitioner's complaint, the Court held that "Section 10(b) reaches the use of a
     manipulative or deceptive device or contrivance only in connection with the purchase or sale of a
27   security listen on an American stock exchange." *Id.* at 273. Though the Court held that Section
     10(b) was designed only to combat deception for claims listed on an American stock exchange, it
28   has not rendered a decision so limiting the effect of RICO, specifically the injury requirement of
     Section 1964(c). Further, RICO claims lack the bright-line territoriality of Section 10(b) claims
     because a RICO scheme can include activities that take place both domestically and abroad.

United States District Court
Northern District of California

1   of the scheme: the Complaint was filed on December 2, 2014, and the most recent alleged

2   predicate act, a four-day trip to Vegas taken by Reynaud, occurred on June 15, 2009. Defendants

3   therefore argue that Plaintiffs' RICO claims are barred by the statute of limitations, for several

4   reasons: first, that Reynaud and Pemex's COO, as corporate officials, were aware of Pemex's

5   injury – "the acceptance of harmful contractual terms and the payment of significant cost

6   overcharges" – and that this awareness is imputed to Pemex, *see* Mot. at 22; second, that Plaintiffs

7   have failed to successfully plead an invocation of the "adverse agent" doctrine, which declines to

8   impute knowledge from an agent to his principal in the narrow circumstance where the agent

9   "completely abandon[s] the principal's interests and act[s] entirely for his own purposes," *see*

10  Mot. at 23 (citing *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard*

11  *Co.*, 964 F. Supp. 2d 1128, 1144 (N.D. Cal. 2013)); and third, that even if Reynaud and the COO's

12  knowledge were not imputed to Pemex, "plaintiffs' allegations reveal that they had more than

13  enough information to warrant an investigation which, if reasonably diligent, would have led to

14  discovery." Mot. at 23 (citing *Pincay v. Andrews*, 238 F.3d 1106, 1110 (9th Cir. 2001)). Plaintiffs

15  respond that the Complaint sets forth sufficient facts to show that Reynaud and the COO were

16  acting adverse to Pemex, and that the "adverse interest" and constructive notice issues are fact-

17  intensive ones which cannot be adjudicated at the motion to dismiss stage. *See* Opp. at 20-22.

18          The Court, however, agrees with Defendants that Plaintiffs have not sufficiently pled

19  around RICO's statute of limitations. First, district courts have repeatedly resolved the adverse

20  interest question at the motion to dismiss stage. *See, e.g.*, *Nathanson v. Polycom, Inc.*, 2015 WL

21  1517777, at *11 (N.D. Cal. Apr. 3, 2015). Second, Plaintiffs have not sufficiently pled facts to

22  show that Reynaud and the COO "completely abandoned" Pemex; instead, the Complaint alleges

23  in a cursory fashion that "the COO and Reynaud [] had abandoned their relationship and were

24  acting solely for their own personal benefit and the benefit of the criminal enterprise." Compl. ¶

25  60; *see also Nathanson* at *11 ("[T]heft or looting or embezzlement . . . is the classic example of

26  the adverse interest exception."); *but see Puskala v. Koss Corp.*, 799 F. Supp. 2d 941, 947

27  ("[E]ven if the adverse interest exception applies, that does not mean that [the agent's] fraud

28  cannot by imputed to the company under principles of apparent authority."). Plaintiffs must plead

facts that plausibly show that Reynaud and the COO were acting wholly for their own benefit and not *also* for the benefit of Pemex, and will be given the opportunity to do so through amendment.[7]

**E.    UCL**

Defendants also move to dismiss Plaintiffs' fifth cause of action, for violations of Business and Professions Code §§ 17200 *et seq.*, on the ground that the statute does not apply extraterritorially. *See* Mot. at 25. Defendants contend that Plaintiffs have failed to allege an illegal act that took place within California. Plaintiffs respond that their allegations that Defendants' conduct was "coordinated at, emanate[d] from and . . . developed at Defendants' California headquarters" is sufficient to state a claim under Section 17200, *see* Opp. at 24, and that California courts have held that a California corporation's violation of the FCPA is sufficient to state a claim under the UCL. *Id.* at 24-25.

The Court agrees with Plaintiffs that the Complaint pleads illegal acts taking place in California sufficient to give rise to a claim under Section 17200. For example, Plaintiffs plead that HP committed wire fraud and violated the Travel Act by sending an email authorizing an increased bribe payment to the Pass-Through Partner in December 2008, *see* Compl. ¶ 138b, and the payment of such bribes through a United States bank account. *See* Compl. ¶¶ 42-43. Section 17200 may be invoked by "out-of-state parties when they are harmed by wrongful conduct occurring in California." *In re iPhone 4S Consumer Litig.*, 2013 WL 3829653, at *7 (N.D. Cal. July 23, 2013). Plaintiffs' UCL claim therefore survives the motion to dismiss.

**F.    Supplemental Jurisdiction**

Finally, Defendants argue that the Court should decline to exercise supplemental jurisdiction over Plaintiffs' pendant state law claims because Plaintiffs have failed to adequately plead a cause of action arising under federal law. A court may "decline to exercise supplemental

---

[7] Defendants' third argument, that Plaintiffs "had substantial information to warrant an investigation into the negotiation of the BTO contracts," is unpersuasive. Plaintiffs have not alleged facts in the Complaint that show they had enough information that would have warranted investigation. Defendants may reassert such an argument in the form of an affirmative defense, but they have not shown, by Plaintiffs' pleadings *alone*, that the claim should be barred because Plaintiffs had enough information to merit an investigation into Reynaud or the COO's conduct. *Cf. Conmar Corp. v. Mitsui & Co. (U.S.A.) Inc.*, 858 F.2d 499, 502 (9th Cir. 1988).

United States District Court
Northern District of California

jurisdiction over a claim [] if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Because the Court grants Plaintiffs leave to amend with regard to their RICO claims, dismissal of the state law claims for want of supplemental jurisdiction would be inappropriate at this time.

## IV.   CONCLUSION

Although Defendants are largely successful on the issues presented in this motion, based upon the presentation made by Pemex in its brief and at the hearing, the Court anticipates that sufficient facts can be pled to support the claims asserted. Nothing in the papers submitted to date suggests that this case will terminate at the pleading stage.

## V.   ORDER

The motion to dismiss IS GRANTED IN PART AND DENIED IN PART, as follows:

1.   Defendants' motion to dismiss Counts I, II, III, and IV is DENIED to the extent Defendants argue that Plaintiffs have failed to plead a domestic injury. The motion is GRANTED to the extent Plaintiffs have not sufficiently pled: (1) a domestic pattern of racketeering activity; (2) closed- or open-ended continuity with regard to the HP Mexico scheme; (3) that the HP Poland and HP Russia schemes were sufficiently related to the HP Mexico scheme; and (4) that the Complaint is not barred by RICO's statute of limitations.

2.   Defendants' motion to dismiss Count V, the Section 17200 claim, is DENIED.

3.   Defendants' motion to dismiss Counts V, VI, VII, and VII for want of supplemental jurisdiction is DENIED.

4.   Any amended Complaint must be filed **no later than August 7, 2015**.

**IT IS SO ORDERED.**

Dated: July 13, 2015

BETH LABSON FREEMAN
United States District Judge