DANIEL J. BERGESON, SBN 105439, dbergeson@be-law.com
CAROLINE McINTYRE, SBN 159005, cmcintyre@be-law.com
JOHN D. PERNICK, SBN 155468, jpernick@be-law.com
BERGESON, LLP
2033 Gateway Place, Suite 300
San Jose, California  95110
Telephone:  (408) 291-6200
Facsimile:   (408) 297-6000

GEORGE T. CONWAY III, appearance *pro hac vice*
gtconway@wlrk.com
CAROLINE A. OLSEN, appearance *pro hac vice*
caolsen@wlrk.com
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
Telephone:  (212) 403-1000
Facsimile:   (212) 403-2000

*Attorneys for Defendants Hewlett-Packard Co.*
*    and Hewlett-Packard Mexico, S. de R.L. de C.V.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| PETRÓLEOS MEXICANOS, and PEMEX EXPLORACIÓN Y PRODUCCIÓN,<br><br>                                        Plaintiffs,<br><br>v.<br><br>HEWLETT-PACKARD COMPANY,<br>and HEWLETT-PACKARD MEXICO,<br>S. DE R.L. DE C.V.,<br><br>                                        Defendants. | Case No. CV-14-05292-BLF<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST AMENDED COMPLAINT; SUPPORTING MEMORANDUM**<br><br>Date:          December 10, 2015<br>Time:          9:00 a.m.<br>Courtroom:  Courtroom 3, 5th Floor<br>Judge:         Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ................................................................ 1

STATEMENT OF ISSUES TO BE DECIDED .................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 2

INTRODUCTION ........................................................................................................ 2

FACTUAL BACKGROUND AND THE AMENDED
COMPLAINT .............................................................................................................. 5

    1.    "No improper payment." ...................................................................... 5

    2.    The revisions to Pemex's complaint ..................................................... 9

    3.    The deficiency of the "predicate acts" ................................................ 12

ARGUMENT ............................................................................................................. 13

I.    PEMEX'S RICO CLAIMS ARE STILL
    IMPERMISSIBLY EXTRATERRITORIAL. .................................................... 13

    A.    Pemex still alleges a pattern of racketeering
        activity that is impermissibly extraterritorial. ............................. 13

    B.    Pemex still alleges impermissibly extra-
        territorial losses. ........................................................................ 16

II.    PEMEX STILL FAILS TO ALLEGE A
    PATTERN OF RACKETEERING ACTIVITY .............................................. 17

    A.    Pemex still fails to allege a related "global
        scheme." .................................................................................... 17

    B.    Pemex still fails to allege open-ended
        continuity. .................................................................................. 18

    C.    Pemex still fails to allege closed-ended
        continuity. .................................................................................. 20

III.    PEMEX'S RICO CLAIMS ARE TIME-BARRED. ...................................... 21

IV.    EVEN APART FROM PEMEX'S FAILURE OF
    PLEADING, THE COURT SHOULD DISMISS
    THE COMPLAINT IN LIGHT OF PEMEX'S
    ADMISSION THAT THERE WAS NO BRIBE. .............................................. 23

CONCLUSION .......................................................................................................... 25

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4
*5-Star Mgmt. Inc.* v. *Rogers*,
    940 F. Supp. 512 (E.D.N.Y. 1996) ................................................................. 24 n.15

5
*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009) .............................................................................................. 20
6

*Alda* v. *SBMC Mortg.*,
7
    No. 11–cv–00678–LHK, 2012 WL 10589
    (N.D. Cal. Jan. 3, 2012) .................................................................................... 25 n.16

8
*Bao* v. *SolarCity Corp.*,
    No. 14–cv–01435–BLF, 2015 WL 1906105
9
    (N.D. Cal. Apr. 27, 2015) ..................................................................................... 7 n.2

10
*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007) .............................................................................................. 10

11
*Cummings* v. *Harris*,
12
    No. 14–cv–02539–BLF, 2015 WL 4552446
    (N.D. Cal. July 28, 2015) ........................................................................................ 5

13
*Dreiling* v. *American Express Co.*,
    458 F.3d 942 (9th Cir. 2006)................................................................................ 7 n.2

14
*Eclectic Props. E., LLC* v. *Marcus & Millichap Co.*,
15
    751 F.3d 990 (9th Cir. 2014)............................................................................. 12–13

16
*European Cmty.* v. *RJR Nabisco, Inc.*,
    764 F.3d 129 (2d Cir.), *panel reh'g denied*,
    764 F.3d 149 (2d Cir. 2014) (per curiam),
17
    *reh'g en banc denied*, 783 F.3d 123 (2d Cir. 2015),
    *pet. for cert. filed*, No. 15–138 (U.S. July 27, 2015) ...................................... 16 n.10

18
*European Cmty.* v. *RJR Nabisco, Inc.*,
19
    783 F.3d 123 (2d Cir. 2015), *pet. for cert. filed*,
    No. 15–138 (U.S. July 27, 2015) ...................................................................... 16 n.10

20
*Flint* v. *Beneficial Fin. I Inc.*,
    No. 12–cv–01675–GEB, 2012 WL 3277109
21
    (E.D. Cal. Aug. 9, 2012) ................................................................................... 24 n.15

22
*Hourani* v. *Mirtchev*,
    943 F. Supp. 2d 159 (D.D.C. 2013), *aff'd*,
    No. 13–7088, 2015 WL 4590324
23
    (D.C. Cir. July 31, 2015)........................................................................................ 15

24
*Hourani* v. *Mirtchev*,
    No. 13–7088, 2015 WL 4590324
25
    (D.C. Cir. July 31, 2015)........................................................................ 12, 16 n.10

26
*Howard* v. *Am. Online, Inc.*,
    208 F.3d 741 (9th Cir. 2000)............................................................................. 19 n.11

27
*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*,
    794 F. Supp. 1424 (D. Ariz. 1992)........................................................................ 22
28

# TABLE OF AUTHORITIES

Page

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*,
 959 F. Supp. 2d 476 (S.D.N.Y. 2013) ......................................................... 7 n.2

*Int'l Norcent Tech.* v. *Koninklijke Philips Elecs. N.V.*,
 No. 07–cv–00043–MMM, 2007 WL 4976364
 (C.D. Cal. Oct. 29, 2007) ........................................................................... 10

*L-3 Commc'ns Integrated Sys., L.P.* v. *United States*,
 91 Fed. Cl. 347 (2010), *amended in part on reconsideration*,
 98 Fed. Cl. 45 (2011) .................................................................................. 23

*Mattel, Inc.* v. *MGA Entertainment, Inc.*,
 782 F. Supp. 2d 911 (C.D. Cal. 2011) ....................................................... 17

*Mohebbi* v. *Khazen*,
 50 F. Supp. 3d 1234 (N.D. Cal. 2014) ........................................................ 18

*Morrison* v. *Nat'l Austl. Bank Ltd.*,
 561 U.S. 247 (2010) ..................................................................................... 13

*Ove* v. *Gwinn*,
 264 F.3d 817 (9th Cir. 2001) ...................................................................... 17

*Pincay* v. *Andrews*,
 238 F.3d 1106 (9th Cir. 2001) .................................................................... 22

*Reich* v. *Lopez*, 38 F. Supp. 3d 436 (S.D.N.Y. 2014) .............................. 13, 15, 16 n.10

*Schneider Rucinski Enters.* v. *Stratasoft, Inc.*,
 No. 08–cv–138–WQH, 2009 WL 559827
 (S.D. Cal. Mar. 3, 2009) .......................................................................... 19 n.11

*Sever* v. *Alaska Pulp Corp.*,
 978 F.2d 1529 (9th Cir. 1992) .................................................................... 19

*United States* v. *Chao Fan Xu*,
 706 F.3d 965 (9th Cir. 2013) ......................................................... 13, 15, 16 n.10

*United States* v. *Kiewit Pac. Co.*,
 No. 12–cv–02698–JST, 2013 WL 5770514
 (N.D. Cal. Oct. 24, 2013) ....................................................................... 22–23 n.14

*United States* v. *Kincaid-Chauncey*,
 556 F.3d 923 (9th Cir. 2009) ...................................................................... 17

*Von Saher* v. *Norton Simon Museum of Art at*
 *Pasadena*, 592 F.3d 954 (9th Cir. 2009) ................................................ 23 n.14

**Statutes and Rules**

Fed. R. Civ. P. 9(b) ...................................................................................... 13

Fed. R. Civ. P. 12(b)(6) ................................................................................. 1

Fed. R. Evid. 801 ......................................................................................... 23

18 U.S.C. § 1343 ..................................................................................... 12–13

18 U.S.C. § 1952(a) ...................................................................................... 12

1

## TABLE OF AUTHORITIES

2

**Page**

3      18 U.S.C. § 1956(a)(2) ........................................................................................ 12–13

4      Inspector General Act of 1978, §§ 2–4,
        5 U.S.C. App. 3 (2012) ............................................................................... 9 n.6

5      Ley Federal de las Entidades Paraestatales [LFEP],
        *as amended*, § 62, Diario Official de la
6      Federación [DO], 14 de mayo 1986 (Mex.)........................................................ 8 n.5

7      Ley Orgánica de la Administración Pública
        Federal [LOAPF], *as amended*, §§ 37–VIII, XII,
8      Diario Official de la Federación [DO],
        29 de diciembre 1976 (Mex.)........................................................................ 8 n.5

9      Reglamento Interior de la Secretaría de la Función
        Pública §§ 79–80, Diario Official de la Federación
10     [DO], 15 de abril de 2009 (Mex.) ................................................................. 8 n.5

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**NOTICE OF MOTION AND MOTION TO DISMISS**

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE that on December 10, 2015 at 9:00 a.m. or as soon thereafter as

4

counsel may be heard, in the courtroom of the Honorable Beth Labson Freeman, United States

5

District Judge for the Northern District of California, located at the United States Courthouse, 280

6

South 1st Street, San Jose, California 95113, defendants Hewlett-Packard Company and Hewlett-

7

Packard Mexico, S. de R.L. de C.V., will and hereby do move this Court for an order dismissing

8

this action with prejudice.  Defendants bring this motion under Rule 12(b)(6) of the Federal Rules

9

of Civil Procedure on the ground that plaintiffs' complaint fails to state a claim upon which relief

10

may be granted.  Defendants base their motion on this notice of motion and motion to dismiss this

11

action; the supporting memorandum of points and authorities; the pleadings, records, and papers

12

filed in this action; and such other arguments as defendants may present at oral argument.

13

**STATEMENT OF ISSUES TO BE DECIDED**

14

1.  Do Pemex's amended RICO claims, which continue to allege a scheme perpetrated by

15

foreign entities against foreign victims, and misconduct that allegedly occurred virtually entirely

16

outside the United States and resulted in alleged injury outside the United States, "show

17

plausibly," as this Court put it in its July 13, 2015 opinion dismissing Pemex's original complaint,

18

that "Defendants engaged in a domestic scheme rather than just peripheral or isolated domestic

19

acts"?  July 13, 2015 Opinion ("Op.") 17.

20

2.  Do Pemex's amended RICO claims, which continue to allege three entirely separate

21

schemes perpetrated by different entities against different victims in different countries, with no

22

plausible, factually supported allegation that these entities communicated with one another or

23

knew of one another's schemes, establish that the "schemes are sufficiently related to one another

24

such that they could be considered part of a single 'global scheme'"?  Op. 18.

25

3.  Do Pemex's amended RICO claims, which continue to attempt to allege predicate acts

26

that occurred, at most, from December 2008 through June 2009, if even that, plead a pattern of

27

28

DEFENDANTS' MOT. TO DISMISS FIRST
AM. COMPLAINT; SUPPORTING MEMO.
CASE NO.:  CV-14-05292-BLF

1

1  racketeering activity constituting a "substantial period of time" or a risk "that similar conduct will

2  occur in the future"?  Op. 19, 20.

3       4.  Are Pemex's amended RICO claims time-barred under RICO's four-year statute of

4  limitations because Pemex "ha[s] not sufficiently pled facts to show that Reynaud and [Pemex's]

5  COO 'completely abandoned' Pemex," and that they "were acting solely for their own personal

6  benefit"?  Op. 24.

7       5.  Should the Court dismiss the complaint in its entirety in light of Pemex's admission, in

8  its most recent SEC Form 20-F filing, that there was "no improper payment" in connection with

9  the BTO contracts?

10      6.  Should the Court decline to exercise supplemental jurisdiction over plaintiffs' state

11  law claims if the Court has dismissed all claims over which it has original jurisdiction?

12                    **MEMORANDUM OF POINTS AND AUTHORITIES**

13                                    **INTRODUCTION**

14      There is little new in the amended complaint, and what little that is new does not matter.

15  What the First Amended Complaint mostly adds is conclusions.  That was the problem the first

16  time around:  This Court faulted the original pleading for, among many other things, "cursorily

17  alleg[ing] that HP 'directed the scheme' from the United States"; "cursory pleading" as to how

18  Reynaud's trips were "inten[ded] to induce him to award Pemex contracts to HP" and were "quid

19  pro quo for Reynaud's signing of the contracts"; and "alleg[ing] in a cursory fashion that the

20  "COO and Reynaud [] had abandoned their relationship" with Pemex and "were acting wholly for

21  their own benefit and not *also* for the benefit of Pemex."  Op. 16 & n.4, 24–25.

22      The new pleading doubles, triples, quadruples down on conclusory words—as the redline

23  submitted here as Exhibit A amply shows.  The supposedly new allegations about Reynaud's trips

24  and meetings, for example, illustrate Pemex's cursory approach to repleading:  The trips now

25  allegedly were "designed … to groom and induce them to accept corruption and entirely abandon

26  their employer."  First Amended Compl. ("FAC") ¶ 3.  "The purposes of this meeting were to

27

28  DEFENDANTS' MOT. TO DISMISS FIRST            2
   AM. COMPLAINT; SUPPORTING MEMO.
   CASE NO.:  CV-14-05292-BLF

groom Reynaud Aveleyra to accept bribes …." *Id.* ¶ 25.  "The purposes of this trip were to groom Reynaud …." *Id.* ¶ 26.  "The purposes of this lavish trip were to groom Reynaud …." *Id.* ¶ 27.  "HP and HP Mexico intended this trip to groom Reynaud …." *Id.* ¶ 153(a)(1).  "The purposes of this extravagant trip were to plan and fuel the scheme and to further induce Reynaud …." *Id.* ¶ 29.  "The purposes of this trip were to plan and fuel the scheme and to further induce Reynaud …." *Id.* ¶ 30.  "[P]lan and fuel … and … further induce …" *Id.* ¶ 31.  "[P]lan and fuel … and … further induce …" *Id.* ¶ 32.  "[P]lan and fuel … and to induce …." *Id.* ¶ 153(a)(2).  "[P]lan and fuel … and to induce …." *Id.* ¶ 153(a)(3).  "[P]lan and fuel … and to induce …." *Id.* ¶ 153(a)(4).  Just more verbiage, incanted over and over again.

That dependence on repetitious and conclusory embellishment should come as no surprise.  Even Pemex's core allegation of bribery—the $125,000 in payments by Intellego to Reynaud—boiled down to a legal conclusion.  The material on which Pemex bases its claims— Exhibits 1 and 2 to the complaint, the DOJ and SEC resolutions—*never* referred to those payments as a "bribe," even though, in contrast, the government used that word many times to describe what happened in Russia and Poland.  And yet *hundreds of times* in this Court—73 times in its original complaint, 35 times in its opposition on the prior motion, and now 119 times in its new complaint—Pemex has used "bribe," "bribery," or some variant of the word to describe Intellego's payments to Reynaud.

Now it appears that Pemex takes its obligations under Federal Rule of Civil Procedure 11—and to this Court—far less seriously than it does its obligations under the U.S. federal securities laws and to its bondholders and noteholders.  Pemex is wholly owned by the Mexican government, but it raises money from private investors who buy its debt.  And so every year, Pemex files an extensive annual report with the SEC on the SEC's Form 20-F.  This year's report, filed April 30, 2015, states the following about the central allegation in this case:

> On April 9, 2014, the SEC issued an order imposing sanctions against Hewlett-Packard Company (or HP) based on its findings that HP's subsidiaries in Mexico, Russia and Poland made improper payments to certain public officials in order to obtain public contracts in violation of the U.S. Foreign Corrupt Practices Act.  In the case related to

1
2
3
4

Mexico, the sanctions related in part to allegations that Hewlett-Packard México, S. de R.L. de C.V., an HP subsidiary in Mexico, paid a Mexican information-technology and consulting company more than U.S. $1 million to win a software and licensing contract with Petróleos Mexicanos worth approximately U.S. $6 million. *The SEC's order alleged that a former officer of Petróleos Mexicanos received a portion of the HP subsidiary's unlawful payment to the consulting company.* **The Internal Control Body of Petróleos Mexicanos concluded its investigation after finding no improper payment.**

Ex. B at 194 (emphasis added).

5
6
7

After an investigation, "no improper payment." *No bribe*. That binding, unambiguous admission should end this case. To comply with Rule 11, Pemex should voluntarily dismiss its case, and today HP has written Pemex to insist it do just that.

8
9
10

But even if Pemex persists, and even if the admission in its SEC Form 20-F is disregarded, the Court should dismiss the amended complaint for the very same reasons it dismissed the RICO claims in the first complaint.

11
12
13
14
15
16
17

Pemex still fails to allege a domestic scheme. The mishmash of additional allegations pleaded in the amended complaint add no domestic facts of substance to what was previously alleged in the original complaint. There are no new factual allegations establishing that "Defendants engaged in a domestic scheme rather than just peripheral or isolated domestic acts." Op. 17. Like its predecessor, the amended complaint "only cursorily alleges that HP 'directed the scheme' from the United States," and lacks the "widespread allegations of wrongdoing based in the United States" required to state a domestic civil RICO claim. Op. 13.

18
19
20
21
22
23
24

Pemex also still fails to plead a pattern of racketeering activity. As to the alleged "global scheme," Pemex adds a host of new legal conclusions, but it does not allege any new facts demonstrating "how the HP Poland and HP Russia schemes … are similar to the HP Mexico scheme." Op. 19. As to continuity, the amended complaint still alleges a series of events that occurred over seven months at most, focused on a discrete business transaction, with two individuals who are no longer employed by Pemex. As the Court has previously held, these allegations in no way suffice to establish that "similar conduct will occur in the future." Op. 19.

25
26
27

And the complaint is still untimely. Reynaud's and the COO's knowledge must be imputed to Pemex, as there is still no factually supported allegation that these Pemex officials

28

were "acting wholly for their own benefit and not *also* for the benefit of Pemex." Op. 25. No matter what, Pemex cannot avoid the fact that, while acting on behalf of Pemex, these officials secured a valuable contract for BTO services that HP did in fact provide. And Pemex has separately failed to allege any facts that could justify Pemex's alleged ignorance of its injury after Reynaud's June 2009 resignation, which followed public reports that he accepted a bribe from a different technology company. These pleading failures again require that Pemex's RICO claims be dismissed.

Given the policy underlying Rule 15 that leave to amend should be freely given, it was certainly understandable that the Court granted Pemex leave to amend after the last motion. But now it is abundantly clear that this case can and will go nowhere. Given the chance to replead, Pemex has come up with nothing but more conclusions, more speculations, and more arguments—but no facts that matter. In addition, Pemex has candidly told the world in its securities filings with the SEC—but not this Court—that it has nothing. Simply put, Pemex has now twice failed to state RICO claims for the simple reason that it cannot, and no amendment can cure that. "[F]urther leave to amend would be futile." *Cummings* v. *Harris*, No. 14–cv–02539–BLF, 2015 WL 4552446, at *3 (N.D. Cal. July 28, 2015).

Pemex should not be allowed to consume any more of this Court's valuable time in its apparent quest to test the boundaries of permissible pleading. It is respectfully submitted that this case should end, once and for all, now.

**FACTUAL BACKGROUND AND
THE AMENDED COMPLAINT**

**1.** ***"No improper payment."*** The amended complaint adds little, and the Court is already fully familiar with the case, so there is no need for a full factual rendition here. Nevertheless, before getting into the few differences between the original complaint and the new one, there is one preliminary, overarching point worth noting—a point that gives context to what Pemex has now told the SEC and the investing public.

The new complaint, like the old one, contains only thin factual support even for its central

1  allegation:  that the approximately $125,000 that Manuel Reynaud Aveleyra allegedly received

2  from Intellego was a bribe for signing the BTO contracts, a bribe supposedly understood to be

3  such by HP Mexico.  *See*, *e.g.*, FAC ¶¶ 58–60.  The asserted factual basis for that claim, as

4  before, is Exhibits 1 and 2 to the complaint, HP Mexico's non-prosecution agreement with the

5  DOJ, and the cease-and-desist order from the SEC.

6  　　　　But *neither* of those documents states that Reynaud, or anyone else at Pemex, was

7  "bribed."  *Neither* says that HP Mexico "bribed" Reynaud, or anyone else.  To the contrary, all

8  that the DOJ non-prosecution agreement said is that "HP MEXICO was able to circumvent HP

9  Co.'s policies," and that "HP MEXICO … circumvented HP Co.'s controls by failing to identify

10  the role of INTERMEDIARY in the BTO Deal when seeking a 1.5% increase in the commission

11  for CONSULTANT," and that, as a result, "HP MEXICO's books and records falsely reflected

12  that the INTERMEDIARY was the deal partner."  FAC Ex. 1, at A6.  Although the DOJ went on

13  to note that "CONSULTANT" (Intellego) later made $125,000 in payments to Reynaud, *id.*, *the*

14  *word "bribe" does not appear*.  Nor is there any allegation that HP knew about the payments.

15  　　　　So too, with the SEC order.  It said the same thing:  that "by injecting the Pass-Through in

16  the transaction, HP Mexico sales managers were able to evade HP's policies requiring pre-

17  approval of channel partners," and that, as a result, "HP Co.'s books and records falsely reflected

18  that the Pass-Through was the deal partner."  FAC Ex. 2, at 11.  But again, while the SEC noted

19  that "the Mexican Consultant [(Intellego)] made cash payments totaling approximately $125,000

20  to an entity controlled by Pemex's Chief Information Officer [(Reynaud)]," *id.*, *the word "bribe"*

21  *does not appear.*  Nor, again, is there any allegation that HP knew about the payments.

22  　　　　In short, what the DOJ and SEC found and said, and what HP Mexico and HP admitted,

23  was that HP Mexico improperly pulled the wool over HP (U.S.)'s eyes to get Intellego paid—*not*

24  that HP Mexico actually paid a bribe.  FAC Ex. 1, at A5; *id.* Ex. 2, at 10.  What HP Mexico

25  admitted was a violation of the FCPA's *internal-controls* and *books-and-records* provisions—*not*

26  the statute's anti-bribery provisions.  FAC Ex. 1, at A-3; *see id.* Ex. 2, at 2.

27

28  DEFENDANTS' MOT. TO DISMISS FIRST
AM. COMPLAINT; SUPPORTING MEMO.
CASE NO.:  CV-14-05292-BLF

Contrast that with what the SEC and DOJ had to say about HP Russia and HP Poland. The SEC cease-and-desist order repeatedly uses the word "bribe" to describe what happened in Poland and Russia. "HP Russia promised to pay and did pay bribes," and HP Poland "provided gifts and cash bribes," the order says. FAC Ex. 2, at 2, 3; *see also id.* at 4, 8. So, too, with the DOJ: in contrast to the *non*-prosecution agreement with HP Mexico, the DOJ filed actual criminal charges in this Court against HP Russia and HP Poland; it entered into a plea agreement with HP Russia, and a deferred prosecution agreement with HP Poland. The HP Russia and HP Poland agreements, filed in this Court, unreservedly use the word "bribe" to describe what HP Russia and HP Poland did.[1]

Still, despite the absence of any charge or admission that HP Mexico had actually paid a bribe, it was understandable that Pemex, and its sole owner, the Government of Mexico, would investigate the payments Reynaud received from Intellego. On May 15, 2014, a month after HP settled with the SEC, Pemex stated in its SEC Form 20-F that "[t]he SEC's order alleged that a former officer of Petróleos Mexicanos received a portion of the HP subsidiary's unlawful payment to the consulting company." Ex. C at 188.[2] Pemex then concluded: "As of the date of this report, *we are conducting an internal investigation* into the tendering of this software and licensing contract by Petróleos Mexicanos to HP's Mexican subsidiary." *Id.* (emphasis added).

Now, as already noted, the results of Pemex's internal investigation are apparently in.[3]

---

[1] *See* Plea Agreement, Ex. 5, at 8, 10, *United States* v. *ZAO Hewlett-Packard A.O.*, No. CR–14–201–DLJ (N.D. Cal. filed Apr. 9, 2014) (Docket No. 2), *available at* http://1.usa.gov/1Po4clw; Deferred Prosecution Agreement, Attachment A, at 6, 7, 8, *United States* v. *Hewlett-Packard Polska, Sp. z o.o.*, No. CR–14–202–EJD (N.D. Cal. Apr. 9, 2014) (Docket No. 2), *available at* http://1.usa.gov/1PaO5Hj.

[2] The Court may take judicial notice of SEC filings on a motion to dismiss. *See, e.g.*, *Dreiling* v. *Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006); *Bao* v. *SolarCity Corp.*, No. 14–cv–01435–BLF, 2015 WL 1906105, at *4 n.1 (N.D. Cal. Apr. 27, 2015) ("SEC filings … are appropriate for judicial notice because they are matters of public record not subject to reasonable dispute"); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 959 F. Supp. 2d 476, 492 & n.141 (S.D.N.Y. 2013) (taking judicial notice of Form 20-F).

[3] Defendants' counsel were unaware of Pemex's Form 20-F filing during the proceedings on the first motion to dismiss. Nonetheless, the Internal Control Body's finding that there was "no

1  This year's Form 20-F contained essentially the same paragraph, except the last sentence, which

2  provides the conclusion of the investigation:  "*The Internal Control Body of Petróleos Mexicanos*

3  *concluded its internal investigation finding no improper payment.*"   Ex. B at 194 (emphasis

4  added).[4]   Pemex's Chief Financial Officer, Mario Alberto Beauregard Álvarez, attested to the

5  veracity of that statement, as well as the one in the prior year's Form 20-F, by certifying that

6  neither SEC filing "contain[ed] any untrue statement of a material fact or omit[ted] to state a

7  material fact necessary to make the statements made … not misleading."  Ex. B at Ex.12.2, Ex. C

8  at Ex. 12.2.

9       Under Mexican law, Pemex's Internal Control Body must investigate allegations of

10  misconduct at Pemex, and must report to the Mexican government, Pemex's sole owner, through

11  the Ministry of Public Function.[5]  This process is akin to the work of inspector general offices

12  found in U.S. government-controlled corporations and entities, such as Amtrak, the United States

13

14  improper payment" was highly publicized in Mexico.   In particular, *El Finaciero*, one of
Mexico's largest business and financial newspapers (if not the country's largest), reported on
15  Pemex's Form 20-F with the headline "Pemex *Exonerates* HP of Megabribe."  *See* Edgar Sigler,
*Pemex Exonera a HP de Megasoborno*, EL FINANCIERO, May 13, 2015 (emphasis added),
16  http://bit.ly/1NycYON.  Nor did it escape the Mexican press's notice that Pemex's Form 20-F
flatly contradicts Pemex's allegations in this suit.  *See id.* ("La declaración se contrapone con una
17  demanda iniciada por Pemex en contra de HP en Estados Unidos a finales del 2014, …." ["The
statement contrasts with a lawsuit filed by Pemex against HP in the United States in late 2014,
18  …"]); *accord* Patricia Guerrero, *Concluye Investigacion Sobre Corrupcion*; *Exonera HP*, TERRA
MÉXICO, May 13, 2015, http://bit.ly/1PlcKZY (similar headline and observation).
19
  [4] Pemex made the same admission in the annual report it filed with the Comisión Nacional
20  Bancaria y de Valores, Mexico's equivalent of the SEC. *See* Petróleos Mexicanos Reporte Anual
para el año terminado el 31 de diciembre de 2014, at 132 (Apr. 30, 2015) ("El Órgano Interno de
21  Control de la Emisora llevó a cabo una investigación sobre el procedimiento de contratación
realizado en esta operación, cuyo resultado no acreditó el pago indebido.").  Pemex has posted
22  that report on its website at http://bit.ly/1UIyqCF.
23  [5] *See* Ley Orgánica de la Administración Pública Federal [LOAPF], *as amended*, §§ 37–VIII,
XII, Diario Oficial de la Federación [DO], 29 de diciembre de 1976 (Mex.), en relación con el
24  artículo segundo transitorio de la LOAPF publicado en el DO el 2 de enero de 2013; Ley Federal
de las Entidades Paraestatales [LFEP], *as amended*, § 62, Diario Oficial de la Federación [DO],
25  14 de Mayo 1986 (Mex.); Reglamento Interior de la Secretaría de la Función Pública [RISFP], *as
amended*, §§ 79–80, Diario Official de la Federación [DO], 15 de abril de 2009 (Mex.).
26
27
28

Postal Service, the Corporation for Public Broadcasting, and so on.[6] After investigating the issues at the heart of this case, Pemex's Internal Control Body found no bribe.

**2. *The revisions to Pemex's complaint.*** For the court's convenience, defendants' counsel prepared a redline of the First Amended Complaint against the original complaint. Ex. A. As the Court can see from the redline, Pemex's emendations group into essentially four categories: (a) communications and meetings involving Reynaud; (b) trips involving Reynaud; (c) transfers of money; and (d) the December 12, 2008 communications between HP Mexico and HP (U.S.) regional managers.

**(a.)** As for the first category, the new complaint adds a smattering of additional allegations about meetings and communications that are *not* alleged to have taken place in the United States. Indeed, these meetings and communications variously involved personnel of HP Mexico and Intellego, and presumably took place in *Mexico*, even though they may have involved discussions about possible trips elsewhere, such as Monaco, Brazil, or the United States. FAC ¶¶ 24, 25, 26, 27, 29, 30, 32, 55, 57. And the complaint offers no detail about what was discussed, only weak, rote conclusions: that the purposes were "to groom and induce," and "to plan and fuel," whatever that means. *Id.* ¶¶ 25, 26, 27, 29, 30, 31, 32; *see also id.* ¶¶ 153(a)(1), (2), (3), (4), (5).

**(b.)** So too with the second category of allegations—the trips. There are no new trips alleged, only the ones alleged last time—to Monaco, Brazil, Orlando, Miami, and so on. Mostly what is new is some additional calendar-entry-type detail here and there: For example, instead of just saying "three-day forum event in San Francisco," Original Complaint ("OC") ¶ 48, Pemex now specifies that the event took place "from at least April 1 to April 3, 2009," FAC ¶ 56; *see also* FAC ¶¶ 26, 27, 29, 30, 32, 55, 56, 57, 63, 64. But none of that trivia cures the central defect

---

[6] *See* Inspector General Act of 1978, 5 U.S.C. App. 3 §§ 2–4 (2012) (describing responsibilities of the Inspector General, including "conduct[ing] and supervis[ing] audits and investigations relating to the programs and operations," and "to prevent and detect fraud and abuse in, such programs and operations").

1    of the travel allegations, as identified by the Court:  that "Plaintiffs have not pled how these trips

2    violated the Travel Act, or were otherwise quid pro quo for Reynaud's signing of the contracts."

3    Op. 16 n.4; *see also* Op. 20.  On that score, instead of just mouthing "quid pro quo," the new

4    complaint speaks of "groom[ing]", "induc[ing]," "plan[ning]," and "fuel[ing]," as to the pre-BTO

5    deal trips; and, as to post-signing trips, repeatedly asserts that the purposes were "to reward

6    Reynaud Aveleyra" for the BTO contracts and "to induce and plan additional corrupt schemes."

7    FAC ¶¶ 55, 56, 57, 63, 64; *see also id.* ¶¶ 131, 153(a)(6), (7), (8), (9), (10).  Again, Pemex just

8    adds verbiage and rhetoric unreasonably inferred from innocuous emails and calendar entries—

9    not facts.  Rule 8, of course, requires more than "'magic words'" to infer an agreement.  *E.g.*, *Int'l*

10   *Norcent Tech.* v. *Koninklijke Philips Elecs. N.V.*, No. 07–cv–00043, 2007 WL 4976364, at *8

11   (C.D. Cal. Oct. 29, 2007) (finding allegations of illicit agreement insufficient and noting that,

12   "[a]lthough [plaintiff] added allegations that the [alleged conspirators] 'combined,' 'coerced'

13   content providers, and 'actively combated,'" "the amendments did not 'nudge [plaintiff's] claims

14   across the line from conceivable to plausible'"; quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544,

15   570 (2007)).[7]

16          **(c.)**  Which brings up the third category—the money.  The only additional "purpose"

17   ascribed to any of the trips is one about the alleged trip to Cupertino on May 16 through 19, 2009.

18   As to that one, the new complaint adds that one "reason[] for this trip w[as] for Reynaud

19   Aveleyra to receive and collect bribe money in California."  FAC ¶ 57.  Needless to say, Pemex

20   doesn't bother to explain how this conclusion comports with its Internal Control Body's finding

21   that there was no bribe.  In fact, Pemex's public securities filing eviscerates its amended

22   complaint's effort to infer a nefarious purpose from an innocuous fact alleged in the prior

23   _____

24       [7] Plaintiffs' allegations that these trips even occurred can hardly be considered plausible in
     light of the carefully phrased allegations in the original complaint—that Reynaud was merely
25   "*invited*" to attend them.  *See, e.g.*, OC ¶¶ 23, 24, 48, 54, 55.  The amended complaint offers no
     new allegations that the trips actually occurred, and instead offers only pure conclusions that they
26   did occur.

27

28   DEFENDANTS' MOT. TO DISMISS FIRST          10
     AM. COMPLAINT; SUPPORTING MEMO.
     CASE NO.:  CV-14-05292-BLF

1  complaint (an invitation to meet with HP management in California).  *See* OC ¶ 48.

2        But even leaving that aside, the allegation is still just a conclusion—there are no new *facts*

3  alleged to support it.  The only detail alleged is the same as alleged before, and trumpeted at oral

4  argument:  that "[a]t the time of these bribery payments, Reynaud Aveleyra had a personal

5  account at California Bank of Commerce, which has offices located in San Jose …."  OC ¶ 51;

6  FAC ¶ 60.  To that sentence, Pemex now tacks on the conclusion:  "Reynaud Aveleyra received

7  the four bribe payments in California."  FAC ¶ 60.

8        That is sheer speculation.  And even if it were true, it would have nothing to do with HP,

9  or even HP Mexico:  it was Intellego that made the payments, and there is no allegation that the

10  defendants had any knowledge about Reynaud's personal bank account, or any dealings with his

11  personal bank.  Beyond that, the speculation *directly contradicts* allegations *Pemex itself makes*

12  *multiple times* elsewhere in its complaint:  that the four payments were made *not* to Reynaud

13  *personally*, but "*to an entity* controlled by Reynaud Aveleyra," FAC ¶ 58 (emphasis added), a

14  "Reynaud Aveleyra-controlled *entity*," *id.* ¶ 59; *accord id.* ¶¶ 153(a), 228; and, not only that, that

15  Intellego made the payments to this "entity controlled by Reynaud Aveleyra … *for his use and*

16  *benefit in Mexico*," *id.* ¶ 150, 151 (emphasis added).

17        So which is it?  Pemex presents speculation, not facts, and self-contradictory speculation

18  at that.

19        **(d.)**  Finally, there is the email exchange and phone call between HP Mexico and HP

20  regional managers on December 12, 2008.  There is nothing new here.  That email chain was the

21  centerpiece of the DOJ fact statement and the SEC order, and was thus featured prominently in

22  the original complaint.  *E.g.*, OC ¶¶ 35, 138(a), (b), 150(a), (b); *see also* OC/FAC Ex. 1 at A5, *id.*

23  Ex. 2 at 10.  It does not reflect that anyone paid a bribe, and it certainly does not establish "that

24  HP 'directed the scheme' from the United States."  Op. 16 (describing "cursory" allegation in OC

25  ¶ 132).  Adding quotes from the emails does not change that.  *See* FAC ¶¶ 28, 42, 155.  (For the

26  record's sake, although it makes no substantive difference, it should be noted that Pemex sloppily

27

28  DEFENDANTS' MOT. TO DISMISS FIRST            11
   AM. COMPLAINT; SUPPORTING MEMO.
   CASE NO.:  CV-14-05292-BLF

and repeatedly misreads the email by asserting that ZettingBiz was the "pass-through partner." *E.g.*, *id.* ¶ 28.  The DOJ's and SEC's descriptions of the emails make clear that ZettingBiz was the "*Consultant,*" and thus affiliated with Intellego.[8])

**3.  *The deficiency of the "predicate acts."***  In short, the new complaint only highlights Pemex's failures of pleading.  Among other problems with the purported RICO predicates:

> ➢ Pemex still fails to allege how any of the purported Travel Act predicates (nos. 1–13, 15–17, 19, 21, 23–26) actually "violated the Travel Act, or were otherwise quid pro quo for Reynaud's signing of the contracts."  Op. 16 n.4; *see also* 18 U.S.C. § 1952(a) (Travel Act requires "intent to—(1) distribute the proceeds of any unlawful activity; or … (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity").

> ➢ Pemex again fails to plead how it "has been injured in [its] business or property," *Hourani* v. *Mirtchev*, No. 13–7088, 2015 WL 4590324, at *7 (D.C. Cir. July 31, 2015),[9] as a result of any of the predicates involving Reynaud's trips (nos. 1–5, 19, 21, 23–25), or any of the predicate acts involving the avoidance of "internal controls" (nos. 8, 10, 13, 17, 26).

> ➢ And Pemex once more fails to sufficiently plead that HP or HP Mexico acted with any intent to pay a bribe, both as to the wire fraud predicates (nos. 6–9, 11–12, 14–16, 18, 20, 22), *see Eclectic Props. E., LLC* v. *Marcus & Millichap Co.*, 751 F.3d 990, 997

---

[8] *Compare* FAC Ex. 1, at A5 ("HP MEXICO executives sent an e-mail claiming that CONSULTANT deserved an increased commission primarily because it had put in extra work …."; *id.* Ex. 2, at 10 ("an HP Mexico sales manager sent an email claiming that the Mexican Consultant deserved an increased commission primarily because it had put in extra work …."), *with* Docket No. 58-2 ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

[9] Indeed, this is true even of the money-laundering predicates—even if money was ultimately deposited in a U.S. bank account, it was not any such deposit that harmed Pemex.

1    (9th Cir. 2014) (wire fraud, 18 U.S.C. § 1343, requires "the specific intent to

2    defraud"), and the money-laundering predicates (nos. 11–12, 14–16, 18, 20–22), *see*

3    18 U.S.C. § 1956(a)(2) (money laundering requires "intent to promote the carrying on

4    of specified unlawful activity"). Certainly Pemex does not do so with the particularity

5    required by Rule 9(b) for wire fraud, *see* Op. 9—and, indeed, it cannot do so in light

6    of its admission that "no improper payment" was made.

7                              **ARGUMENT**

8         Even leaving apart Pemex's public admission that there was "no improper payment," the

9    First Amended Complaint must be dismissed: Pemex has failed to cure the multiple independent

10   deficiencies that this Court identified when it dismissed the RICO claims in the original

11   complaint. *See* Points I, II, and III below. But if any more is needed to dispose of this case,

12   Pemex's SEC Form 20-F supplies it—a binding admission that Pemex has no case. *See* Point IV

13   below.

14   **I.    PEMEX'S RICO CLAIMS ARE STILL IMPERMISSIBLY
            EXTRATERRITORIAL.**

15
16        **A.    Pemex still alleges a pattern of racketeering
                 activity that is impermissibly extraterritorial.**

17        In its opinion dismissing the RICO claims in the original complaint, this Court agreed

18   that, under *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247, 254–55 (2010), and *United*

19   *States* v. *Chao Fan Xu*, 706 F.3d 965, 978–99 (9th Cir. 2013), RICO does not apply

20   extraterritorially. The Court held that, to state a properly domestic civil RICO claim, Pemex must

21   "allege a cohesive set of predicate acts, taking place in the United States, which show plausibly

22   that the focus of their racketeering activity was domestic." Op. 14. Pemex must thus "plausibly

23   show[] that the pattern of racketeering activity was domestic," Op. 16—"that Defendants engaged

24   in a domestic scheme rather than just peripheral or isolated domestic acts," Op. 17.

25        The Court held that Pemex had failed to meet that standard. The Court held that "the

26   complaint only cursorily allege[d] that HP 'directed the scheme' from the United States, and lacks

27

28   DEFENDANTS' MOT. TO DISMISS FIRST                    13
     AM. COMPLAINT; SUPPORTING MEMO.
     CASE NO.: CV-14-05292-BLF

the same widespread allegations of wrongdoing based in the United States" as had been alleged in *Reich* v. *Lopez*, 38 F. Supp. 3d 436, 448 (S.D.N.Y. 2014). Op. 16 (citing OC ¶ 132). The Court added that Pemex had also "failed to plead sufficient facts to show that several of Reynaud's trips suffice as predicate acts," as Pemex had "not pled how those trips violated the Travel Act, or were otherwise quid pro quo for Reynaud's signing of the contracts, … and were not instead lawful preparatory acts that cannot be considered part of a pattern of racketeering activity." Op. 16 n.4. Still, the Court gave Pemex "leave to amend to allege additional facts to show that the pattern of activity in the alleged scheme was domestic." Op. 17.

The amendment, however, fails to move the domesticity needle at all. There is no new factual allegation that plausibly establishes "that HP 'directed the scheme' from the United States," or that turns "peripheral or isolated domestic acts" into "widespread … wrongdoing based in the United States." Op. 16, 17. In particular, the allegations about Reynaud's travel are *still* deficient. Pemex's colorful but utterly conclusory language—about "groom[ing]" and "induc[ing]" and "fuel[ing]" and "plan[ning]" and "reward[ing]"—adds nothing factual that wasn't in the complaint before. Even if the travel could somehow be said to violate the Travel Act—and it still can't—it would still be peripheral to the alleged scheme.

There remains nothing to support the notion that the supposed scheme was directed from the United States. As before, the December 12 emails and phone call certainly still show nothing of the sort. As the emails themselves (submitted by Pemex on the prior motion) show, and as the DOJ and SEC found, the *HP Mexico* representatives precipitated those exchanges—and got approval for a 1.5% increase in a commission by concealing the existence of the pass-through partner from middle managers at HP in the U.S. *See* Docket Nos. 58-2, 58-3; FAC Ex. 1 at A5, FAC Ex. 2 at 10. And what they got from the mid-level regional U.S. people was not authorization for any bribe, but authorization to pay a supposedly hardworking consultant a little bit more. Again, peripheral, not widespread, and certainly not evidence of a scheme directed from the United States.

1  Finally, Pemex's claim that Reynaud used one trip to California to collect money from a
2  personal bank account is, as noted above, utterly conclusory, contradicted by multiple allegations
3  in the complaint itself (allegations that say that the pass-through partner transferred money to a
4  Reynaud-controlled "*entity* controlled … *for his use and benefit in Mexico,*" FAC ¶ 150, 151),
5  and doesn't involve any wrongdoing by HP (because HP is not alleged to have had any
6  knowledge or dealings with Reynaud's alleged personal account). *See* p. 11, above. In any event,
7  even if the allegation of money in a U.S. account were plausible, it wouldn't matter: As this
8  Court noted, "to the extent the Bank of China fraud [in *Chao Fan Xu*] 'was predicated on
9  extraterritorial activity, it is beyond the reach of RICO even if the bank fraud resulted in some of
10  the money reaching the United States.'" Op. 13 (quoting *Chao Fan Xu*, 706 F.3d at 978); *accord*,
11  *e.g.*, *Hourani* v. *Mirtchev*, 943 F. Supp. 2d 159, 164, 167–68 (D.D.C. 2013) (cited with approval
12  at Op. 15), *aff'd on other grounds*, No. 13–7088, 2015 WL 4590324 (D.C. Cir. July 31, 2015).
13  So too here: even if the supposed Mexican bribery scheme resulted in money reaching the United
14  States, it would still be beyond the reach of RICO. *See* Mem. ISO Defs.' Mot. to Dismiss Compl.
15  ("Mot. to Dismiss") (Docket No. 31) at 11–13, 15; Defs.' Reply Mem. ISO Mot. to Dismiss
16  Compl. ("Reply") (Docket No. 41) at 10–11.

17  Accordingly, Pemex's complaint still "lacks the same widespread allegations of
18  wrongdoing based in the United States as the court found in *Reich*." Op. 16. In *Reich*, the
19  individuals who orchestrated the alleged scheme, defendants Betancourt and D'Agostino—who
20  were "founder[s]," "principal[s], "owner[s]," and "operator[s]" of the corporate defendants—
21  "own[ed] residential property in New York and reside[d] there for part of the year, including
22  during the time period of the alleged illegal activities." 38 F. Supp. 3d at 444. There is nothing
23  like that here. The two individuals "conduct[ed] and manage[d] the day-to-day affairs of [their
24  businesses] from their office in New York." *Id.* That didn't happen here. They unsuccessfully
25  tried to bribe the plaintiff, Reich, an American, presumably *in the United States*, in connection
26  with Reich's work on a lawsuit *in the United States*. *Id.* Not so here. And from the United

27

28

States, they made phone calls conveying false information about the American plaintiff, causing him economic harm.  *Id.* at 445, 448.  Again, not this case.[10]

To the contrary, Pemex still claims a predominantly foreign scheme:  that, to get a contract in Mexico for software and services in Mexico, Mexican personnel of a Mexican company, in Mexico, bribed a Mexican official of the Mexican state oil company, by paying, through a Mexican pass-through partner, money to a Mexican consultant, some of which the Mexican consultant, in turn, paid to a Mexican "entity controlled" by the Mexican official—all "for his use and benefit in Mexico."  FAC ¶¶ 150, 151.  The RICO claims must still be dismissed.

### B.    Pemex still alleges impermissibly extraterritorial losses.

That suffices to dispose of Pemex's RICO claims, but there is more to say on extraterritoriality—about Pemex's failure to plead a domestic injury.  *See* Mot. to Dismiss at 16–18; Reply at 1–4.  The Court, of course, found defendants' argument on this issue to be "facially appealing" but "ultimately unpersuasive," Op. 22, but defendants nonetheless respectfully seek to preserve it, and to make a quick point about it here.  The Court "grant[ed] Plaintiffs leave to amend in order to allege additional facts that would show a domestic injury," Op. 23, and Pemex has apparently replied to that invitation by claiming that Reynaud received money in the United States, FAC ¶ 138, and by claiming that his trips to the United States "robb[ed] Plaintiffs of Reynaud Aveleyra's faithful and honorable services in the United States," *id.* ¶ 139.  The first

---

[10]  Although the First Amended Complaint fails to allege the quantum of domestic activity alleged in *Reich*, the fact remains that *Reich* applied a more generous extraterritoriality standard for plaintiffs than the law of this Circuit allows. That is because *Reich* followed *European Community* v. *RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir.), *panel reh'g denied*, 764 F.3d 149 (2d Cir. 2014) (per curiam), *reh'g en banc denied*, 783 F.3d 123 (2d Cir. 2015), *pet. for cert. filed*, No. 15–138 (U.S. July 27, 2015).  *Reich*, 38 F. Supp. 3d at 447–48. As the D.C. Circuit has now observed, and as the Second Circuit en banc dissenters in *European Community* explained, the panel decision in *European Community* squarely conflicts with the Ninth Circuit's decision in *Chao Fan Xu.  Hourani* v. *Mirtchev*, 2015 WL 4590324, at *6 n.2 ("The courts of appeals have split on the issue"); *European Cmty.*, 783 F.3d at 130, 132, 139 (Raggi, J., dissenting from denial of rehearing en banc); *id.* at 129–30 (Cabranes, J., dissenting from denial of rehearing en banc).

1   allegation has already been addressed:  the claim that Reynaud got money in the United States is

2   factually baseless and contradicted elsewhere in the complaint.  *See* pp. 10–11, 15, above.  The

3   second is answered by the law:  "To demonstrate injury for RICO purposes, plaintiffs must show

4   proof of concrete financial loss, … and the deprivation of 'honest services' does not constitute

5   concrete financial loss."  *Ove* v. *Gwinn*, 264 F.3d 817, 825 (9th Cir. 2001); *accord*, *e.g.*, *United*

6   *States* v. *Kincaid-Chauncey*, 556 F.3d 923, 941 n.14 (9th Cir. 2009); *Mattel, Inc.* v. *MGA Entm't,*

7   *Inc.*, 782 F. Supp. 2d 911, 1021–22 (C.D. Cal. 2011).

8   **II.    PEMEX STILL FAILS TO ALLEGE A PATTERN OF**
        **RACKETEERING ACTIVITY.**

9

10        Even if Pemex's RICO claims were not impermissibly extraterritorial, the amended

11  complaint should be dismissed because Pemex has still failed, as this Court found on the earlier

12  motion, "to plead sufficient facts to show either closed- or open-ended continuity, and to plead

13  that the HP Russia, HP Poland, and HP Mexico schemes were sufficiently related to form a global

    pattern."  Op. 21.

14

15        **A.    Pemex still fails to allege a related "global scheme."**

16        This Court rejected Pemex's original attempt to cobble together its so-called "global

17  scheme" because Pemex had failed to establish "a relationship between the predicates"

18  comprising the three disparate schemes.  Op. 17 (internal quotation marks omitted).  Pemex had

19  failed to show how "the HP Poland and HP Russia schemes … are similar to the HP Mexico

20  scheme."  Op. 19.  Pemex has still failed to do so.

21        The First Amended Complaint fails to plead a single new fact linking the three schemes

22  together.  *See* Ex. A ¶¶ 76–116 (redline comparison of complaint and amended complaint).

23  Instead, to elide the absence of new facts, Pemex has essentially submitted a section of a brief—

24  six lengthy but conclusory paragraphs purporting to draw parallels between the facts previously

25  alleged in the complaint.  *See* FAC ¶ 166–171.  But the facts are still the same—the same facts

26  this Court has already deemed insufficient to establish relatedness.  Op. 18–19.  These six new

27  paragraphs consist entirely of legal conclusions; they do nothing to establish that these were

28  DEFENDANTS' MOT. TO DISMISS FIRST                    17
    AM. COMPLAINT; SUPPORTING MEMO.
    CASE NO.:  CV-14-05292-BLF

anything but "three factually distinct bribery schemes." Op. 19.

Pemex's effort to tie the schemes together based on the government investigations is equally futile. As explained above, each of the three HP subsidiaries entered a separate agreement with the DOJ—and as against HP Russia and HP Poland in particular, the DOJ brought *separate* criminal cases that wound up before *separate* district judges in this District. *See* p. 7 & n.1, above. The fact that the United States considered the HP Mexico, HP Russia, and HP Poland schemes to involve *three separate cases* demonstrates that there was no "relationship between the *predicate[]*" acts years earlier. Op. 17 (internal quotation marks omitted).

Likewise shy of the mark is Pemex's superficial effort to repackage its claim that the three schemes were coordinated by HP. Pemex now claims that HP "communicated" "the knowledge that each of its members acquired" in Poland and Russia to HP Mexico. *Compare* FAC ¶ 163 *with* OC ¶ 146. That is another raw conclusion: As with the original complaint, Pemex does not allege what actions HP took to direct the purported enterprise, or what HP supposedly "communicated" to its subsidiaries. Pemex can't allege that: as the DOJ and SEC fact statements incorporated into the complaint make clear, HP did not know of the isolated instances of misconduct at HP Russia, HP Poland, or HP Mexico. FAC Exs. 1, 2. Pemex's claims remain legally insufficient: they "give[] the Court no information as to the form or structure of that enterprise, the ways in which decisions are made in the enterprise, or even the hierarchy of the alleged actors in the enterprise." *Mohebbi* v. *Khazen*, 50 F. Supp. 3d 1234, 1254 (N.D. Cal. 2014).

### B. Pemex still fails to allege open-ended continuity.

As for the alleged Mexico scheme, the Court dismissed Pemex's open-ended continuity claims because the complaint failed to "ple[a]d facts to suggest that similar conduct will occur in the future." Op. 19. This ruling applies equally to the amended complaint, which again describes "a series of events that were undertaken to effectuate a single scheme, with two individuals—the COO and Reynaud" who "are no longer employed by Pemex." Op. 19.

1    Pemex's attempt to plead around the Court's ruling by alleging that racketeering was the

2    enterprise's "regular way of doing business" is unavailing.  FAC ¶ 155.  On its face, the amended

3    complaint alleges a series of acts relating to a single commercial transaction—the signing of the

4    BTO contracts.  The law in the Ninth Circuit is clear and directly on point:  "predicate acts

5    designed to bring about a single event (the signing of [a] contract) d[o] not pose a threat of

6    continuity."  *Sever* v. *Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992).[11]

7    Recognizing this problem, Pemex insists that "additional corrupt schemes" were in the

8    works.  *See, e.g.*, FAC ¶¶ 56, 57, 63, 64, 131.  But Pemex fails to provide any details that could

9    render this allegation remotely possible, including who was involved, what products were at

10   issue, or when these additional schemes allegedly occurred.  Indeed, the only support Pemex can

11   muster for its claim that there were other potential contracts on the horizon is a strained reading of

12   one of the December 12 emails.  *See* Docket Nos. 58-2, 58-3 (December 12 emails).

13   In that email, HP Mexico sought authorization from HP to increase Intellego's fee by

14   1.5% based on its successful management of the deal, including "discounts" ███████████

15   ████████████████████████████████████████████████████████████████

16   FAC ¶ 42 (quoting Docket No. 58-2).  Contrary to Pemex's assertions, nothing about this

17   statement suggests that "███████████████████████████████████████████

18   ██████████████"  *Id.*; *see also id.* at ¶ 155.  There isn't even a hint of illicitness in the

19   exchange.  Like any business, when HP sells software to a client, it does so with the expectation

20   that it will be able to compete for future business opportunities.  ███████████████████

21   ████████████████████████████████████████████████████████████████

22   _____

[11] *See also Howard* v. *Am. Online Inc.*, 208 F.3d 741, 750 (9th Cir. 2000) ("Plaintiffs present

23   no facts indicating that misleading advertising would continue into the future, particularly given
     that the problems stemmed from a one-time change in pricing policy."); *Schneider Rucinski*

24   *Enters.* v. *Stratasoft, Inc.*, No. 08–cv–138–WQH, 2009 WL 559827, at *10 (S.D. Cal. Mar. 3,
     2009) ("[T]he pattern of racketeering activity is related to a single transaction in which a single

25   victim is alleged to have been defrauded. … Since the only goal of the defendants was to 'defraud
     [the plaintiff's corporation],' any threat of continuing racketeering ceased when Plaintiff sent the

26   purchase money to defendants.").

27

28

███████.  Given this more plausible reading of the email, Pemex's interpretation "do[es] not plausibly establish [its] purpose." *Ashcroft* v. *Iqbal,* 556 U.S. 662, 681 (2009).

Further grasping at straws, Pemex alleges that the fact that HP and HP Mexico agreed to implement additional FCPA safeguards as a condition of entering the non-prosecution agreement with the DOJ suggests that the government believed there was an "ongoing threat of repetition." FAC ¶¶ 156, 177.  This claim fails on the face of the agreement.  One of the bases for the DOJ's entry into the non-prosecution agreement was the fact that defendants had *already* implemented "extensive remediation" measures before entering the settlement, including "enhancing their due diligence protocol … and enhancing their controls for payment of sales commissions to channel partners in Mexico."  FAC Ex. 1, at 1.  Defendants' enhanced internal controls and procedures made the threat of repetition *less* likely.

### C.    Pemex still fails to allege closed-ended continuity.

This Court found that the original complaint alleged, at most, a seven-month period over which the predicate acts occurred:  December 2008 until June 2009.  As the Court has already held, this is "insufficient for purposes of closed-ended continuity," which requires a showing that the predicate acts occurred over "a substantial period of time."  Op. 20–21.

The amended complaint contains the same defect.  In particular, Pemex's attempt to stretch the scheme back to January 2008 fails on its own terms.  Although it alleges some sporadic communications between HP Mexico and Reynaud in early 2008, the amended complaint alleges that the first BTO-related meeting occurred on *March 31*.  FAC ¶¶ 24–25.

More fundamentally, Pemex was unable to plead *any* predicate act before the contracts were signed in December 2008.  As the Court made clear, Pemex was required to show "how … the pre-contract travel by Reynaud to the United States [] violated the Travel Act."  Op. 20.  Pemex has again failed to do so.  Instead, the complaint cursorily alleges that, beginning in mid-April 2008, HP and HP Mexico offered Reynaud a series of trips with the purpose of "groom[ing]" him to accept additional trips and to "induce him to award the BTO Contracts to

1    HP and HP Mexico."  FAC ¶¶ 25–27.  This all remains utterly conclusory.  Pemex offers no

2    factual support establishing that any of these trips concerned BTO services, let alone a potential

3    bribe for the contracts.  Pemex still doesn't even offer factual support for the conclusion that these

4    trips even occurred.  *See* p. 10, n.7, above.  Beyond that, the same problems plague Pemex's *post-*

5    *signing* allegations as well:  For example, Pemex's repeated refrain that each post-December

6    2008 trip was paid for "with the intent to improperly reward Reynaud Avelyera … and to plan

7    and induce additional corrupt schemes," FAC ¶¶ 153(a)(6), (7), (8), is equally conclusory and

8    insufficient.

9    **III.    PEMEX'S RICO CLAIMS ARE TIME-BARRED.**

10        The Court granted Pemex leave to amend the complaint to "show that Reynaud and the

11   COO 'completely abandoned' Pemex"—that is, to "plead *facts* that plausibly show that Reynaud

12   and the COO were acting wholly for their own benefit and not *also* for the benefit of Pemex."

13   Op. 24–25 (first emphasis added).  Despite this directive, the best Pemex could come up with is

14   the cursory statement that the "sole, objective, intent and motivation for [Reynaud and the COO]

15   to enter into the BTO contracts was to steal $4 million to personally enrich themselves and their

16   co-conspirators."  FAC ¶ 70.[12]  This fails as a matter of law.

17        There is no plausible, factually supported allegation that Reynaud and the COO were not

18   acting at least in part for Pemex's benefit in securing the BTO deal from HP Mexico.  In

19   particular, Pemex does *not* plead—and cannot plead—that it did not receive the full value of the

20   products and services that Reynaud and the COO secured for Pemex's benefit while acting on

21   Pemex's behalf.  To the contrary, Pemex *concedes* (as the DOJ found) that those valuable

22

23        [12] Pemex's claim that the enterprise stole $4 million is a red herring.  That figure is just the
     rounded sum of HP's alleged proceeds from the BTO contracts—$2.52 million—and the $1.66
24   million received by Intellego, the Pass-Through Partner, and Reynaud.  FAC ¶ 71.  As the
     government found, Reynaud received payments totaling approximately $125,000, FAC Ex. 2 ¶
25   48, none of which is alleged to have come from Pemex's coffers.  But even taking Pemex's $4
     million calculation as fact would mean that Reynaud and the COO, acting for Pemex, secured at
26   least $2 million in BTO services for Pemex's benefit.

27

28   DEFENDANTS' MOT. TO DISMISS FIRST         21
     AM. COMPLAINT; SUPPORTING MEMO.
     CASE NO.:  CV-14-05292-BLF

1    products and services were worth at least $3.47 million. *See* FAC ¶ 135–37 (alleging that HP

2    earned $2.53 million on $6 million price). Nor does Pemex allege that the products and services

3    provided by HP Mexico were in any way defective. "[A]lthough [Reynaud's] motives may have

4    been entirely self-serving," his knowledge should be imputed to Pemex because it "arguably

5    benefited from the transaction[]." *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F.

6    Supp. 1424, 1463 (D. Ariz. 1992).

7         Pemex tries to salvage its abandonment claim by alleging that "[t]he services provided in

8    the BTO contract were not essential" and that Pemex "would have been far better off without

9    these services than they were by overpaying for them." FAC ¶ 72. According to Pemex,

10   Reynaud's failure to seek a better deal or to forgo it entirely is evidence of abandonment. *Id.*

11   ¶ 70. But the Court has already rejected this kind of conclusory allegation. Why, exactly, were

12   the services non-essential? On what basis would Pemex have been better off without them? How

13   do we know that Reynaud did not consider alternatives to the deal? Pemex offers no answers.

14        Putting aside Pemex's inability to plead complete abandonment, the amended complaint is

15   untimely for a second, independent reason: it fails to allege *anything* about Reynaud's June 2009

16   resignation and why it did not provide Pemex with "enough information to warrant an

17   investigation which, if reasonably diligent, would have led to discovery" of the alleged injury.

18   *Pincay* v. *Andrews*, 238 F.3d 1106, 1110 (9th Cir. 2001). Reynaud's June 5, 2009 resignation

19   was widely reported in Mexican and U.S. news sources, as were the reasons for his resignation.[13]

20   According to contemporaneous sources, Reynaud resigned as CIO following public reports that

21   he accepted a bribe—an all-expense paid trip to Monaco—from SAP, a German software

---

[13] *See, e.g.*, Robert Campbell, *SAP Denies Wrongdoing in Pemex Formula 1 Case*, Reuters, June 8, 2009, http://reut.rs/1Powk7n; Carolina Gómez, *Inhabilitará la SFP a Ex Funcionario de Pemex*, LA JORNADA, June 6, 2009, http://bit.ly/1NHRHA5; Alma Hernández, *Disfruta Premio, Pero Deja Cargo*, MURAL, June 6, 2009, 2009 WLNR 10880469; David Biller, *Pemex Official Resigns in Wake of Corruption Allegation*, BNAMERICAS.COM, June 5, 2009, http://bit.ly/1JtpRdd.

DEFENDANTS' MOT. TO DISMISS FIRST
AM. COMPLAINT; SUPPORTING MEMO.          22
CASE NO.: CV-14-05292-BLF

1     company, in exchange for granting SAP a technology contract.[14]

2          Pemex makes no effort to plead around these facts.  There is still no explanation as to why

3 Pemex was "in the dark" about its alleged injury, or why a diligent investigation could not have

4 uncovered it.  June 25 Hearing Transcript at 43 (Docket No. 57).  Because Pemex had actual or

5 constructive knowledge of its injury long before December 2010, the Court should dismiss

6 Pemex's claims as barred by the statute of limitations.

7 **IV.    EVEN APART FROM PEMEX'S FAILURE OF PLEADING,**
8        **THE COURT SHOULD DISMISS THE COMPLAINT IN**
       **LIGHT OF PEMEX'S ADMISSION THAT THERE WAS NO**
9        **BRIBE.**

10          Each of the above deficiencies—Pemex's failure to allege a domestic scheme or injury, its

11 failure to plead a pattern of racketeering, and its complaint's untimeliness—provides an

12 independent basis to dismiss the complaint even without reference to Pemex's statement in its

13 latest Form 20-F that there was "no improper payment" to Reynaud.  Pemex's admission that

14 there was no bribe provides an additional reason to dismiss the complaint with prejudice.

15          The law is clear that the Internal Control Body's conclusion that there was "no improper

16 payment" binds Pemex.  As the court held in *L-3 Commc'ns Integrated Sys., L.P.* v. *United*

17 *States*, 91 Fed. Cl. 347 (2010), *amended in part on other grounds on reconsideration*, 98 Fed. Cl.

18 45 (2011), conclusions of one arm of a government agency are binding on the rest of the agency

19 under Federal Rule of Evidence 801(d)(2)(D) as "admissions by a party-opponent."  91 Fed. Cl.

20 at 359.  Thus, in *L-3*, the court found that a report of the inspector general summarizing its

21         [14] The law is clear in this Circuit that "media reports" like those cited above "are judicially
22 noticeable documents provided they are not considered by the Court for the truth of their content,
but rather for the fact that the reports were made."  *United States* v. *Kiewit Pac. Co.*, No. 12–cv–
23 02698–JST, 2013 WL 5770514, at *5 (N.D. Cal. Oct. 24, 2013); *see also Von Saher* v. *Norton
Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2009) (taking judicial notice of
24 "various newspapers, magazines, and books … introduced to indicate what was in the public
realm at the time" (internal quotation marks omitted)).  Here, it is enough to take note of the fact
25 of Reynaud's resignation and widespread media reports suggesting that he resigned after
accepting a bribe in connection with a software contract.  These reports were sufficient to put
26 Pemex on notice of its need to investigate Reynaud's recent dealings.

27

28    DEFENDANTS' MOT. TO DISMISS FIRST        23
   AM. COMPLAINT; SUPPORTING MEMO.
   CASE NO.:  CV-14-05292-BLF

findings regarding the Air Force's procurement practices constituted an admission by the Air Force.  The same logic applies here:  The finding by Pemex's Internal Control Body that there was "no improper payment" is binding on plaintiffs as an admission of Pemex.[15]

This admission is fatal, as it renders each of Pemex's claims irredeemably implausible:

> ➤ *There was no pattern of predicate acts*.  The thesis of the complaint is that "Defendants … engaged in a pattern of racketeering designed to bring Pemex officials to the United States … to groom and induce them to accept corruption and entirely abandon their employer by stealing money from Pemex."  FAC ¶ 3. This claim falls apart if there was "no improper payment," as there could be no quid pro quo or theft from Pemex.

> ➤ *Pemex suffered no injury.*  Pemex alleges that, in exchange for the alleged bribes, Reynaud agreed to a contract "at inflated prices."  FAC ¶ 57.  Because there was "no improper payment," any alleged overpayment by Pemex was not a result of any bribe to Reynaud.

> ➤ *There was no illegal conduct sufficient to sustain Pemex's state-law claims.* The court sustained Pemex's state-law claims based on its allegation that HP sent "an email authorizing an increased *bribe* payment" from California, and "payment of such *bribes* [were made] through a United States bank account."   Op. 25 (emphasis added).  Because Pemex has admitted there was no bribe, there were no "illegal acts taking place in California," and the claims fail.  Op. 25.

---

[15] Separate and apart from the statement's admissibility under Rule 801, the Court can also take judicial notice of Pemex's Forms 20-F for the truth of the matter asserted because they incorporate "admission[s] … that bear[] substantially upon the legal sufficiency of [the] complaint."  *5-Star Mgmt. Inc.* v. *Rogers*, 940 F. Supp. 512, 519 (E.D.N.Y. 1996); *see also Flint* v. *Beneficial Fin. I Inc.*, No. 12–cv–01675–GEB, 2012 WL 3277109, at *3–4 (E.D. Cal. Aug. 9, 2012) (considering an admission made by plaintiff in a related state court proceeding for the truth of the matter asserted and dismissing the complaint on that basis).

**CONCLUSION**

For all of these reasons, Pemex has failed to cure the deficiencies of its RICO claims in accordance with this Court's prior opinion.  It thus has failed to allege a viable RICO claim, and, without a proper federal claim, the Court should not exercise jurisdiction over Pemex's pendent state-law claims.[16]  The complaint should be dismissed in its entirety, this time with prejudice, and without leave to amend.

WACHTELL, LIPTON, ROSEN & KATZ


By:  *George T. Conway III*                    Dated:  August 21, 2015
     George T. Conway III
     Caroline A. Olsen
     51 West 52nd Street
     New York, New York  10019
     Telephone:  (212) 403-1000
     Facsimile:  (212) 403-2000

     BERGESON, LLP
     Daniel J. Bergeson
     Caroline McIntyre
     John D. Pernick
     2033 Gateway Place, Suite 300
     San Jose, California  95110
     Telephone:  (408) 291-6200
     Facsimile:   (408) 297-6000

*Attorneys for Defendants Hewlett-Packard Co.*
  *and Hewlett-Packard Mexico, S. de R.L. de C.V.*

---

[16] *E.g.*, *Alda* v. *SBMC Mortg.*, No. 11–cv–00678–LHK, 2012 WL 10589, at *6 (N.D. Cal. Jan. 3, 2012) (declining to exercise supplemental jurisdiction over state-law claims after granting motion to dismissing all federal claims).  To preserve their rights on appeal, defendants continue to assert that Pemex has not stated a claim under California's Unfair Competition Law because it has failed to adequately allege that an illegal act occurred within California.  *See* Mot. to Dismiss at 25.