# EXHIBIT A

Melinda M. Morton, SBN 209373
mindy.morton@procopio.com
PROCOPIO, CORY, HARGREAVES AND SAVITCH LLP
1020 Marsh Road, Suite 200
Menlo Park, CA  94025
Telephone:  650.645.9000
Facsimile:  650.566.1061

Richard D. Bernstein, *pro hac vice* to be filed
Frank M. Scaduto, SBN 271451
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC  20006
Telephone:  202.303.1000
Facsimile:  202.303.2000

**UNREDACTED
(Highlighted)
CONFIDENTIAL**

*Attorneys for Plaintiffs*
PETRÓLEOS MEXICANOS, and
PEMEX EXPLORACIÓN Y PRODUCCIÓN

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| PETRÓLEOS MEXICANOS, and PEMEX EXPLORACIÓN Y PRODUCCIÓN <br><br>            Plaintiffs, <br><br>    v. <br><br> HEWLETT-PACKARD COMPANY, and HEWLETT-PACKARD MEXICO, S. DE R.L. DE C.V. <br><br>            Defendants. | Case No. CV-14-05292 BLF (NC) <br><br> **FIRST AMENDED COMPLAINT FOR:** <br><br> **VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND OF THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR FRAUDULENT CONCEALMENT AND TORTIOUS INTERFERENCE WITH CONTRACTS** <br><br> **DEMAND FOR JURY TRIAL** <br><br> Complaint filed:  December 2, 2014 |

1

KEY:  Deletion  Relocation  Addition

Plaintiffs, Petróleos Mexicanos ("Petróleos Mexicanos") and Pemex Exploración y Producción ("PEP") (collectively, "Pemex" or "Plaintiffs"), by and through counsel, file this First Amended Complaint against Defendants Hewlett-Packard Company ("HP") and Hewlett-Packard Mexico, S. de R.L. de C.V. ("HP Mexico") (collectively, "Defendants") and allege the following:

## NATURE OF THE ACTION

1.    Plaintiffs bring this action to seek restitution and injunctive relief and to recover damages relating to Defendants' pattern of bribery and other unlawful acts in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964, the California Business & Professions Code § 17200, *et seq*., and the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1, *et seq*. Plaintiffs also seek to recover for fraudulent concealment and tortious interference with contracts.

2.    During 2008 and 2009, Defendants, together with other members of HP's criminal enterprise, secured valuable contracts to sell Plaintiffs business technology optimization ("BTO") products and services by causing the corruption of officials who worked for Pemex through payments of an "influencer fee" to entities with ties to these officials. The contracts for these BTO products were for approximately $6 million. The Defendants received approximately $2,527,750 in net benefits from these contracts.

3.    Defendants, together with the other members of the criminal enterprise, engaged in a pattern of racketeering designed to bring Pemex officials to the United States for lavish trips—each trip a violation of the Travel Act and other US law—to groom and induce them to accept corruption and entirely abandon their employer by stealing money from Pemex for their own personal gain and the gain of their conspirators.

3̶4.    As a result of Defendants' scheme, Plaintiffs suffered millions of dollars of harm from the acceptance of harmful contractual terms and the payment of significant cost overcharges. Plaintiffs bring this action to seek restitution, to recover damages, and to enjoin further wrongdoing.

## JURISDICTION AND VENUE

4̶5.    This Court has federal question jurisdiction over Plaintiffs' RICO claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 1961, 1964. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

5̶6.     This Court has personal jurisdiction over Defendants. A substantial part of their wrongdoing occurred in California. HP maintains its principal place of business within the Northern District of California and harmed Plaintiffs by, in this District: (i) devising and implementing an inadequate and unlawful system of internal controls, (ii) making inaccurate and unlawful entries in its books and records, and (iii) authorizing and paying bribes. HP Mexico continuously and systematically transacts affairs and has general business contacts in the Northern District of California. HP Mexico purposefully directed its activities and consummated transactions in California, which proximately caused harm to Plaintiffs. Defendants corrupted Pemex officials through payments of money from a bank account in California, as described in this First Amended Complaint. Indeed, the allegations of the First Amended Ceomplaint are substantially based on the results of an investigation by the U.S. Attorney's Office by the Northern District of California into HP and HP Mexico's violations of the FCPA, which provides that "[a]ny criminal proceeding [under this chapter] may be brought in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa.

6̶7.     This Court also has personal jurisdiction over HP Mexico based on its actions as the agent, alter ego, and/or co-conspirator of HP.

        (a)     At all relevant times, as described below, Defendant HP Mexico was the agent of Defendant HP, and in doing the acts herein alleged, was acting in the scope of such agency, for the benefit of HP, with the permission and consent of HP. HP instructed and controlled HP Mexico, and as HP Mexico understood, HP controlled the business in Mexico. The basis for this allegation includes the interactions between HP and HP Mexico, the involvement of HP senior officials, the actions undertaken by HP Mexico for the benefit of HP, and other California and U.S. connections, all as alleged in this First Amended Ceomplaint. HP Mexico officers and employees caused the corruption of Pemex officials to secure business and profits for HP's benefit.

        (b)     At all relevant times, as described below, HP Mexico acted as a co-conspirator of HP with respect to conduct occurring in, and directed to, California, including by agreeing to form an enterprise and conducting the affairs of the enterprise by channeling bribes through intermediaries and agents to corrupt Pemex officials to win the contracts.

        (c)     In the alternative, at all relevant times, HP Mexico operated as the alter ego of HP. HP Mexico is wholly owned by HP, financially dependent on HP, and controlled by

3

HP. HP and HP Mexico commingle funds and other assets, including by jointly controlling a bank account located in California, as alleged in this First Amended Complaint. HP uses HP Mexico as a mere conduit for the affairs of HP, including by directing HP Mexico to secure the BTO contracts at issue, and carry out the other activities described in this First Amended Complaint, for the benefit of HP. There is a lack of segregation of HP and HP Mexico corporate records, as HP Mexico's books, records, and accounts are consolidated into HP's books and records and reported by HP in its financial statements. Accordingly, HP and HP Mexico share a unity of interest such that failure to disregard their separate entities would result in fraud or injustice. HP operated HP Mexico as its alter ego, at least in part, to carry out the bribery scheme described herein and cause substantial harm to Plaintiffs.

78.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because HP has its principal place of business in this district and because events giving rise to this First Amended Ccomplaint occurred in this district. Venue is also proper in this district pursuant to 18 U.S.C. § 1965.

## INTRADISTRICT ASSIGNMENT

89.     Division assignment to the San Jose Division of the United States District Court for the Northern District of California is proper pursuant to Civil Local Rules 3-2(c) and 3-2(e) because a substantial part of the events giving rise to the claims occurred in Santa Clara County, California.

## THE PARTIES

910.     Petróleos Mexicanos is, and at all relevant times was, an oil and gas entity with its principal place of business located in Mexico City, Mexico. Petróleos Mexicanos's main purpose is the development of business, economic, industrial and commercial activities related to the exploration and extraction of oil and hydrocarbons. Petróleos Mexicanos is a state-owned productive enterprise empowered by its law (the "Pemex Law") to act as an independent legal entity with technical, operational, and managerial autonomy. Petróleos Mexicanos is authorized to own property, conduct industrial operations, and perform sales and marketing activities. Petróleos Mexicanos and its subsidiary entities are authorized by law to enter into contracts, carry out operations, and Petróleos Mexicanos's chief executive officer has full general powers "for acts of ownership, management, litigation and collections." Petróleos Mexicanos's Board of

Directors is the highest governing body of Pemex and sets forth the policies, guidelines, and strategies for Petróleos Mexicanos and its subsidiary entities. In the case of acts of an international character, Pemex and its subsidiary entities are authorized to make claims under foreign law and under the jurisdiction of foreign courts in commercial matters.

~~10~~11. PEP is, and at all relevant times was, an entity and a subsidiary of Petróleos Mexicanos with its principal place of business located in Mexico City, Mexico. PEP's main activities include oil and natural gas exploration and exploitation, conveyance, storage in terminals and first hand commercialization. PEP is a state-owned subsidiary productive enterprise and is authorized to own property and carry out business in its own name, under the control and direction of Petróleos Mexicanos.

~~11~~12. HP is, and at all relevant times was, a corporation organized under the laws of Delaware with its principal place of business located in Palo Alto, California. HP is a global provider of personal computing devices, information technology infrastructure, and imaging and printing products and services. HP's common stock is registered with the Securities and Exchange Commission and trades on the New York Stock Exchange.

~~12~~13. HP Mexico is, and at all relevant times was, a wholly-owned subsidiary of HP with its principal place of business in Mexico City, Mexico. HP Mexico's books, records, and accounts are consolidated into HP's books and records and reported by HP in its financial statements.

## **FACTUAL BACKGROUND**

~~13~~14. For at least ~~eight~~ten years, beginning in ~~2003~~2000, HP functioned as an origin of corruption and bribery in different countries aimed at obtaining supply and services contracts. During this time, HP, operating through at least three of its nominal subsidiaries, made unlawful payments to numerous foreign government officials to illegally obtain lucrative contracts for HP. By partnering with these subsidiaries and other intermediaries and agents, Defendants operated a criminal ~~enterprises~~enterprise designed to obtain and retain business for HP.

~~14~~15. In Mexico, Russia, and Poland the scheme was the same. HP, through its wholly-owned subsidiaries HP Mexico, ZAO Hewlett-Packard A.O. ("HP Russia"), and Hewlett-Packard Polska, Sp. Z o.o. ("HP Poland"), channeled bribes through intermediaries and agents to government officials that could influence the awarding of government contracts.

~~15~~16.  In each case, the lavish bribes were falsely recorded in HP's books and records as legitimate consulting contracts, commissions, or travel expenses. The improper recording of these bribes by ~~the~~ Defendants and other enterprise members ensured that these corrupt payments, and the corresponding ill-gotten gains, would avoid detection by the scheme's victims.

~~16~~17.  During this period of corruption, HP's internal controls were unlawfully deficient and enabled the payment of bribes to foreign officials and the corruption of the governments and state-owned entities that employed them. Just as a fish rots from the head, the internal controls violations at HP's headquarters caused and spawned a pattern of criminal conduct throughout its subsidiaries.

~~17~~18.  Federal prosecutors ultimately uncovered HP's pattern of corruption and began investigations of the Defendants' criminal enterprise. At the conclusion of these investigations, HP Mexico acknowledged and accepted responsibility for its role in the criminal enterprise by agreeing with the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the Northern District of California (collectively the "Department") to enter into a Non-Prosecution Agreement (the "NPA"). In the NPA, HP Mexico admitted to making bribes and further agreed that had the matter proceeded to trial, the Department would have proven such facts, as described in detail therein, beyond a reasonable doubt. Bruce Ives, Senior Vice President and Deputy General Counsel at HP, signed the NPA on behalf of HP Mexico. A copy of this NPA and the accompanying Statement of Facts is attached hereto as Exhibit 1.

~~18~~19.  The Securities and Exchange Commission (the "SEC") simultaneously issued an Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order (the "SEC Order") to settle its investigation of the HP criminal enterprise. The SEC Order describes that HP "violated Section 13(b)(2)(A)" of the Securities Exchange Act by falsely recording bribes in its books and records and "also violated Section 13(b)(2)(B)" of the Securities Exchange Act for failing to maintain sufficient controls. In addition, the SEC Order describes illegal payments made by HP Mexico to obtain business from Pemex. The SEC Order further details the illegal payments made by HP Russia and HP Poland to accomplish the same ends. A copy of this SEC Order is attached hereto as Exhibit 2.

1920. The press release issued by the Department contemporaneous with the announcement of the NPA correctly described the Defendants' and enterprise members' misconduct as "a global labyrinth of complex financial transactions used by HP to facilitate bribes to foreign officials."

2021. Under the terms of the NPA and the SEC Order, Defendants agreed, *inter alia*, to pay the United States $34 million to settle the pending or expected proceedings. HP has also agreed to guarantee more than $73 million in payments to the United States to resolve the HP Russia and HP Poland investigations.

## I.    Defendants Corrupted Pemex Officials

2122. Beginning around 2008, HP, HP Mexico, and other enterprise members targeted Pemex. Around this time, HP Mexico entered into discussions to secure contracts to sell BTO software, hardware, and licenses to Plaintiffs. The contracts for these BTO products were for approximately $6 million.

2223. Defendants targeted Pemex's Chief Operating Officer and Pemex's Chief Information Officer, Manuel Reynaud Aveleyra, who would be a signatory on behalf of Pemex for the BTO contracts.

23. Over the course of the relevant period, the Defendants conferred a number of benefits on Reynaud Aveleyra with the intent to induce him to award Pemex contracts to HP. On April 21, 2008, HP Mexico's Account Manager, Miguel Angel Campos, invited Reynaud Aveleyra to attend a conference and dinner in Orlando, Florida. That same day, Angel Campos also invited Reynaud Aveleyra to attend a conference in Monaco from June 2 to June 4, 2008.

24. On January 30, 2008, HP Mexico's Technology Service Group Sales Manager, Luis Maza, and Manuel Fernandez from a Mexican information-technology consulting company, which also maintains operations in the United States, called Intellego, S.C. (collectively, with its affiliated companies and agents, "Intellego") scheduled a meeting with Reynaud Aveleyra. Reynaud Aveleyra then did meet with Maza and Fernandez the second week of February 2008.

25. Reynaud Aveleyra then met with HP Mexico's Account Manager, Miguel Angel Campos, regarding BTO services on March 31, 2008, and again the week of April 14, 2008. On April 1, 4, and 7, 2008, Reynaud Aveleyra and Angel Campos exchanged emails through a facility in interstate or foreign commerce to arrange the April 14, 2008, meeting. The purposes of this meeting were to groom Reynaud Aveleyra to accept bribes from HP and HP Mexico in the

form of lavish trips to the United States and payments in U.S. dollars.

26.    Over the course of the relevant period, the Defendants conferred a number of benefits on Reynaud Aveleyra with the intent to induce him to award Pemex contracts to HP. On April 21, 2008, HP Mexico's Angel Campos followed up with Reynaud Aveleyra regarding BTO services and offered Reynaud Aveleyra a trip to attend a conference and dinner in Orlando, Florida. Angel Campos made this offer to Reynaud Aveleyra by email through a facility in interstate or foreign commerce. HP and HP Mexico then caused and paid for Reynaud Aveleyra to travel to Orlando, Florida from at least May 4 to May 7, 2008. The purposes of this trip were to groom Reynaud Aveleyra to accept lavish trips to the United States and payment in U.S. dollars and to actually induce him to award the BTO contracts to HP and HP Mexico.

27.    On April 21, 2008, Angel Campos also offered Reynaud Aveleyra a trip to attend a conference in Monaco, noting that "[i]t is very important for us that you are able to attend." Angel Campos made this offer to Reynaud Aveleyra by email through a facility in interstate or foreign commerce. On May 13, 2008, Angel Campos emailed Reynaud Aveleyra and Eduardo Graniello, Intellego's chief executive, to discuss their "face-to-face meetings" in Monaco. HP and HP Mexico then caused and paid for Reynaud Aveleyra to travel to Monaco from at least June 2 to June 4, 2008. The purposes of this lavish trip were to groom Reynaud Aveleyra to accept other lavish trips to the United States and payment in U.S. dollars and to actually induce him to award the BTO contracts to HP and HP Mexico.

28.    HP Mexico began working on this scheme with another enterprise member, Zetting Business, S.C. and Zetting Services (collectively "ZettingBiz"), no later than June 2008. ZettingBiz, which maintains offices in the United States, acted as pass-through partner for the enterprise. ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Consequently, the key members of the enterprise were all actively participating no later than June 2008.

~~24~~29. On June 6, 2008, and again on June 9, 2008, Angel Campos ~~invited~~offered Reynaud Aveleyra a trip to meetings with HP executives and a lavish four-day event in Las Vegas, Nevada, concerning BTO services. Angel Campos made these offers to Reynaud Aveleyra by email through a facility in interstate or foreign commerce. This offer to Reynaud Aveleyra was confirmed by the HP Marketing Department through a facility in interstate or

foreign commerce. HP and HP Mexico then caused and paid for Reynaud Aveleyra to travel to Las Vegas, Nevada, from at least June 16 to June 19, 2008. The purposes of this extravagant trip were to plan and fuel the scheme and to further induce Reynaud Aveleyra to award the BTO contracts to HP.

~~25~~30. On September 3, 2008, and again on September 5, 2008, Angel Campos ~~contacted~~offered Reynaud Aveleyra a trip to ~~arrange~~attend a dinner meeting with HP's Vice President and Managing Director, and former CFO for HP Financial Services, Thomas Adams. Angel Campos made these offers to Reynaud Aveleyra by email through a facility in interstate or foreign commerce. HP and HP Mexico then caused and paid for Reynaud Aveleyra to travel to the United States to meet with Adams on or around September 10, 2008. The purposes of this trip were to plan and fuel the scheme and to further induce Reynaud Aveleyra to award the BTO contracts to HP.

~~26~~31. On September 16, 2008, HP Mexico's ~~Technology Service Group Sales Manager, Luis~~ Maza~~,~~ sent Reynaud Aveleyra an ~~e-mail~~email to confirm that an HP representative from Miami, Florida would be discussing ~~the BTO contracts~~meeting with Reynaud Aveleyra and "will be looking after [Reynaud Aveleyra] *on our behalf* in Rio~~." This communication corresponded with Reynaud Aveleyra's scheduled trip to Brazil.~~" (emphasis added). HP and HP Mexico then caused and paid for Reynaud Aveleyra to travel to Brazil on a lavish trip. The purposes of this trip were to plan and fuel the scheme and to further induce Reynaud Aveleyra to award the BTO contracts to HP.

~~27~~32. On October 13, 2008, Angel Campos and Maza ~~contacted~~offered Reynaud Aveleyra ~~to inquire if he could~~a trip to Miami, Florida to meet with HP's Vice President of Sales, Felix Feddersen~~, in Miami, Florida on November 4, 2008~~. Angel Campos and Maza made this offer to Reynaud Aveleyra by email through a facility in interstate or foreign commerce. The Defendants offered to pay for Reynaud Aveleyra's transportation, food, and lodging expenses for this trip. HP and HP Mexico then caused and paid for Reynaud Aveleyra~~,~~ to travel to Miami, Florida to meet with Feddersen on November 4, 2008. The purposes of this trip were to plan and fuel the scheme and to further induce Reynaud Aveleyra to award the BTO contracts to HP. Reynaud Aveleyra, Angel Campos and the HP Vice President of Sales had also met a few months prior to this communication.

~~28~~33. Pursuant to HP's global labyrinth of bribery, HP Mexico sales managers decided

to make payments to ~~a Mexican information technology consulting company, which also maintains operations in the United States, called Intellego, S.C. (collectively, with its affiliated companies and agents, "Intellego")~~ Intellego in order to obtain the BTO business from Plaintiffs. As HP Mexico admitted in the NPA, HP Mexico "understood from the earliest days of its negotiation with Pemex that it had to retain [Intellego] in order to win the Pemex contracts."

~~29~~34.   HP Mexico knew that the Chief Operating Officer was a former principal of Intellego. HP Mexico also knew that the Chief Operating Officer supervised Reynaud Aveleyra, who had significant responsibilities for the BTO contracts. HP Mexico retained Intellego because of the connection between Intellego and the Chief Operating Officer, Reynaud Aveleyra, and other Pemex officials. For example, Reynaud Aveleyra met with ~~Eduardo Graniello, Intellego's chief executive,~~ Intellego's Graniello on August 18, 2008, during the negotiations for this deal. Graniello also contacted Reynaud Aveleyra to arrange for additional discussions on September 17, 2008, November 19, 2008, and December 18, 2008. The connection amongst these enterprise members began ~~at least around~~ no later than January 30, 2008, when Maza and a representative from Intellego contacted Reynaud Aveleyra to schedule a meeting.

~~30~~35.   Intellego agreed to join the enterprise. As part of the agreement with Intellego, HP Mexico agreed to pay Intellego an "influencer fee" equal to 25% of the licensing and supporting components of the BTO contracts.

36.   On December 12, 2008, HP officials located in the United States approved the payment of an influencer fee to Intellego. That same day, an HP official in the United States sent an email to an HP Mexico official to coordinate the eschewing of internal controls. ██████████ ████████████████████████████████████████████████████████ ██████████████████████████████████

~~31~~37.   HP officials located in California approved the payment of an influencer fee to Intellego. The basis for this allegation includes the following, each of which is more fully described in this First Amended Complaint:  (i) HP Mexico entered into the NPA with federal prosecutors in the Northern District of California, which indicates that HP Mexico had material contacts in California; (ii) HP and HP Mexico arranged for a key Pemex official to meet with HP officials based in California as part of the bribery scheme; (iii) HP is headquartered in California and promulgated and implemented its inadequate internal controls from California; (iv) HP Mexico was seeking to procure the BTO contracts at the direction of, and for the benefit

of, California-based HP; and (v) the large number of HP subsidiaries involved in criminal conduct strongly suggests that the enterprise was run from ~~the~~HP headquarters in California.

~~32~~38. Defendants worked closely with Intellego throughout the negotiations in order to insure the influencer fee was paid in full and the bribe was successfully completed. A senior decision-maker with Intellego was a former HP Mexico senior executive who, just months earlier, had supervised HP Mexico's sales managers on the BTO contracts team.

~~33~~39. Intellego was not a pre-approved channel partner for HP Mexico and had not signed a channel partner agreement. Accordingly, HP Mexico executives also arranged for ~~another entity (the "Pass Through Partner")~~ZettingBiz, which was already an approved HP Mexico channel partner, to join the enterprise. Defendants arranged for ~~the Pass Through Partner~~ZettingBiz to receive funds from HP Mexico and then channel those funds to Intellego. As described by the Department, "HP agreed to pay a $1.41 million 'commission' to [Intellego] and hid the payments by inserting into the deal structure another third party, which had been approved by HP as a channel partner."

~~34~~40. ~~The Pass Through Partner~~ZettingBiz played no legitimate role in negotiating the BTO contracts, but was rewarded with payment of a portion of the influencer fee in exchange for passing on the bribe payments. HP Mexico executives falsely recorded ~~the Pass Through Partner~~ZettingBiz as the deal partner on the BTO contracts in HP's internal tracking system.

~~35~~41. Because HP Mexico had already agreed to pay Intellego an influencer fee equal to 25% of licensing and supporting components of the BTO contracts—which was the maximum amount permitted without seeking additional approvals—additional money was needed for ~~the Pass Through Partner's~~ZettingBiz's share of the illicit funds. Consequently, on or about December 12, 2008, HP Mexico executives sent an e-mail request to HP regional management requesting permission to increase the influencer fee from 25% to 26.5%.

~~36. This request for an increased influencer fee was sent by HP Mexico officials via an e-mail to HP officials located in California. The basis for this allegation includes the following, each of which is more fully described in this Complaint: (i) HP Mexico entered into the NPA with federal prosecutors in the Northern District of California, which indicates that HP Mexico had material contacts in California; (ii) HP Mexico arranged for a key Pemex official to meet with HP officials based in California as part of the bribery scheme; (iii) HP is headquartered in California and promulgated and implemented its inadequate internal controls~~

11

~~from California; (iv) HP Mexico was seeking to procure the BTO contracts at the direction of, and for the benefit of, California based HP; and (v) the large number of HP subsidiaries involved in criminal conduct strongly suggests that the enterprise was run from the headquarters in California.~~

██ ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████

43.    This request for an increased influencer fee was sent by HP Mexico officials via an e-mail to HP officials located in the United States.

~~37~~44.   Consistent with HP's global labyrinth of bribing foreign officials, the HP officials in ~~California~~the United States approved the increased influencer fee on the same day they received the request, thereby approving ~~the Pass Through Partner's~~ZettingBiz's share of the scheme's illicit proceeds and its role in the enterprise. HP Mexico has admitted that this approval was granted "[w]ith little or no additional review." HP officials sent this critical approval from ~~California~~the United States to HP Mexico officials in Mexico. ~~The basis for this allegation is the same as the preceding paragraph.~~

~~38~~45.   On or about December 22 and December 23, 2008, HP Mexico signed the contracts with Pemex and PEP for the BTO deal. Reynaud Aveleyra, among others, signed on behalf of Pemex. Luis Barraza, ~~Software Sales Manager for HP Mexico,~~ signed on behalf of HP Mexico.

~~39~~46.   On or about January 20, 2009, HP Mexico received a payment request from ~~the Pass Through Partner~~ZettingBiz "for recommending an HP solution to your customer." Later that day, ~~the Pass Through Partner~~ZettingBiz advised Intellego of an expected payment schedule from HP Mexico.

~~40~~47.   On January 21, 2009, Reynaud Aveleyra had a lunch meeting with Intellego's Graniello and others.

~~41~~48.   On or about January 23, 2009, HP Mexico informed ~~the Pass Through Partner~~ZettingBiz that the payment request had been approved. Consequently, Defendants' records falsely reflect that ~~the Pass Through Partner~~ZettingBiz was due a commission for the

BTO contracts. Defendants' records should instead have indicated that ~~the Pass Through Partner~~ZettingBiz was paid to forward a bribe to secure contracts for HP.

~~42~~49.  On or about January 28, 2009, ~~the Pass Through Partner~~ZettingBiz submitted an invoice to HP Mexico for the first influencer fee payment. HP Mexico ~~paid that invoice on or about February 10, 2009. HP Mexico~~ admitted in the NPA that it ~~made~~paid this ~~payment~~invoice "via wire transfer in U.S. dollars through a correspondent bank account in the United States." On behalf of itself and HP, HP Mexico sent bribe money on or about February 10, 2009, to a correspondent bank account in the United States. HP and HP Mexico then caused the bribe money to be sent from the correspondent bank account in the United Stated to ZettingBiz on or about February 10, 2009.

~~43~~50.  On or about February 5, 2009, ~~the Pass Through Partner~~ZettingBiz submitted another invoice to HP Mexico for the second influencer fee payment. HP Mexico ~~paid that invoice on or about February 12, 2009. HP Mexico~~ also admitted in the NPA that it ~~made~~paid this ~~payment~~invoice "via wire transfer in U.S. dollars through a correspondent bank account in the United States." On behalf of itself and HP, HP Mexico sent bribe money on or about February 12, 2009, to a correspondent bank account in the United States. HP and HP Mexico then caused the bribe money to be sent from the correspondent bank account in the United Stated to ZettingBiz on or about February 12, 2009.

~~44~~51.  These separate payments of the influencer fee were made in U.S. dollars through a correspondent bank account in the United States. This bank account was controlled by HP and HP Mexico and located in California. The basis for this allegation includes the following, each of which is more fully described in this First Amended Complaint: (i) HP Mexico entered into the NPA with federal prosecutors in the Northern District of California, which indicates that HP Mexico had material contacts in California; (ii) HP Mexico arranged for a key Pemex official to meet with HP officials based in California as part of the bribery scheme; (iii) HP is headquartered in California and promulgated and implemented its inadequate internal controls from California; (iv) HP Mexico was seeking to procure the BTO contracts at the direction of, and for the benefit of, California-based HP; (v) Reynaud Aveleyra had a bank account in California; and (vi) the large number of HP subsidiaries involved in criminal conduct strongly suggests that the enterprise was run from the headquarters in California.

~~45~~52.  The corrupt payments from Defendants to ~~the Pass Through Partner~~ZettingBiz

totaled approximately $1,663,503.

4653.   On or about February 11, 2009, the Pass Through PartnerZettingBiz transferred approximately $517,821 in the illegal funds to Intellego. On or about February 23, 2009, the Pass Through PartnerZettingBiz transferred an additional $892,493.23 in those illegal funds to Intellego. Together, these two transfers totaled approximately $1.41 million.  Intellego received each of these transfers in the United States, where both it and ZettingBiz have offices.

4754.   The Pass Through PartnerZettingBiz kept the remainder, approximately $250,000, as its compensation for participating in the enterprise's scheme.

4855.   In the midst of these payments, on February 2621, 2009, HP invited Reynaud Aveleyra to attend a three day forum event in San Francisco, California, in order to engage in discussions with HP executives. A short time later, on March 3, 2009, Defendants invited Reynaud Aveleyra to a separate four day meeting in Cupertino, California concerning BTO services. Around this same time, Angel Campos wrote to confirm, Angel Campos offered Reynaud Aveleyra a trip to attend a meeting with Reynaud Aveleyra and HP's Vice President of Enterprise Servers & Storage, Rudi Schmickl, for the last week of February 2009, to discuss "the importance of the projects that you have planned." At this time, Schmickl's office was at HP's headquarters in Palo Alto, California.  HP and HP Mexico then caused and paid for Reynaud Aveleyra to travel to Palo Alto, California around February 24, 2009. The purposes of this trip were to reward Reynaud Aveleyra for causing Pemex to award the BTO contracts to HP and HP Mexico at inflated prices and to induce and plan additional corrupt schemes.

56.   On February 26, 2009, HP offered Reynaud Aveleyra a trip to attend a three-day forum event in San Francisco, California in order to engage in discussions with HP executives. HP made this offer to Reynaud Aveleyra by email through a facility in interstate or foreign commerce. HP and HP Mexico then caused and paid for Reynaud Aveleyra to travel to San Francisco, California from at least April 1 to April 3, 2009. The purposes of this trip were to reward Reynaud Aveleyra for causing Pemex to award the BTO contracts to HP and HP Mexico at inflated prices and to induce and plan additional corrupt schemes.

57.   On February 26, 2009, and again on March 3, 2009, HP and HP Mexico also offered Reynaud Aveleyra a trip to attend a four-day meeting in Cupertino, California concerning BTO services. HP and HP Mexico made these offers to Reynaud Aveleyra by email through a facility in interstate or foreign commerce. HP and HP Mexico then caused and paid for

14

Reynaud Aveleyra to travel to Cupertino, California from at least March 16 to March 19, 2009. The reasons for this trip were for Reynaud Aveleyra to receive and collect bribe money in California, to reward Reynaud Aveleyra for causing Pemex to award the BTO contracts to HP and HP Mexico, at inflated prices, and to induce and plan additional corrupt schemes.

~~49~~58. On or about March 2, 2009, within weeks of receiving its second influencer fee payment from HP Mexico through ~~the Pass Through Partner~~ZettingBiz, Intellego made a cash payment of approximately $30,000 to an entity controlled by Reynaud Aveleyra. Two days later, Reynaud Aveleyra met with Angel Campos to discuss "Advances of BTO-HP."

~~50~~59. On or about March 30, 2009, Intellego made three additional cash payments totaling approximately $95,000 to the Reynaud Aveleyra-controlled entity.

~~51~~60. At the time of these bribery payments, Reynaud Aveleyra had a personal account at California Bank of Commerce, which has offices located in San Jose, California and Lafayette, California. Reynaud Aveleyra received the four bribe payments in California.

~~52~~61. Reynaud Aveleyra met with HP Mexico's Angel Campos on March 31, 2009, and April 6, 2009, to discuss additional details regarding the BTO contracts and the Defendants' corrupt plans. Reynaud Aveleyra, Angel Campos, Luis Barraza, and several others held similar meetings on March 30, 2009, ~~and~~ April 1, 2009, and April 6, 2009.

~~53~~62. The relationship amongst the enterprise members and Reynaud Aveleyra persisted beyond the passing of the bribe payments. For example, Intellego's Graniello reached out to speak with Reynaud Aveleyra on May 13, 2009, and again on May 14, 2009.

~~54~~63. On May 7, 2009, and again on May 12, 2009, HP ~~later invited~~offered Reynaud Aveleyra a trip to attend a three-day HP IT Forum with Randy Mott, the Executive Vice President and Chief Information Officer of HP, ~~beginning on June 3, 2009,~~ in Chicago, Illinois. HP offered to pay for Reynaud Aveleyra's hotel accommodations and meals and to arrange for a meeting with a professional race car driver. HP made these offers to Reynaud Aveleyra by email through facilities in interstate or foreign commerce. In 2009, Mott's office was located at HP's headquarters in Palo Alto, California. HP made this offer to Reynaud Aveleyra by email through a facility in interstate or foreign commerce. HP and HP Mexico then caused and paid for Reynaud Aveleyra to travel to Chicago, Illinois from June 3 to June 5, 2009. The purposes of this trip were to reward Reynaud Aveleyra for causing Pemex to award the BTO contracts to HP and HP Mexico at inflated prices and to induce and plan additional corrupt schemes.

5564. On May 13, 2009, HP ~~also invited~~offered Reynaud Aveleyra a trip to attend a four-day event at the Venetian Hotel in Las Vegas, Nevada, ~~from June 15, 2009,~~ along with Tom Hogan, Senior Vice President of HP Software Universe, and other HP executives. The ~~invitation~~offer included a VIP pass that provided access to clients, receptions, lunches, a guided tour, a dinner for executives, and priority information meetings. In 2009, Hogan's office was located at HP's headquarters in Palo Alto, California. HP and HP Mexico then caused and paid for Reynaud Aveleyra to travel to Las Vegas, Nevada from June 15 to June 19, 2009. The purposes of this trip were to reward Reynaud Aveleyra for causing Pemex to award the BTO contracts to HP and HP Mexico at inflated prices and to induce and plan additional corrupt schemes.

5665. U.S. interstate and international mail and wires were used by HP and HP Mexico to supply products and services under the BTO contracts, to transfer funds received from Plaintiffs under the BTO contracts, and to maintain an accounting of the proceeds received under the BTO contracts. Those proceeds were ultimately returned to HP in the United States as profits.

5766. At all relevant times, HP Mexico was subject to HP's internal accounting controls, and HP Mexico financial results were included in the consolidated financial statements of HP.

5867. HP and HP Mexico failed to properly record the unlawful cash payments bestowed on the Pemex officials in their books and records. In addition, as HP Mexico admitted in the NPA, HP Mexico's "books and records falsely reflected that ~~the [Pass Through Partner~~ZettingBiz] was the deal partner and principal recipient of the commission from the BTO Deal, which ultimately caused certain HP Co. books and records to be falsified."

5968. As Defendants have admitted, HP's inadequate internal controls caused improper payments to Pemex officials over an extended period.

6069. Throughout the relevant period, and including the entire time the BTO contracts were being negotiated, the Chief Operating Officer and Reynaud Aveleyra had abandoned their relationship with Pemex and were acting solely for their own personal benefit and the benefit of the criminal enterprise. These former Pemex officials were not acting within the scope of their employment, but instead, were acting directly adverse to Pemex's interests.

~~61.   According to publicly available information, the Chief Operating Officer was~~

16

~~employed by the Pass-Through Partner after leaving Pemex.~~

70.   The sole objective, intent and motivation for Reynaud Aveleyra and the Chief Operating Officer to enter into the BTO contracts was to steal $4 million to personally enrich themselves and their co-conspirators. Reynaud Aveleyra and the Chief Operating Officer had no objective, intent, or motive to seek the services provided in the BTO contracts at a lower price or a better quality from HP or others and did nothing to do so. They also did not even attempt to decide whether it would be better for Plaintiffs not to buy services from HP rather than overpay for them by over $4 million. Rather, their sole objective was, in fact, to steal over $4 million from Pemex and divide it among themselves and their fellow conspirators. They did not report and had no incentive to report the scheme to others working for Plaintiffs because doing so would have exposed their own theft.

71.   As a matter of economic reality, the enterprise stole over $4 million from Pemex in order to fund the bribe payments and the inflated profits of HP. The sale of services to Pemex, at inflated prices, through the BTO contracts was solely a foil to engage in this theft from Pemex. The enterprise members split up the proceeds of this theft, with HP retaining over $2.52 million and the other co-conspirators receiving over $1.66 million.

72.   The services provided in the BTO contract were not essential services for Plaintiffs. Plaintiffs would have been far better off without these services than they were by overpaying for them by over $4 million.

~~62~~73.   At all relevant times, Defendant HP Mexico was the agent of Defendant HP, and in doing the acts herein alleged, was acting in the scope of such agency, for the benefit of HP, with the permission and consent of HP. HP instructed and controlled HP Mexico, and HP Mexico understood that HP controlled the business in Mexico. HP controlled HP Mexico beyond the degree expected as an incident of HP's ownership of HP Mexico. HP Mexico officers and employees paid bribes to Pemex officials to secure business and profits for HP's benefit. As the SEC found, "the true purpose of the payments and gifts was to make improper payments to foreign government officials to obtain lucrative government contracts *for HP*" (emphasis added).

~~63~~74.   In the alternative, HP Mexico operated as the alter ego of HP. HP Mexico is wholly owned by HP, financially dependent on HP, and controlled by HP, HP and HP Mexico commingle funds and other assets, including by jointly controlling a bank account located in California, as alleged in this First Amended Complaint. HP uses HP Mexico as a mere conduit

for the affairs of HP, including by directing HP Mexico to secure the BTO contracts at issue, and carry out the other activities described in this First Amended Complaint, for the benefit of HP. There is a lack of segregation of HP and HP Mexico corporate records, as HP Mexico's books, records, and accounts are consolidated into HP's books and records and reported by HP in its financial statements. Accordingly, HP and HP Mexico share a unity of interest such that failure to disregard their separate entities would result in fraud or injustice. HP operated HP Mexico as its alter ego, at least in part, to carry out this bribery scheme and cause substantial harm to Plaintiffs.

6475.   HP, HP Mexico, Intellego and the Pass Through PartnerZettingBiz conspired together by agreeing to form an enterprise and conducting the affairs of the enterprise by channeling bribes through intermediaries and agents to Pemex officials to win the Pemex contracts. Accordingly, at all relevant times, HP, HP Mexico, Intellego and the Pass Through PartnerZettingBiz were co-conspirators.

## II.    HP's Other Racketeering Activity

6576.   An HP criminal enterprise began operating by approximately 2000, when it paid bribes to government officials in Russia, through its subsidiary HP Russia and a series of agents and consultants, to secure a government tender to automate the telecommunications and computing infrastructure of the Office of the Prosecutor General of Russia (the "GPO"), which was worth more than €35 million. This enterprise expected the tender to be the first phase of a larger project worth between $100 million and $150 million. According to an internal project memorandum circulated within HP Russia and elsewhere, enterprise members also believed this project was the "golden key" that could unlock other business opportunities with Russian state entities.

6677.   In addition to HP Russia, two HP business units, the Enterprise Systems Group and HP Services, were principally responsible for the GPO project.

6778.   From the inception of the GPO deal, HP Russia agreed to partner with intermediaries having close ties to the Russian government, with almost no due diligence. As described by the Department, internal financial documents identified these intermediaries as "'[Russian Government Agency 1]' or its 'authorized companys'; 'Intermediary 1,' a company registered in Switzerland but operated by Russian nationals; and 'Intermediary 2,' a three employee shell company incorporated in New York in 1997 with its business address at an

apartment building in Jersey City, New Jersey." Intermediary 1 and Intermediary 2 each agreed to participate in this enterprise.

~~68~~79. In December 2000, the principal of a small U.S. company with ties to Russian government officials approached HP Russia executives about participating in this scheme. In order to win the GPO tender, HP Russia executives agreed to pay the U.S. company $1.2 million and to use ~~him~~it as a subcontractor for the GPO tender.

~~69~~80. HP Russia was declared the winner of the GPO contract around January 2001, approximately six weeks after signing a teaming agreement with Intermediary 1 and in the midst of negotiating an agreement with Intermediary 2.

~~70~~81. In June 2001, HP Russia's Country Manager signed the GPO contract on behalf of HP pursuant to a power-of-attorney. HP agreed to serve as the contracting party on this deal. Years later, HP arranged for its German subsidiary, Hewlett-Packard ISE GmbH, to become the contracting entity on the GPO deal. Around August 2003, an HP Russia executive signed this later contract on behalf of Hewlett-Packard ISE GmbH, but did so without proper authorizations or power of attorney. In addition, HP failed to complete a Solution Opportunity and Review process or due diligence review prior to the execution of this contract.

~~71~~82. The Russian government initially attempted to secure U.S. government-backed financing for the GPO deal. Consequently, the enterprise substituted Intermediary 2, a U.S. company, for Intermediary 1, a Swiss company, as the principal contractor on the deal. In reality, Intermediary 2 was a pass-through entity and incapable of performing this role.

~~72~~83. In July 2001, and again in September 2001, HP Russia executives, principals from Intermediary 2, and HP managers met at HP's offices in Rockville, Maryland to discuss the GPO deal. During this meeting of enterprise members, the Intermediary 2 principals balked at providing HP managers with requested information and informed the HP managers that HP was fortunate to be involved in the GPO deal, and that Intermediary 2 could redirect the deal to HP's principal competitor.

~~73~~84. In 2002, the Russian government switched to German-backed financing for the GPO transaction. In 2003, to avoid losing the GPO tender following the change in financing and to skirt Russian officials considering whether to re-open the bidding process, HP Russia promised to make unlawful payments of approximately €2.8 million to the Russian government official—the director of a Russian foreign trade agency—responsible for handling the GPO

project.

74 85.  The enterprise used shell companies to funnel payments to Russian officials, at least one of which was Burwell Consulting, Ltd. ("Burwell"), a company registered in the United Kingdom and associated with a senior Russian official connected with managing the GPO project.

75 86.  The promise to pay the bribe to the Russian government official was approved by an HP Russia country manager. An HP Russia executive also signed a document titled "letter of obligation" that required HP to pay Burwell approximately €2.8 million. This contract appeared on letterhead with the HP logo and the name of the German-based HP entity Compaq Computers BDG, which had been acquired by HP around May 2002. This off-the-books contract was not disclosed to auditors and no due diligence was conducted of Burwell.

76 87.  HP Russia arranged to create a slush fund and to make these illicit payments through another enterprise member located in Germany (the "German Agent"). HP Russia sold contract hardware and other products to a Russian channel partner who in turn sold them to the German Agent. HP Russia then bought them back from the German Agent at a nearly €8 million markup, thereby creating a slush fund for the enterprise members. HP Russia maintained two sets of books and records, one which revealed the slush fund and bribe recipients, and another sanitized version that unlawfully omitted this information.

77 88.  The German Agent also acted as the pass-through for the bribes. HP Russia funneled approximately €8 million to the German Agent to pass through to other shell companies, at least one of which was Burwell Consulting, Ltd. Over the course of the scheme, HP and HP Russia paid over €21 million to, or through, the German Agent. The German Agent kept approximately €200,000 as compensation for its role in the enterprise.

78 89.  On behalf of HP and HP Russia, the German Agent also funneled at least €311,000 to bank accounts associated with the Russian government official to obtain and secure the GPO contracts. The German Agent also wired €2.2 million to bank accounts of other shell companies to further the enterprise's goals and purchase expensive jewelry, luxury cars, travel, tuition, furniture, electronic equipment, and other items.

79 90.  HP earned approximately $10.4 million in illicit profits from the GPO contracts. HP received these profits in the United States.

80 91.  At all relevant times, HP Russia was subject to HP's internal accounting controls,

and HP Russia's financial results were included in the consolidated financial statements of HP.

~~81~~92. Neither HP nor HP Russia conducted any meaningful due diligence on the German Agent. HP also failed to maintain sufficient internal controls that could have prevented the bribery of the Russian officials and the corruption of their tender process.

~~82~~93. HP and HP Russia failed to properly record the unlawful payments bestowed on the Russian government official in their books and records.

~~83~~94. The Russian government remained a target of enterprise conduct until at least 2007. For example, enterprise members conferred improper travel and entertainment benefits to such government officials in June and July 2006 in connection with the FIFA World Cup.

~~84~~95. On April 9, 2014, HP Russia agreed to plead guilty to felony violations of the FCPA, and to admit its role in the unlawful scheme described above, in United States v. ZAO Hewlett-Packard A.O., CR-14-201 (N.D. Cal. 2014). HP Russia acknowledged that these facts would have been proven beyond a reasonable doubt. HP Russia agreed to pay a criminal fine in excess of $58 million in connection with this settlement. As part of this plea agreement, HP guaranteed all payments due from HP Russia. HP further agreed to cooperate with the Department's investigations, to review internal controls, and to remediate ~~it~~its compliance measures. Bruce Ives, Senior Vice President and Deputy General Counsel at HP signed the plea agreement on behalf of HP Russia.

~~85~~96. At all relevant times, HP Russia was the agent of Defendant HP, and in doing the acts herein alleged, was acting in the scope of such agency, for the benefit of HP, with the permission and consent of HP. HP controlled and instructed HP Russia; HP Russia understood that HP controlled the business in Russia. HP Russia officers and employees paid bribes to government officials to secure profits for HP. As the SEC found, "the true purpose of the payments and gifts was to make improper payments to foreign government officials to obtain lucrative government contracts for HP." In addition, HP Russia explicitly entered into an illegally secured contract on behalf of HP through a power-of-attorney.

~~86~~97. In the alternative, HP Russia operated as the alter ego of HP. HP and HP Russia operated as the same entity, ignoring independence of corporate formalities and separate operations. HP operated HP Russia as its alter ego, at least in part, to carry out its bribery scheme and cause substantial harm to the Russian government.

~~87~~98. From approximately 2006 to 2010, an HP criminal enterprise targeted the Polish

government. During this time, HP Poland made unlawful payments to a government official to secure and maintain lucrative contracts with the Polish national police agency (the "KGP") for HP.

8899. Around 2006, a new KGP official, the Director of Information and Communications Technology (the "Polish government official"), assumed responsibility for reviewing previously-awarded technology contracts and reviewing future contracts.

89100. In or around October 2006, HP and HP Poland sponsored the Polish government official to attend a technology conference, near HP's headquarters, in San Francisco, California. HP Poland officials attended this conference and HP officials also attended this conference. The basis for this allegation includes HP's involvement as a sponsor of the conference, the proximity of the technology conference to HP headquarters, the opportunity and motive for HP to benefit from having its officials in attendance, and the other instances of meetings being arranged between HP officials and foreign government officials, as alleged in this First Amended Ccomplaint.

90101. Over the course of the conference, this enterprise conferred a number of impermissible benefits on the Polish government official with the intent to induce him to award government contracts to HP. The weekend before the conference, and without any legitimate promotional or educational purpose, HP Poland employees paid for dinners, gifts and sightseeing by the Polish government official in California. On the third day of the conference, these employees abandoned any notion that the California conference constituted a legitimate business purpose. Rather, the California conference was a launching point to treat the Polish government official to a sightseeing trip to Las Vegas, Nevada, including cash payments for expenses, drinks, dining, and a private tour flight over the Grand Canyon. The expenses were paid in cash, without proper authorization, and were not accurately recorded in HP Poland's books and records.

91102. Following this California boondoggle, HP Poland officials and the Polish government official met frequently to discuss business opportunities. Around this same time, HP Poland improperly provided expensive gifts to the public official for his personal use, including HP products such as desktop and laptop computers. Over an extended period of time, enterprise members provided the Polish government official with flat screen televisions, iPods, a home theatre system, and other HP devices.

92103. Around January and February 2007, shortly after receiving the first round of

bribes from the enterprise, the Polish government official signed two contracts with HP Poland valued at approximately $10.1 million. Around this time, HP Poland expanded the bribes to include large cash payments to the Polish government official in an amount equal to 1.2% of HP and HP Poland's net revenue on any contract awarded by the KGP. As part of this arrangement, the Polish government official agreed not to have existing contracts with HP examined for irregularities and potentially re-bid.

93104. In or around March 2007, HP Poland agreed to another KGP contract, which was also signed by the Polish government official, and was valued at approximately $15.8 million. Around this time, an HP Poland executive left a bag containing $150,000 in cash at the home of the Polish government official. On another occasion in 2007, an HP Poland executive gave the Polish government official $100,000 in cash in a parking lot in Warsaw.

94105. This enterprise continued paying bribes in exchange for official acts of the Polish government official at least through 2008. That year, an HP Poland executive gave the Polish government official bags of cash on at least four occasions totaling approximately $360,000. That same year the Polish government official signed three contracts on behalf of the Polish government with HP Poland. These agreements, executed in or about January, April, and May 2008, were valued at approximately $32 million in total.

95106. Enterprise members also paid the Polish government official $6,000 in 2009 and offered to pay him to help secure a new $4 million contract with the KGP in 2010.

96107. As a result of the bribery scheme, HP was awarded approximately $60 million in contracts by the Polish government. HP earned approximately $16.1 million in illicit profits from the KPGKGP contracts. HP received some or all of these profits in the United States.

97108. HP Poland was subject to HP's internal accounting controls, and HP Poland's financial results were included in the consolidated financial statements of HP.

98109. HP and HP Poland failed to properly record the unlawful gifts, hospitality, and cash payments bestowed on the Polish government official in their books and records.

99110. HP's inadequate internal controls enabled and caused improper payments to the Polish government official over the course of nearly four years.

100111. On April 9, 2014, HP RussiaPoland agreed to a Deferred Prosecution Agreement ("DPA") to potentially avoid prosecution for violations of the FCPA, in connection with its role in the unlawful scheme described above, in United States v. Hewlett-Packard

Polska, SP. Z o.o., CR-14-201 (N.D. Cal. 2014). HP Poland admitted and accepted responsibility for these acts and acknowledged that these facts would have been proven beyond a reasonable doubt. HP Poland agreed to pay a monetary penalty in excess of $15 million in connection with this settlement. As part of this plea agreement, HP guaranteed all payments due from HP ~~Russia~~Poland. HP further agreed to cooperate with the Department's investigations, to review internal controls, and to remediate its compliance measures. Bruce Ives, Senior Vice President and Deputy General Counsel at HP, signed the plea agreement on behalf of HP Poland.

~~101~~112. At all relevant times, HP Poland was the agent of Defendant HP, and in doing the acts herein alleged, was acting in the scope of such agency, for the benefit of HP, with the permission and consent of HP. HP instructed and controlled HP Poland. HP Poland understood that HP controlled the business in Poland. HP Poland officers and employees paid bribes to Polish officials to secure profits for HP. As the SEC found, "the true purpose of the payments and gifts was to make improper payments to foreign government officials to obtain lucrative government contracts for HP."

~~102~~113. In the alternative, HP Poland operated as the alter ego of HP. HP and HP Poland operated as the same entity, ignoring independence of corporate formalities and separate operations. HP operated HP Poland as its alter ego, at least in part, to carry out its bribery scheme and cause substantial harm to the Polish government.

~~103~~114. HP, HP Mexico, HP Poland, HP Russia and the various partners who acted as intermediaries and agents described above, conspired together and agreed to conduct and participate in the affairs of a global criminal enterprise.

~~104~~115. As reflected in the preceding paragraphs, HP directed the enterprise and shared information and strategies between HP Russia, HP Poland, and HP Mexico.

~~105~~116. In each country, Russia, Poland and Mexico, the enterprise channeled bribes through intermediaries and agents to government officials that could influence the awarding of government contracts. Accordingly, at all relevant times, HP, HP Mexico, HP Russia and HP Poland were co-conspirators.

### III.   Defendants' Inadequate Internal Controls and Control Failures

~~106~~117. In enacting the internal controls and other provisions of the FCPA, Congress sought to address a critical problem effecting domestic and foreign commerce:

Corporate bribery is bad business. In our free market system it is basic that the

sale of products should take place on the basis of price, quality, and service. Corporate bribery is fundamentally destructive of this basic tenet. Corporate bribery of foreign officials takes place primarily to assist corporations in gaining business. Thus foreign corporate bribery affects the very stability of overseas business. Foreign corporate bribes also affect our domestic competitive climate when domestic firms engage in such practices as a substitute for healthy competition for foreign business.

S. Rep. No. 95-114, at 4, *available at* 1977 U.S.C.C.A.N. 4098, 4101. For this reason, Congress determined that "[a] fundamental aspect of management's stewardship responsibility is to provide shareholders with reasonable assurances that the business is adequately controlled," the expected benefits of which are "of basic importance to investors and the maintenance of the integrity of our capital market system." *Id*. at 8, *available at* 1977 U.S.C.C.A.N. 4105-06. It further stressed that the internal controls provision "should effectively deter corporate bribery of foreign government officials." Criminal Div. of the U.S. Dep't of Justice and Enforcement Div. of the U.S. Sec. & Exch. Comm'n, *FCPA: A Resource Guide to the U.S. Foreign Corrupt Practices Act* 38 n.211 (2012) ("FCPA Guidance"). Federal authorities still recognize that internal controls provisions should deter corruption. *See id*.

~~107~~118. "The payment of bribes often occurs in companies that have weak internal controls environments." FCPA Guidance at 40. "Good internal controls can prevent not only FCPA violations, but also other illegal or unethical conduct by the company, its subsidiaries, and its employees." *Id*. at 41. Indeed, "[a]n issuer's responsibility thus extends to ensuring that subsidiaries or affiliates under its control, including foreign subsidiaries and joint ventures, comply with the accounting provisions." *Id*. at 43.

~~108~~119. Under the internal controls provision of the FCPA, 15 U.S.C. § 78m(b)(2), issuers must devise and maintain "an adequate system of internal controls to assure, among other things, that the assets of the issuer are used for proper corporate purpose." S. Rep. No. 95-114 at 7, *available at* 1977 U.S.C.C.A.N. 4105. The impetus for effective internal controls is created by a tone set at the top of an organization. FCPA Guidance at 57 ("Within a business organization, compliance begins with the board of directors and senior executives setting the proper tone for the rest of the company."). A basic directive of the internal controls provision requires that "[r]easonable assurances should be maintained that transactions are executed as authorized."

*SEC v. World-Wide Coin Investments, Ltd.*, 567 F.Supp. 724, 750-52 (N.D. Ga. 1983). Effective internal controls should also include a compliance program that promotes "an organizational culture that encourages ethical conduct and a commitment to compliance with the law," and "ensure[s] that the organization's compliance and ethics program is followed, including monitoring and auditing to detect criminal conduct." U.S. SENTENCING GUIDELINES MANUAL § 8B2.1(b) (2013).

~~109~~120. HP implemented a system of internal controls through its Standards of Business Conduct ("SBC"), which was in effect throughout the relevant time period. The SBC specified company rules and regulations governing legal and ethical practices, preparation of accurate books and records, contracting, and approvals and engagement of third parties.

~~110~~121. The SBC applied to HP business divisions and subsidiaries, including HP Mexico, HP Russia, and HP Poland. The SBC was developed and promulgated at HP's headquarters in California.

~~111~~122. HP's anti-corruption policies and controls were inadequate and thus enabled and caused the payment of illegal bribes to obtain business from Plaintiffs. As the SEC found, "HP failed to devise and maintain an adequate system of internal accounting controls sufficient to provide reasonable assurances that: (1) access to assets was permitted only in accordance with management's authorization; (2) transactions were recorded as necessary to maintain accountability for assets; and (3) transactions were executed in accordance with management's authorization."

~~112~~123. HP's internal controls and policies were insufficiently implemented at HP, HP Mexico, HP Russia, and HP Poland and allowed for the circumvention of internal accounting controls and the falsification of HP's books and records. The inadequacy of HP's internal controls and the occurrence of the bribery schemes are inextricably intertwined. But for the internal controls violations at HP's headquarters in California, HP Mexico, HP Russia, and HP Poland would not have implemented such a pattern of bribery, kickbacks, and corruption.

~~113~~124. With respect to the enterprise's conduct in Mexico, HP's inadequate internal controls enabled and caused, among other things, HP's approval of the increased influencer fee, which represented the bribes paid to the Pemex officials and the share of the illicit proceeds for Intellego and ~~the Pass Through Partner~~ZettingBiz, and the inadequate due diligence performed on this transaction. HP's inadequate internal controls also enabled and caused HP Mexico to

26

avoid channel partner controls by causing ~~the Pass Through Partner~~ZettingBiz, a previously approved channel partner, to enter the BTO transaction and consequently eschewing the completion of proper due diligence and written channel partner agreements for Intellego. HP's inadequate internal controls further enabled and caused HP Mexico to falsely request—and HP to approve—a 1.5% increase in the commission for Intellego that was actually paid to ~~the Pass Through Partner~~ZettingBiz. Moreover, HP's inadequate internal controls enabled and caused offers of improper gifts, travel, and entertainment in California and elsewhere in the United States to a Pemex official.

~~114~~125. At all relevant times, Defendant HP Mexico was the agent of Defendant HP, and in fraudulently concealing the bribery scheme from Plaintiffs, was acting in the scope of such agency, for the benefit of HP, with the permission and consent of HP. HP instructed and controlled HP Mexico, and HP Mexico understood that HP controlled the business in Mexico. HP Mexico paid bribes to secure business and profits for HP's benefit. In the alternative, HP Mexico operated as the alter ego of HP.

~~115~~126. In Russia, HP's inadequate internal controls enabled and caused, among other things, off-the-books payments, mechanisms for concealing third parties, a slush fund and attempts to conceal it with a second set of books and records, and secret contracts executed without proper authority.

~~116~~127. Similarly, in Poland, HP's inadequate internal controls enabled and caused, among other things, improper gifts, travel, and entertainment to a foreign official, bribes, and mechanisms for making and concealing cash payments to a foreign government official through its agents.

## IV.   Pemex Discovers the Criminal Conduct

~~117~~128. Defendants and enterprise members concealed the existence of the bribery scheme from Plaintiffs in order to effectuate the goals of the scheme and obtain business from Plaintiffs and relevant Pemex officials.

~~118~~129. Defendants concealed the payment of bribes by falsely recording these bribes and payments to Intellego as payments for legitimate services or commissions, when the true purpose of these payments was to make corrupt payments to Pemex officials to obtain business. HP Mexico's books and records falsely listed ~~the Pass Through Partner~~ZettingBiz as the deal partner and principal recipient of the commission from the BTO contracts. These false records

were consolidated and reported by HP to the SEC and other government agencies in its consolidated financial statements.

130. Reynaud Aveleyra and the Chief Operating Officer also concealed from Plaintiffs that they had received bribe payments from Defendants and other enterprise members. In fact, Defendants' concealment of the payments to the Chief Operating Officer was so effective, that even the federal prosecutors that investigated this matter were unable to determine how the enterprise funneled to him a share of the illicit proceeds. Likewise, the concealment of the payments to Reynaud Aveleyra was so effective that federal prosecutors were unable to determine where, or through which accounts, those payments were funneled or received.

131. Plaintiffs were not aware that Defendants provided Reynaud Aveleyra with lavish trips to the United States and abroad as an inducement to secure the BTO contracts, as a reward for those contracts, and as inducement for additional corrupt schemes. Defendants so thoroughly concealed those trips that federal prosecutors were unable to discover them.

~~119~~132. Accordingly, Plaintiffs could not, in the exercise of reasonable due diligence, have uncovered these facts for itself prior to the public disclosures by the Department and the SEC. Plaintiffs had no other notice of these injuries.

~~120~~133. Plaintiffs first discovered HP's illegal conduct around April 9, 2014, when the Department publicly announced that it had entered into the NPA with HP Mexico in connection with the events described in this First Amended Complaint. Also on April 9, 2014, the SEC issued the SEC Order regarding HP. Both the NPA and the SEC Order describe illegal payments made by HP Mexico to obtain business from Pemex and the Defendants' internal controls and books and records violations.

~~121~~134. Plaintiffs were not aware of this illegal conduct, or the losses and damages that resulted, until it received and reviewed the NPA and the SEC Order.

**V.     Injuries to Plaintiffs**

~~122~~135. As a direct and proximate result of ~~Defendant's~~Defendants' actions, Plaintiffs entered into the BTO contracts with HP Mexico and paid HP Mexico approximately $6,000,000.

~~123~~136. In total, HP and HP Mexico received approximately $2,527,750, or over 40%, as its net profits on the BTO contracts. HP received these profits in the United States.

~~124~~137. As a direct and proximate result of ~~Defendant's~~Defendants' actions, Plaintiffs suffered damages through increased costs that it would otherwise have not incurred had the BTO

contracts been awarded at fair market prices. That Defendants reaped more than $2.5 million in profits on a $6 million deal is substantial evidence that Pemex was overcharged.

138. The over $4 million that Defendants stole from Plaintiffs was obtained in U.S. dollars and sent to at least HP, Intellego, and Reynaud Aveleyra in the United States. Accordingly, Defendants caused Plaintiffs injury in the United States.

139. Plaintiffs were further injured by Defendants' sponsorship of Reynaud Aveleyra's trips to the United States. This is because while Reynaud Aveleyra was on United States soil, he was serving the interests of the conspirators, when he should have been providing faithful and honorable services to Plaintiffs. Defendants were thus robbing Plaintiffs of Reynaud Aveleyra's faithful and honorable services in the United States.

~~125~~140. Plaintiffs have no satisfactory or practical remedy available for monetary or injunctive relief in Mexico. Plaintiffs have no adequate recourse under Mexican law to recover an adequate remedy for Defendants' bribery and other unlawful acts. The presence of Defendant HP, its headquarters and a myriad of its employees and documents in California, the head of the enterprise sitting in California, the promulgation and implementation of HP's internal controls from California, and the interests of California and the United States in thwarting corruption and criminal conduct in and emanating from their jurisdictions, strongly support Plaintiffs' seeking justice in the Northern District of California.

~~126~~141. HP's criminal enterprises operated and caused injuries for at least eight years. The prolonged nature of the scheme, the Defendants' pattern of misconduct, and the frequency with which HP, its subsidiaries, and other enterprise members repeated similar crimes, threatens future harm to Plaintiffs and consumers and competitors in California.

~~127~~142. Defendants' prolonged and harmful conduct toward Plaintiffs was malicious, oppressive, and fraudulent.

## COUNT ONE
### (RICO)

~~128~~143. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

~~129~~144. Defendants are "persons" as defined in 18 U.S.C. § 1961(3).

~~130~~145. Defendants HP and HP Mexico along with Intellego and ~~the Pass Through Partner~~ZettingBiz were an association-in-fact "enterprise" as defined in 18 U.S.C. § 1961(4).

29

The members of the enterprise functioned together as an ~~on going~~ongoing organization with a common purpose of maximizing sales, commissions, and profits, and securing contracts for HP. The enterprise functioned together from at least January 2008 when members of the enterprise targeted Plaintiffs by beginning discussions with Reynaud Aveleyra to secure contracts to sell BTO software, hardware, and licenses to Plaintiffs and then by offering him lavish trips, gifts, and entertainment, which continued through the performance of the BTO contracts. The enterprise operated for a sufficient duration to permit its members to successfully pursue the enterprise's purpose by securing the BTO contracts for HP and by receiving sales, commission, and profits from Plaintiffs. The enterprise continued through at least ~~mid~~June 2009 as evidenced by Intellego's communication to Reynaud Aveleyra on May 14, 2009, and HP's ~~proposal~~sponsored travel for Reynaud Aveleyra in June 2009.

~~131~~146. The enterprise engaged in, and its activities affected, interstate and foreign commerce. Enterprise members repeatedly communicated and transferred funds between the United States and Mexico.

~~132~~147. Defendants knowingly and willfully conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise. HP directed the affairs of the enterprise from its offices in the United States. HP executives participated in at least eight meetings with Reynaud Aveleyra in the United States, HP sent a representative from the United States to "look after" Reynaud Aveleyra on a trip to Brazil, HP sent emails offering lavish trips to Reynaud Aveleyra, HP officials within the United States approved the payment of an influencer fee, and HP officials within the United States approved increasing the influencer fee. HP Mexico further acted as a conduit for criminal activity for HP. HP Mexico, on HP's behalf and at the direction of HP, corralled the members of the enterprise and coordinated their interactions to secure the BTO contracts for HP. During the relevant period, HP Mexico was acting as an agent of HP because HP Mexico is a wholly owned subsidiary of HP and is under the control of HP. HP Mexico operates on the behalf of HP with the authority to secure contracts and business for HP in Mexico. Alternatively, HP Mexico was acting as the alter ego of HP in coordinating the enterprise. HP approved of the workings of the enterprise and approved of payments made to and through the enterprise.

~~133~~148. Defendants knowingly and willfully conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity

30

involving a series of related ~~illegal~~ predicate acts.

149. As part of the enterprise's regular way of conducting ongoing business, the Defendants engaged in at least the following 26 domestic predicate acts, which are explained in more detail herein:

1)  HP and HP Mexico offered on April 21, 2008, and then caused and paid for Reynaud Aveleyra's trip to attend a conference and dinner in Orlando, Florida, from May 4 to May 7, 2008. (Travel Act)

2)  HP and HP Mexico offered on June 6, 2008 and on June 9, 2008, and then caused and paid for Reynaud Aveleyra's trip to a four-day event in Las Vegas, Nevada, with HP, from June 16 to June 19, 2008. (Travel Act)

3)  HP and HP Mexico offered on September 3, 2008 and on September 5, 2008, and then caused and paid for Reynaud Aveleyra's trip to attend a dinner meeting in the United States with HP's Vice President and Managing Director, on or around September 10, 2008. (Travel Act)

4)  Around September 16, 2008, HP and HP Mexico offered and then caused and paid for Reynaud Aveleyra to travel to Brazil, where an HP representative from Miami, Florida looked after Reynaud "on our behalf." (Travel Act)

5)  HP and HP Mexico offered on October 13, 2008, and then caused and paid for Reynaud Aveleyra's trip to attend a meeting with HP in Miami, Florida, on November 4, 2008. (Travel Act)

6)  On December 12, 2008, HP received an email in the United States requesting authorization to increase the fee paid to ZettingBiz, without due diligence. (Wire Fraud, Travel Act)

7)  On December 12, 2008, HP sent an email from the United States, authorizing an increase in the fee paid to ZettingBiz, without due diligence. (Wire Fraud, Travel Act)

8)  On December 12, 2008, an HP official in the United States sent an email to an HP Mexico official to coordinate the eschewing of internal controls. (Wire Fraud, Travel Act)

9)  On December 12, 2008, an HP official in the United States participated in a phone conversation with an HP Mexico official to discuss the pass-through deal structure

31

and Reynaud. (Wire Fraud, Travel Act)

10) HP and HP Mexico agreed to insert ZettingBiz into the deal structure to hide payments to Intellego and subvert internal controls. (Travel Act)

11) On February 10, 2009, HP Mexico wired bribe money to a correspondent bank account in the United States. (Money Laundering, Wire Fraud, Travel Act)

12) On February 10, 2009, HP Mexico caused bribe money to be wired, in U.S. dollars, from a correspondent bank account in the United States, to ZettingBiz. (Money Laundering, Wire Fraud, Travel Act)

13) The February 10, 2009, bribe payment were then falsely recorded as a legitimate commission in HP's books and records in California. (Travel Act)

14) On February 11, 2009, ZettingBiz sent Intellego part of its share of the bribe money, in U.S. dollars, to a bank account located in the United States. (Money Laundering, Wire Fraud)

15) On February 12, 2009, HP Mexico wired bribe money to a correspondent bank account in the United States. (Money Laundering, Wire Fraud, Travel Act)

16) On February 12, 2009, HP Mexico caused bribe money to be wired, in U.S. dollars, from a correspondent bank account in the United States, to ZettingBiz. (Money Laundering, Wire Fraud, Travel Act)

17) The February 12, 2009, bribe payment was falsely recorded as a legitimate commission in HP's books and records in California. (Travel Act)

18) On February 23, 2009, ZettingBiz sent Intellego its remaining share of the bribe money, in U.S. dollars, to a bank account located in the United States. (Money Laundering, Wire Fraud)

19) HP and HP Mexico offered on February 21, 2009, and then caused and paid for Reynaud Aveleyra's trip to attend a meeting in Palo Alto, California, with an HP Vice President, on or around February 24, 2009. (Travel Act)

20) On or around March 2, 2009, Intellego sent Reynaud Aveleyra part of his share of the bribe money to a bank account located in the United States. (Money Laundering, Wire Fraud)

21) HP and HP Mexico offered on February 26, 2009 and again on March 3, 2009, and then caused and paid for Reynaud Aveleyra's four-day trip to Cupertino, California,

regarding BTO services, from March 16 to March 19, 2009. (Travel Act)

22) On or around March 30, 2009, Intellego sent Reynaud Aveleyra the remaining part of his share of the bribe money to a bank account located in the United States. (Money Laundering, Wire Fraud)

23) HP and HP Mexico offered on February 26, 2009, and then caused and paid for Reynaud Aveleyra's three-day trip to San Francisco, California, with HP executives, from April 1 to April 3, 2009. (Travel Act)

24) HP and HP Mexico offered on May 7, 2009 and again on May 12, 2009, and then caused and paid for Reynaud Aveleyra's three-day trip to Chicago, Illinois, with HP executives and a meeting with a professional race car driver, from June 3 to June 5, 2009. (Travel Act)

25) HP and HP Mexico offered on May 13, 2009, and then caused and paid for Reynaud Aveleyra's four-day trip to the Venetian Hotel in Las Vegas, Nevada, with HP executives, from June 15 to 19, 2009. (Travel Act)

26) The promulgation and implementation of deficient internal controls by HP that enabled and caused the bribe payments. (Travel Act)

~~134~~150. While conducting the enterprise's affairs, Defendant HP Mexico committed multiple acts of money laundering in violation of 18 U.S.C. § 1956(a)(2) by transporting, transferring or transmitting a monetary instrument or funds of a value far exceeding $10,000, from a place in the United States ultimately to Mexico with the intent to promote the carrying on of bribery chargeable under state law and bribery of public officials. HP Mexico arranged with HP for funds totaling $1,663,503 to be paid from a bank account in the United States to ~~the Pass Through Partner~~ZettingBiz on at least two separate occasions around February 2009. HP Mexico transferred these funds to ~~the Pass Through Partner~~ZettingBiz with the intent and knowledge that ~~the Pass Through Partner~~ZettingBiz would, and indeed did, transfer funds to Intellego for the purpose of making payments to an entity controlled by Reynaud Aveleyra, a public official, for his use and benefit in Mexico. These transfers were a *quid pro quo* for awarding HP Mexico the BTO contracts. Bribery of a public official is "specified unlawful activity" under 18 U.S.C. § 1956(c)(7)(B)(iv).

~~135~~151. Defendant HP committed multiple violations of the federal money laundering statute, 18 U.S.C. § 1956(a)(2), while conducting the enterprise's affairs by transporting,

transferring or transmitting a monetary instrument or funds of a value far exceeding $10,000, from a place in the United States ultimately to Mexico with the intent to promote the carrying on of bribery chargeable under state law and bribery of public officials. HP approved of multiple payments to be made from an account that HP controlled in the United States to ~~the Pass Through Partner~~ZettingBiz on two separate occasions in February 2009. HP approved the payments knowing, or willfully blinding itself to, the fact that ~~the Pass Through Partner~~ZettingBiz would, and indeed did, transfer funds to Intellego for the purpose of making payments to an entity controlled by Reynaud Aveleyra, a public official, for his use and benefit in Mexico. These transfers were a *quid pro quo* for awarding HP Mexico the BTO contracts. Bribery of a public official is "specified unlawful activity" as defined by 18 ~~USC~~U.S.C. § 1956(c)(7)(B)(iv).

      (a)     Defendant HP is liable for the money laundering acts committed by HP Mexico in violation of 18 U.S.C. § 1956(a)(2) because, during the relevant period, HP Mexico was acting as an agent of HP and acted within the scope of its authority to benefit HP. In the alternative, HP is liable for the acts committed by HP Mexico because HP Mexico was the alter ego of HP.

      (b)     Defendant HP is liable for the money laundering acts committed by HP Mexico in violation of 18 U.S.C. § 1956(a)(2) because, during the relevant period, HP Mexico was a co-conspirator of HP'~~s~~s, and HP's violations of 18 U.S.C. § 1956(a)(2) were within the scope of the conspiracy and reasonably foreseeable.

~~136~~152. Defendant HP Mexico committed multiple violations of the Travel Act, 18 U.S.C. § 1952 (the "Travel Act"), while conducting the enterprise's affairs, by using facilities in interstate and foreign commerce with the intent to promote and carry on the unlawful activities of bribery and money laundering in violation of California's commercial bribery statute, California Penal Code Section 641.3, money laundering in violation of 18 U.S.C. § 1956(a)(2), and the FCPA, while promoting, carrying on and facilitating its bribery and money laundering schemes. HP Mexico arranged with HP for wire transfers of funds totaling $1,663,503 to be paid from a bank account in the United States to ~~the Pass Through Partner~~ZettingBiz on at least two separate occasions around February 2009. HP Mexico transferred these funds with the intent for ~~the Pass Through Partner~~ZettingBiz to transfer funds to Intellego for the purpose of making payments to an entity controlled by Reynaud Aveleyra, a public official, as a *quid pro quo* for

awarding HP Mexico the BTO contracts. In sending the wire approval request by e-mail from Mexico to HP in the United States, HP Mexico promoted, carried on and facilitated the enterprise's bribery and money laundering schemes in violation of California and federal law. Some or all of the proceeds of the enterprise's unlawful activity were distributed in the United States through a facility in interstate or foreign commerce. Defendants HP and HP Mexico also coordinated and participated in the travel of Reynaud Aveleyra to multiple locations in the United States, such as San Francisco, California, Palo Alto, California, Cupertino California, Orlando, Florida, ~~Las Vegas, Nevada,~~ Miami, Florida, Chicago, llinois, and ~~Miami, Florida~~Las Vegas, Nevada, throughout the relevant period, including travel to California on ~~two~~three separate occasions within weeks of making the wire transfers in 2009. The travel was provided in connection with a *quid pro quo* arrangement for awarding HP Mexico the BTO contracts for the benefit of HP, in facilitation of the enterprise's bribery and money laundering schemes and in violation of California and federal law.

~~137~~153. Defendant HP committed multiple violations of the Travel Act while conducting the enterprise's affairs by using facilities in interstate and foreign commerce with the intent to promote and carry on the unlawful activities of bribery and money laundering in violation of California's commercial bribery statute, California Penal Code Sections 641.3, money laundering in violation of 18 U.S.C. § 1956(a)(2), and the FCPA, while promoting, carrying on and facilitating the enterprise's bribery and money laundering schemes.

(a)     HP violated the Travel Act through the following violations of California's commercial bribery statute and federal money laundering and antibribery statutes: HP sent an e-mail approving wire transfers to be paid from a bank account under HP's control in the United States to ~~the Pass Through Partner~~ZettingBiz on at least two separate occasions in 2009. HP approved the transfer of these funds while knowing, or willfully blinding itself to the fact that, ~~the Pass Through Partner~~ZettingBiz would, and indeed did, transfer funds to Intellego for the purpose of making payments to an entity controlled by Reynaud Aveleyra, a public official, as a *quid pro quo* for awarding HP Mexico the BTO contracts. In sending approval for the wire transfers to HP Mexico, HP promoted, carried on and facilitated the enterprise's bribery and money laundering schemes in violation of California and federal law. HP also ~~coordinated~~offered by email, then caused and paid for the travel of Reynaud Aveleyra to multiple locations in and outside the United States, ~~such as San Francisco, California, Orlando,~~

35

Florida, Las Vegas, Nevada and Miami, Florida throughout the relevant period, including travel to California on two separate occasions within weeks of making the wire transfers. The travel was provided with the intent of promoting its bribery and money laundering schemes, made in connection with a *quid pro quo* arrangement for awarding HP Mexico the BTO contracts, in facilitation of the enterprise's bribery and money laundering schemes in violation of California and federal law. The following trips are each Travel Act violations:

1)  HP and HP Mexico offered, then caused and paid for Reynaud Aveleyra's trip to Orlando, Florida from May 4 to May 7, 2008. HP and HP Mexico intended this trip to groom Reynaud Aveleyra to accept additional trips to the United States and to accept payments in U.S. dollars, and to induce Reynaud Aveleyra to award the BTO contracts to HP. The intent is demonstrated by the temporal proximity of the offer of the travel (April 21, 2008), just days after Reynaud Aveleyra met with HP Mexico's Account Manager concerning the BTO contracts in April 2008, and the offer was made in connection with the BTO contracts.

2)  HP and HP Mexico offered, then caused and paid for Reynaud Aveleyra's trip to a lavish four-day event in Las Vegas, Nevada, with HP, from June 16 to June 19, 2008. The trip included meetings with HP executives. This trip was intended by HP and HP Mexico to plan and fuel the scheme and to induce Reynaud Aveleyra to award the BTO contracts to HP. This trip was offered as part of the *quid pro quo* scheme as, at the time, ZettingBiz had begun "support[ing]" HP and HP Mexico with executing the bribery scheme.

3)  HP and HP Mexico offered on September 3, 2008 and September 5, 2008, and then caused and paid for Reynaud Aveleyra's trip to attend a dinner meeting in the United States with HP's Vice President and Managing Director, on or around September 10, 2008, with the intent to plan and fuel the scheme and to induce Reynaud Aveleyra to award the BTO contracts to HP. This travel took place during BTO contract negotiations while Intellego was actively contacting Reynaud Aveleyra as part of the scheme.

4)  Around September 16, 2008, HP and HP Mexico offered, and then caused and paid for Reynaud Aveleyra to travel to Brazil for a lavish trip with the intent to plan and fuel the scheme and to induce Reynaud Aveleyra to award the BTO contracts to HP. HP and HP Mexico's intent is demonstrated by HP Mexico explicit representation to Reynaud Aveleyra that an HP regional representative from Miami, Florida would be "looking

after" Reynaud Aveleyra on "our behalf." Further, this travel took place during BTO contract discussions, while Intellego was actively contacting Reynaud Aveleyra as part of the scheme.

5) HP and HP Mexico offered on October 13, 2008, and then caused and paid for Reynaud Aveleyra's trip to attend a meeting with HP in Miami, Florida, on November 4, 2008, with the intent to plan and fuel the scheme and to induce Reynaud Aveleyra to award the BTO contracts to HP. HP and HP Mexico's intent is demonstrated by the timing of this, which took place during BTO contract negotiations while Intellego was actively contacting Reynaud Aveleyra as part of the scheme.

6) HP and HP Mexico offered on February 21, 2009, and then caused and paid for Reynaud Aveleyra's trip to attend a meeting in Palo Alto, California, with an HP Vice President, on or around February 24, 2009, with the intent to improperly reward Reynaud Aveleyra for awarding the BTO contracts to HP and HP Mexico at inflated prices and to plan and induce additional corrupt schemes. The travel was made in the midst of, and in connection with, the bribe payments filtering from HP and HP Mexico to ZettingBiz and Intellego, shortly following the award of the BTO contracts.

7) HP and HP Mexico offered on February 26, 2009 and March 3, 2009, and then caused and paid for Reynaud Aveleyra's four-day trip to Cupertino, California, from March 16 to March 19, 2009 with the intent to improperly reward Reynaud Aveleyra for awarding the BTO contracts to HP and HP Mexico at inflated prices and to plan and induce additional corrupt schemes. The travel was also offered and provided so that Reynaud Aveleyra could receive and collect bribe money that had been paid in U.S. dollars, on or around March 2, 2009, in California.

8) HP and HP Mexico offered on February 26, 2009, and then caused and paid for Reynaud Aveleyra's three-day trip to San Francisco, California, with HP executives, from April 1 to April 3, 2009, with the intent to improperly reward Reynaud Aveleyra for awarding the BTO contracts to HP and HP Mexico at inflated prices and to plan and induce additional corrupt schemes. The travel was provided in the midst of, and in connection with, Reynaud Aveleyra's receiving the bribe payments on or around March 30, 2009.

9) HP and HP Mexico offered on May 7, 2009 and May 12, 2009, and then caused and paid for Reynaud Aveleyra's three-day trip to Chicago, Illinois, from June 3 to June 5, 2009,

with the intent to improperly reward Reynaud Aveleyra for awarding the BTO contracts to HP and HP Mexico at inflated prices, and to plan and induce further cooperation from Reynaud Aveleyra in awarding HP and HP Mexico additional lucrative contracts. The trip included a meeting with HP executives and featured lavish entertainment and perks, such as a meeting with a professional race car driver.

10) HP and HP Mexico offered by email on May 13, 2009, then caused and paid for Reynaud Aveleyra's four-day trip to the Venetian Hotel in Las Vegas, Nevada, with HP executives, from June 15 to 19, 2009, with the intent to improperly reward Reynaud Aveleyra for awarding the BTO contracts to HP and HP Mexico at inflated prices. The lavish trip included a VIP pass that provided access to clients, receptions, lunches, a guided tour, a dinner for executives, and priority information meetings.

(b)      Defendants HP and HP Mexico also independently violated the Travel Act through the following violations of the FCPA:

i.      Defendants, in conducting the affairs of the enterprise, violated the anti-bribery provisions of the FCPA.

ii.      HP Mexico, a "person" within the meaning of the FCPA, knowingly used and caused to be used interstate and international e-mails and wire transfers in furtherance of payments to corrupt foreign officials employed at Pemex, while knowing that a portion of such money would be given to those foreign officials to influence and induce their decisions with respect to improperly awarding the BTO contracts to HP Mexico for the purpose of obtaining business for HP.

iii.      HP Mexico also offered and conferred a number of benefits to Reynaud Aveleyra with the intent to induce him to award, and reward him for directing, Pemex contracts to HP Mexico for HP's benefit, including invitations toten lavish trips to San Francisco, California, Palo Alto, California, Cupertino California, Orlando, Florida, Miami, Florida, Chicago, Illinois, and Las Vegas, Nevada and Miami, Florida.

iv.      HP, an "issuer" within the meaning of the FCPA, corruptly used and caused to be used interstate and international e-mails and wire transfers in furtherance of payments to corrupt foreign officials employed at Pemex,

while knowing or willfully blinding itself to the fact that a portion of such money would be given to those foreign officials to influence and induce their decisions with respect to improperly awarding the BTO contracts to HP Mexico for the purpose of obtaining business for HP.

v.  HP also offered and conferred a number of benefits to Reynaud Aveleyra with the intent to induce him to award, and reward him for directing, Pemex contracts to HP Mexico for HP's benefit including ~~invitations to~~ lavish trips to San Francisco, California, Palo Alto, California, Cupertino, California, Orlando, Florida, Miami, Florida, Chicago Illinois, and Las Vegas, Nevada ~~and Miami, Florida~~.

vi.  HP is liable for the acts and FCPA violations committed by HP Mexico because, as described herein, during the relevant period, HP Mexico was acting as an agent of HP. In the alternative, HP is liable for the acts committed by HP Mexico because HP Mexico was the alter ego of HP.

vii.  Further, in conducting the affairs of the enterprise, Defendants HP and HP Mexico continuously violated the FCPA by failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that its transactions are properly carried out and recorded and that the company's assets are protected, in violation of the accounting provisions of the FCPA.

viii.  HP violated the FCPA internal controls provision by knowingly approving the increased commission paid to ~~the Pass Through Partner~~ZettingBiz, with little or no due diligence. HP also violated the FCPA internal controls provision by failing to implement effective internal controls at its wholly-owned subsidiary HP Mexico.

ix.  HP Mexico, as an agent of an issuer, violated the FCPA internal controls provision by knowingly avoiding channel partner controls by causing ~~the Pass Through Partner~~ZettingBiz, a previously approved HP Mexico channel partner, to enter the BTO transaction to skirt due diligence and other requirements, and by falsely requesting a 1.5% increase in the commission for Intellego that was actually paid to ~~the Pass Through Partner~~ZettingBiz.

39

x.      Defendants, in conducting the affairs of the enterprise, also violated the FCPA by failing to make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflect the transactions and dispositions of their assets, in violation of the accounting provisions of the FCPA.

xi.      HP violated the FCPA books and records provision by incorporating and consolidating the false records of HP Mexico into its own books and records. HP's books and records falsely reflected ~~the Pass Through Partner~~ZettingBiz as the deal partner and principal recipient of commissions from the BTO contracts and did not accurately reflect that approximately $125,000 in bribes was paid to a Pemex official.

xii.    HP Mexico, as an agent of an issuer, willfully violated the FCPA books and records provision by knowingly recording the bribes paid to the Pemex officials as commissions, including by falsely recording that ~~the Pass Through Partner~~ZettingBiz was due a commission on the BTO contracts, by falsely recording ~~the Pass Through Partner~~ZettingBiz as the BTO deal partner, and by failing to record $1.41 million in payments to Intellego.

xiii.   Following each of these events, HP and HP Mexico thereafter promoted, managed, established, carried on, and facilitated the promotion, management, establishment, or carrying on, of unlawful activity, including bribery, wire fraud, and money laundering in violation of the laws of the United States.

(c)      In addition to the other violations described herein, HP is liable for violating California Penal Code §§ 641.3 and 778a because HP Mexico acted as HP's agent in paying the bribe to Reynaud Aveleyra and securing the BTO contracts on behalf of HP. HP acted as a principal in ~~California~~the United States by approving retention of ~~the Pass Through Partner~~ZettingBiz as a party to the BTO transactions and approving payments to ~~the Pass Through Partner~~ZettingBiz, which ultimately served as the bribe to Reynaud Aveleyra.

(d)    Defendant HP is liable for the Travel Act violations committed by HP Mexico because, during the relevant period, HP Mexico was acting as an agent of HP and acted within the scope of its authority to benefit HP. In the alternative, HP is liable for the acts

committed by HP Mexico because HP Mexico was the alter ego of HP.

(e)     Defendant HP is also liable for the Travel Act violations committed by HP Mexico in violation of 18 U.S.C. § 1952 because, during the relevant period, HP Mexico was a co-conspirator of HP's, and HP's violations of 18 U.S.C. § 1952 were within the scope of the conspiracy and reasonably foreseeable.

~~138~~154. Separately, Defendants conducted the affairs of the enterprise through a pattern of racketeering activity by engaging in multiple instances of wire fraud, in violation of 18 U.S.C. § 1343. The Defendants devised and knowingly participated in a scheme to defraud Plaintiffs by activity in the United States with the specific intent to deceive or defraud Plaintiffs by causing Plaintiffs to enter into the BTO contracts and agree to pay Defendants approximately $6,000,000. The statements that Defendants made regarding the BTO contracts contained material omissions, in that they failed to disclose Defendants' relationship with, and corruption of, Reynaud Aveleyra and the Chief Operating Officer or their affiliated entities. In furtherance of the scheme to defraud Plaintiffs of money through false and fraudulent pretenses, Defendants knowingly and willfully transmitted, or caused to be transmitted, the following wires through interstate or foreign commerce:

(a)     On December 12, 2008, HP Mexico executives sent a request for permission from HP regional management to increase the influencer fee from 25% to 26.5%. This request for an increased influencer fee was sent by HP Mexico officials via an e-mail to HP officials located in ~~California~~the United States.

(b)     On December 12, 2008, the HP officials in ~~California~~the United States approved an increased influencer fee on the same day they received the request, with little or no additional review, thereby approving ~~the Pass Through Partner's~~ZettingBiz's share of the scheme's illicit proceeds and its role in the enterprise. HP officials sent this critical approval from ~~California~~the United States to HP Mexico officials in Mexico.

(c)     On February 10, 2009, HP Mexico wired bribe money to a correspondent bank account in the United States.

(d)     On February 10, 2009, HP Mexico caused bribe money to be wired, in U.S. dollars, ~~through~~from a correspondent bank account in the United States, to ~~the Pass Through Partner~~ZettingBiz.

(e)     On February 12, 2009, HP Mexico wired bribe money to a correspondent

41

bank account in the United States.

(df)        On February 12, 2009, HP Mexico ~~wired~~caused bribe money to be wired, in U.S. dollars, ~~through~~from a correspondent bank account in the United States, to ~~the Pass Through Partner~~ZettingBiz.

(eg)        These payments from Defendants to ~~the Pass Through Partner~~ZettingBiz totaled $1,663,503. A portion of these funds were then used to corrupt Reynaud Aveleyra and the Chief Operating Officer.

(fh)        The correspondent bank account used by HP Mexico was controlled by HP and located in California.

(i)        On or around February 11, 2009, ZettingBiz sent Intellego part of its share of the bribe money, $517,821, to or through a location in the United States.

(j)        On or around February 23, 2009, ZettingBiz sent Intellego its remaining share of the bribe money, $892,493.23, to or through a location in the United States.

(k)        On or around March 2, 2009, Intellego sent Reynaud Aveleyra part of his share of the bribe money, $30,000, to a bank account located in California.

(l)        On or around March 30, 2009, Intellego sent Reynaud Aveleyra the remaining part of his share of the bribe money, $95,000, to a bank account located in California.

~~139~~155. Given the fact that the ongoing enterprise's regular way of doing business was through a pattern of racketeering activity, there ~~is~~was a substantial threat ~~that this established~~, at all times during the pattern of racketeering ~~behavior in the interest of enterprises involving HP products has persisted or could continue into the future.~~activity, that Defendants' established behavior of committing predicate acts to secure contracts for HP products and services would persist and continue into the future. This threat was particularly heightened because HP and its subsidiary HP Poland continued with nearly identical bribery and criminal misconduct through at least April 2010. Moreover, HP and HP Mexico continued corruptly providing Reynaud Aveleyra with expensive travel and accommodations six months after the BTO contracts were signed, as part of their plan to obtain corruptly additional contracts from Plaintiffs. ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████

156. The Department of Justice explicitly recognized a significant, ongoing threat of repetition in April 2014, such that both HP and HP Mexico represent in the NPA that they "will *continue* to implement a compliance and ethics program designed to *prevent and detect* violations of the FCPA and other applicable anti-corruption laws *throughout their operations*, including [in] activities *carrying a high risk of corruption*" (emphasis added). Likewise, the simultaneous SEC Order obligates Defendants to a three year reporting term providing updates on the status of its remediation and implementation of compliance measures.

~~140~~157. The above acts of racketeering took place within ten years of each other, were part of the enterprise's common goal of securing valuable contracts for HP, and involved similar methods, participants, and victims.

~~141~~158. Plaintiffs have suffered injury, including in the form of millions of dollars of harm from the acceptance of harmful contractual terms and the payment of significant cost overcharges in connection with the BTO contracts as a result of the Defendants' racketeering activity in the conduct of the enterprise's affairs.

159. Plaintiffs were further injured by Defendants' sponsorship of Reynaud Aveleyra's trips to the United States. This is because while Reynaud Aveleyra was on United States soil, he was serving the interests of the conspirators, when he should have been providing faithful and honorable services to Plaintiffs. Defendants were thus robbing Plaintiffs of Reynaud Aveleyra's faithful and honorable services in the United States.

## COUNT TWO
### (RICO)

~~142~~160. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

~~143~~161. Defendants are "persons" as defined in 18 U.S.C. § 1961(3).

~~144~~162. Defendants HP and HP Mexico, along with HP Poland, HP Russia, and other partners who acted as intermediaries and agents, were an association-in-fact "enterprise" as defined in 18 U.S.C. § 1961(4). The members of the enterprise functioned together as an ongoing organization, starting at least by 2000 when HP, HP Russia and its agents began engaging in racketeering activity to make payments to government officials in exchange for government contracts and continuing through at least 2010 when HP, HP Poland and its agents ceased

making payments to government officials in exchange for government contracts, with a common purpose of maximizing sales, commissions, and profits, and securing contracts for HP. The enterprise operated for a sufficient duration to permit its members to successfully pursue the enterprise's purpose by securing lucrative contracts for HP and by receiving sales, commission and profits from government contracts.

163. The enterprise members benefitted from the knowledge that each of its members acquired during more than ten years of racketeering activity. For example, HP and HP Mexico were able to refine their criminal techniques and apply them to Plaintiffs based on lessons learned from the earlier criminal conduct of HP, HP Russia, and HP Poland. HP communicated these techniques to its subsidiaries, including HP Mexico. This is evident from the striking similarities amongst the predicate acts committed by HP, HP Mexico, HP Russia, and HP Poland discussed in detail herein.

~~145~~164. The enterprise engaged in, and its activities affected, interstate and foreign commerce. Enterprise members repeatedly communicated, visited and transferred funds between the United States, Russia, Poland, Germany, the United Kingdom and Mexico, among other countries.

~~146~~165. Defendants knowing and willingly conducted or participated, directly or indirectly in the conduct of the affairs of the enterprise. HP directed the enterprise from its offices in the United States and shared information and strategies between HP Russia, HP Poland and HP Mexico. HP Russia, HP Mexico and HP Poland, on HP's behalf and at the direction of HP, corralled the other agents and intermediary members of the enterprise and coordinated their interactions to secure lucrative contracts for HP. During the relevant period, HP Russia, HP Mexico and HP Poland were acting as agents of HP because they are wholly owned subsidiaries and are under the control of HP. HP Russia, HP Mexico and HP Poland operate on behalf of HP with authority to secure contracts and business for HP in the respective countries. Alternatively, HP Russia, HP Mexico and HP Poland were acting as the alter ego of HP in coordinating the enterprise because HP controls HP Russia, HP Mexico and HP Poland to such a degree that they are mere instrumentalities of HP. HP approved of the working of the enterprise and approved of payments made to and through the enterprise.

166. The predicate acts committed by HP, HP Mexico, HP Russia, and HP Poland had similar purposes. These enterprise members sought to secure lucrative contracts to provide HP's

technology at grossly inflated prices. In Mexico, the desired contracts with inflated prices were for business technology software, hardware and licenses. In Russia, the desired contracts with inflated prices were for telecommunications and computing infrastructure. In Poland, the desired contracts with inflated prices were for business technology services and products.

167. The predicate acts committed by HP, HP Mexico, HP Russia, and HP Poland had similar results. Through the payment of bribes, the enterprise members were able to successfully secure the lucrative contracts to provide HP technology services to state-owned entities. The prices for the signed contracts with Pemex were inflated by over $4 million. The prices for the signed contracts for the GPO project in Russia were inflated by approximately $18.4 million. The prices for the signed contracts with the KGP in Poland were inflated by approximately $16.7 million. In addition, these predicate acts in each scheme also resulted in the improper recording of bribe payments in the books and records of HP and a foreign subsidiary. In each scheme, the bribes were falsely recorded as a commission.

168. The predicate acts committed by HP, HP Mexico, HP Russia, and HP Poland had similar participants: each involved HP and its subsidiary located in the country where the sought after contracts were available, and each involved the use of intermediaries or agents with close ties to the government officials to facilitate the scheme. In Mexico, HP and HP Mexico utilized Intellego, because of its connection with Pemex's Chief Operating Officer. In Russia, HP and HP Russia utilized a Swiss intermediary and a U.S. intermediary with close ties to the Russian government. In Poland, HP and HP Poland utilized agents to pay bribes to the government official and used subordinates of the bribed official to secure contracts.

169. The predicate acts committed by HP, HP Mexico, HP Russia, and HP Poland had similar victims. Pemex, the GPO, and the KGP are state agencies or state-owned companies that entered into contracts at inflated prices because HP, HP Mexico, HP Russia, and HP Poland bribed and corrupted a handful of officials with decision-making authority.

170. The predicate acts committed by HP, HP Mexico, HP Russia, and HP Poland had similar methods of commission. In Mexico, HP and HP Mexico (i) paid at least $125,000 in bribes to Reynaud Aveleyra, a government official; (ii) avoided channel partner controls by inserting ZettingBiz into the transaction, although it had no legitimate role in the transaction; (iii) laundered the payments by inserting ZettingBiz, Intellego, and another entity controlled by Reynaud Aveleyra into the transaction to conceal that Reynaud Aveleyra was the ultimate

recipient of the bribe payment; (iv) failed to conduct any due diligence on Intellego; and (v) provided lavish travel to the United States and met with Reynaud Aveleyra in San Francisco, Palo Alto, Cupertino, Miami, Chicago, and Las Vegas. In Russia, HP and HP Russia likewise (i) paid at least €2.8 million in bribes to Russian government officials and (ii) avoided controls on financing by inserting the U.S. intermediary and the German intermediary into the deal as pass-through entities, although they had no legitimate role in the transaction; (iii) laundered the payments by inserting Burwell into the transaction to conceal that a Russian government official was the ultimate recipient of the bribe payments; (iv) failed to conduct any due diligence on Burwell; and (v) provided lavish travel to the United States and met with Russian government officials in Rockville, Maryland, on multiple occassions. In Poland, HP and HP Poland likewise (i) paid at least $600,000 in bribes to the Polish government official; (ii) avoided internal controls by failing to document payments to vendors for gifts and services provided to the Polish government official; (iii) laundered and concealed the payments to the Polish official through cash payments from off-the-books accounts; (iv) failed to conduct adequate due diligence of the agents utilized in the scheme; and (v) provided lavish travel to the United States and met with a Polish government official in San Francisco, California, and in Las Vegas, Nevada.

171. The predicate acts committed by HP, HP Mexico, HP Russia, and HP Poland shared so many similar characteristics that the Department of Justice and the SEC collectively investigated and resolved the criminal acts of HP, HP Mexico, HP Russia, and HP Poland as part of one package deal.

~~147~~172. Defendants knowingly and willingly conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity involving a series of related predicate acts.

~~148~~173. While conducting the affairs of the enterprise, defendant HP committed multiple violations of the federal money laundering statute, 18 U.S.C. § 1956(a)(2), by transporting, transferring or transmitting a monetary instrument or funds of a value far exceeding $10,000, from a place in the United States ultimately to Mexico with the intent to promote the carrying on of bribery chargeable under state law and bribery of public officials. HP approved of payments made from a bank account in the United States to ~~the Pass-Through Partner~~ZettingBiz in Mexico on at least two separate occasions around February 2009. HP approved all the payments with the intent and knowledge that the intermediaries would, and indeed did, make

46

payments to public officials as a *quid pro quo* for awarding HP lucrative government contracts. Bribery of a public official is "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7)(B)(iv).

(a)  HP is responsible for the money laundering acts committed by HP Mexico in violation of 18 U.S.C. § 1956(a)(2) because, during the relevant period, HP Mexico was acting as an agent of HP, and acted within the scope of its authority to benefit HP. In the alternative, HP is responsible for the acts committed by HP Mexico because it is the alter ego of HP.

(b)  HP is responsible for the money laundering acts committed by HP Mexico in violation of 18 U.S.C. § 1956(a)(2) because, during the relevant period, HP Mexico was a co-~~conspirators~~conspirator of HP's, the violations of the law were within the scope of the conspiracy and were reasonably foreseeable.

~~149~~174. While conducting the affairs of the enterprise, defendant HP committed multiple violations of the Travel Act while conducting the enterprise's affairs by using the U.S. mails and facilities and travel in interstate and foreign commerce with the intent to promote and carry on the unlawful activities of bribery and money laundering in violation of California's commercial bribery statute, California Penal Code § 641.3, money laundering in violation of 18 U.S.C. § 1956(a)(2), and the FCPA, while promoting, carrying on and facilitating the enterprise's bribery and money laundering schemes.

(a)  HP violated the Travel Act through the following violations of California's commercial bribery statute and federal money laundering and antibribery statutes: HP sent e-mails to HP Mexico approving payments and wire transfers to be paid from a place in the United States ultimately to Mexico. HP approved the transfer and payment of these funds knowing that the intermediaries would use the funds to make payments to public officials as a *quid pro quo* for awarding HP lucrative government contracts. In approving these payments, HP promoted, carried on and facilitated the enterprise's illegal bribery and money laundering schemes in violation of California and federal law. HP and HP Russia also violated the Travel Act by engaging in foreign and domestic travel to attend a meeting in Maryland to discuss the GPO deal. In doing so, HP and HP Russia intentionally promoted, established and facilitated the unlawful payment of money to Russian government officials in exchange for the awarding of the GPO project to HP Russia, in violation of California and federal antibribery law. HP and HP Poland also violated the Travel Act by engaging in foreign and domestic travel in connection

with bringing a Polish IT Official to San Francisco and Nevada. In doing so, HP and HP Poland intentionally promoted, established, and carried on unlawful payments to a Polish government official in exchange for lucrative government contracts with the KGP in violation of California and federal antibribery law.

   (b)      HP also violated the Travel Act through the following violations of the FCPA:

     i.   HP, in conducting the affairs of the enterprise, violated the anti-bribery provisions of the FCPA.

     ii.   HP, an "issuer" within the meaning of the FCPA, corruptly used and caused to be used interstate and international e-mails and wire transfers in furtherance of corrupt payments to foreign officials in those countries, while knowing, or willfully blinding itself to the fact that a portion of such money would be given to those foreign officials to influence and induce their decisions with respect to improperly awarding the BTO contracts to HP Mexico, the GPO contracts in Russia and the contracts with the KGP in Poland for the purpose of obtaining business for HP.

     iii.   HP also offered and conferred a number of benefits to a Pemex official, Reynaud Aveleyra, a Russian official, and a Polish official, with the intent to induce ~~him~~them to award ~~Pemex~~, and reward them for directing, contracts to HP Mexico, HP Poland, and HP Russia, for HP's benefit, including ~~invitations to~~ lavish trips to San Francisco, California, Palo Alto, California, Cupertino, California, Orlando, Florida, Miami, Florida, Chicago, Illinois, Las Vegas, Nevada and ~~Miami, Florida~~Rockville, Maryland.

     iv.   HP Russia, HP Poland and HP Mexico, also from approximately 2003 to 2010, corruptly used and caused to be used interstate and international e-mails and wire transfers in furtherance of corrupt payments to various foreign government officials to obtain business and falsely recorded these payments in their books and records.

     v.   HP is responsible for the acts and FCPA violations committed by HP Russia, HP Poland and HP Mexico because, as described herein, during the relevant period, HP Mexico was acting as an agent of HP. In the alternative, HP is

liable for the acts committed by HP Russia, HP Poland and HP Mexico because they were the alter ego of HP.

vi.    Further, in conducting the affairs of the enterprise, Defendant HP continuously violated the FCPA by failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that its transactions are properly carried out and recorded and that the company's assets are protected, in violation of the accounting provisions of the FCPA.

vii.    HP violated the FCPA internal controls provision by knowingly approving payments to intermediaries such as ~~the Pass Through Partner,~~ZettingBiz and the German agent, with little or no due diligence. HP also violated the FCPA internal controls provision by failing to implement effective internal controls at its wholly-owned subsidiaries, HP Russia, HP Poland and HP Mexico.

viii.    In conducting the affairs of the enterprise, HP also violated the FCPA by failing to make and keep books, records and accounts, which in reasonable detail, accurately and fairly reflect the transactions and the dispositions of their assets, in violation of the accounting provisions of the FCPA.

ix.    HP violated the FCPA books and records provision by incorporating and consolidating the falsely recorded payments made in Russia, Poland and Mexico to agents as payments for legitimate services or commissions, when the true purpose of these payments was to make corrupt payments to government officials to obtain business.

(c)    In addition to other violations described herein, HP violated the Travel Act by violating California Penal Code 641.3 and 778a because HP Russia, HP Poland and HP Mexico acted as HP's agent in paying bribes to secure contracts on behalf of HP. HP acted as a principal in ~~California~~the United States by approving the retention of the intermediaries and approving payments made to the intermediaries who in turn made payments ~~to~~ in exchange for business for HP.

(d)    Defendant HP is responsible for the Travel Act violations committed by HP Russia, HP Poland and HP Mexico because, during the relevant period, HP Russia, HP Poland and HP Mexico were acting as agents of HP, and acted within the scope of their

authorities to benefit HP. In the alternative, HP is responsible for the acts committed by HP Mexico, HP Poland and HP Russia because they are the alter egos of HP.

(e) HP is responsible for the Travel Act violations committed by HP Russia, HP Poland and HP Mexico because, during the relevant period, HP Russia, HP Poland and HP Mexico were co-conspirators of HP's, and the violations of the law were within the scope of the conspiracy and were reasonably foreseeable.

~~150~~175. Separately, HP conducted the affairs of the enterprise through a pattern of racketeering activity by engaging in multiple instances of wire fraud, in violation of 18 U.S.C. § 1343. HP devised and knowingly participated in a scheme to defraud Plaintiffs by activity in the United States with the specific intent to deceive or defraud Plaintiffs by causing Plaintiffs to enter into the BTO contracts and agree to pay Defendants approximately $6,000,000. The statements that Defendants made regarding the BTO contracts contained material omissions, in that they failed to disclose Defendants' relationship with, and corruption of, Reynaud Aveleyra and the Chief Operating Officer or their affiliated entities. In furtherance of the scheme to defraud Plaintiffs of money through false and fraudulent pretenses, Defendants knowingly and willfully transmitted, or caused to be transmitted, the following wires through interstate or foreign commerce:

(a) On December 12, 2008, HP Mexico executives sent a request for permission from HP regional management to increase the influencer fee from 25% to 26.5%. This request for an increased influencer fee was sent by HP Mexico officials via an e-mail to HP officials located in ~~California~~the United States.

(b) On December 12, 2008, the HP officials in ~~California~~the United States approved an increased influencer fee on the same day they received the request, with little or no additional review, thereby approving ~~the Pass Through Partner's~~ZettingBiz's share of the scheme's illicit proceeds and its role in the enterprise. HP officials sent this critical approval from ~~California~~the United States to HP Mexico officials in Mexico.

(c) On February 10, 2009, HP Mexico wired bribe money~~, in~~ to a correspondent bank account in the United States.

(d) On February 10, 2009, HP Mexico caused bribe money to be wired, in U.S. dollars, ~~through~~from a correspondent bank account in the United States, to ~~the Pass Through Partner~~ZettingBiz.

50

(e)	On February 12, 2009, HP Mexico wired bribe money to a correspondent bank account in the United States.

(df)	On February 12, 2009, HP Mexico wiredcaused bribe money to be wired, in U.S. dollars, throughfrom a correspondent bank account in the United States, to the Pass-Through PartnerZettingBiz.

(eg)	These payments from Defendants to the Pass-Through PartnerZettingBiz totaled $1,663,503. A portion of these funds were then used to corrupt Reynaud Aveleyra and the Chief Operating Officer.

(fh)	The correspondent bank account used by HP Mexico was controlled by HP and located in California.

(i)	On or around February 11, 2009, ZettingBiz sent Intellego part of its share of the bribe money, $517,821, to or through a location in the United States.

(j)	On or around February 23, 2009, ZettingBiz sent Intellego its remaining share of the bribe money, $892,493.23, to or through a location in the United States.

(k)	On or around March 2, 2009, Intellego sent Reynaud Aveleyra part of his share of the bribe money, $30,000, to a bank account located in California.

(l)	On or around March 30, 2009, Intellego sent Reynaud Aveleyra the remaining part of his share of the bribe money, $95,000, to a bank account located in California.

151176. Given the fact that the ongoing enterprise's regular way of doing business was through a pattern of racketeering activity, there iswas a substantial threat that this established, at all times during the pattern of racketeering activity, that Defendants' established behavior in the interest of enterprises involvingof committing predicate acts to secure contracts for HP products has persisted or couldand services would persist and continue into the future. This threat was particularly heightened because HP and its subsidiary HP Poland continued with nearly identical bribery and criminal misconduct through at least April 2010. Moreover, HP and HP Mexico continued corruptly providing Reynaud Aveleyra with expensive travel and accommodations six months after the BTO contracts were signed, which illustrates that Defendants intended to secure additional contracts from Plaintiffs.

177. The Department of Justice explicitly recognized a significant, ongoing threat of repetition in April 2014, such that both HP and HP Mexico represent in the NPA that they "will *continue* to implement a compliance and ethics program designed to *prevent and detect*

violations of the FCPA and other applicable anti-corruption laws *throughout their operations*, including [in] activities *carrying a high risk of corruption*" (emphasis added). Likewise, the simultaneous SEC Order obligates Defendants to a three year reporting term providing updates on the status of its remediation and implementation of compliance measures.

~~152~~179. The above acts of racketeering took place within ten years of each other, were part of the enterprise's common goal of securing valuable contracts for HP, and involved similar methods, participants and victims.

~~153~~179. Plaintiffs have suffered injury, including in the form of millions of dollars of harm from the acceptance of harmful contractual terms and the payment of significant cost overcharges in connection with the BTO contracts as a result of the Defendants' racketeering activity in the conduct of the enterprise's affairs.

## COUNT THREE
## (RICO Conspiracy)

~~154~~180. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

~~155~~181. Defendants HP and HP Mexico agreed to participate in the affairs of an enterprise with Intellego and ~~the Pass-Through Partner~~ZettingBiz, as described above.

~~156~~182. Defendants HP and HP Mexico agreed to conduct those affairs through a pattern of racketeering activity. Specifically, Defendants agreed to commit multiple predicate acts of money laundering, mail and wire fraud, violations of the Travel Act, and violations of state-law prohibited bribery, as described above. HP, the epicenter of the enterprise and conspiracy, directed this scheme from the United States.

~~157~~183. Defendants have therefore conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

~~158~~184. Plaintiffs have suffered injury, including in the form of millions of dollars of harm from the acceptance of harmful contractual terms and the payment of significant cost overcharges in connection with the BTO contracts as a result of the Defendants' violation of 18 U.S.C. § 1962(d).

## COUNT FOUR
## (RICO Conspiracy)

159185. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

160186. Defendant HP agreed with HP Mexico, HP Poland, HP Russia, and other partners who acted as intermediaries and agents, to conduct and participate in the affairs of a global criminal enterprise. This was an association-in-fact "enterprise" as defined in 18 U.S.C. § 1961(4). The members of the enterprise functioned together as an on-going organization, beginning in 2000 and continuing through at least 2010, with a common purpose of maximizing sales, commissions, and profits, and securing contracts for HP.

161187. HP directed the enterprise from the United States and shared information and strategies between HP Russia, HP Poland and HP Mexico.

162188. Defendant HP agreed with HP Mexico, HP Poland, HP Russia and the intermediaries and agents who made up the global enterprise to conduct the affairs of the global enterprise through a pattern of racketeering activity. In each country, the enterprise channeled bribes through intermediaries and agents to government officials that could influence the awarding of government contracts. Specifically HP, which was at the epicenter of the enterprise and conspiracy, agreed to commit multiple predicate acts of money laundering, mail and wire fraud, violations of the Travel Act, and violations of state-law prohibited bribery over the course of a decade.

163189. Defendant HP has therefore conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

164190. Plaintiffs have suffered injury, including in the form of millions of dollars of harm from the acceptance of harmful contractual terms and the payment of significant cost overcharges in connection with the BTO contracts as a result of the Defendant HP's violation of 18 U.S.C. §1962(d).

**COUNT FIVE
(Unfair Competition)**

165191. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

166192. A critical purpose of the California Business & Professions Code § 17200 *et seq.* (the "UCL") is to protect consumers and competitors by promoting fair competition in markets for goods and services and extending to the entire consuming public protections

traditionally afforded to business competitors. In short, the UCL's overarching goal is to promote free and fair competition while prohibiting unfair and unlawful business practices. Part of the motivation for promoting fair competition in California is to attract commerce from other states and foreign nations. Indeed, the UCL protects foreign consumers and competitors from unlawful business practices undertaken, at least in part, in California. California has a vested interest in attracting business from Mexico, particularly from large purchasers of goods and services. Application of the UCL to restore Plaintiffs to their equitable position protects this interest and prevents Defendants' bribery scheme from poisoning the well for foreign business partners.

167193. Defendants engaged in unfair competition by committing some or all of the unlawful business acts and practices alleged herein. In particular, Defendants' conduct is unlawful because it violated the anti-bribery provisions of the FCPA, 15 U.S.C. § 78dd-1, *et seq.*, as described above. Defendants' authorization and transfer of monies to intermediaries to corrupt Pemex officials for the purpose of obtaining business through BTO contracts with Plaintiffs violates the anti-bribery provisions of the FCPA. 15 U.S.C. §§ 78dd-1(a), 78dd-2(a), 78dd-3(a).

168194. In addition, Defendants' conduct is unlawful because Defendants failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that its transactions are properly carried out and recorded and that the company's assets are protected, in violation of the accounting provisions of the FCPA, as described above. 15 U.S.C. § 78m(b)(2)(B). Defendants' conduct is also unlawful because Defendants knowingly circumvented or knowingly failed to implement such a system of internal controls. 15 U.S.C. §§ 78m(b)(5), 78ff(a).

169195. Defendants also engaged in unlawful conduct by conspiring to violate the internal controls provisions of the FCPA, in violation of 18 U.S.C. § 371. Defendants agreed with enterprise members to violate these provisions and committed the overt acts described above in furtherance of the enterprises' goal of obtaining business for HP.

170196. Defendants' conduct is also unlawful because Defendants failed to make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflect the transactions and dispositions of their assets, in violation of the accounting provisions of the FCPA, as described above. 15 U.S.C. § 78m(b)(2)(A).

171197. Defendants also engaged in unlawful conduct by conspiring to violate the books and records provisions of the FCPA, in violation of 18 U.S.C. § 371. Defendants agreed with

enterprise members to violate these provisions and committed the overt acts described above in furtherance of the enterprises' goal of obtaining business for HP.

172198. Defendants also committed unlawful business acts by committing commercial bribery in violation California Penal Code §§ 641.3 and 778a, as described above. After obtaining approval from HP, in March 2009, HP Mexico wired approximately $125,000 from an account in the United States, through other intermediaries, to Reynaud Aveleyra, without the knowledge or consent of Plaintiffs, in exchange for his assistance with securing the BTO contracts for HP, with the specific intent to injure or defraud Plaintiffs by depriving them of a fair market negotiation process. The account from which the funds were wired was located in California.

173199. Defendants further committed unlawful business acts by concealing this fraud from Plaintiffs.

174200. By reason of, and as a direct and proximate result of Defendants' unlawful practices and conduct, Plaintiffs have suffered financial injury to their business and property. In particular, Plaintiffs were injured by Defendants' bribery of Pemex officials and Defendants' inadequate internal controls that enabled and caused such bribery. Plaintiffs paid much more for the products and services provided under the BTO contracts than they would have had those contracts been awarded to a market participant operating under fair circumstances. That Defendants profited by over $2.5 million on a $6 million deal is substantial evidence that Pemex was overcharged.

175201. A substantial portion of Defendants' unlawful business acts were committed in California. Defendant HP maintains its headquarters in California and controlled and directed HP Mexico from, and approved the payment of the influencer fee from, from California. In addition, the bribes were paid from a correspondent bank account controlled by HP and located in California. In the midst of the bribe payments, the Defendants invitedprovided Reynaud Aveleyra to twowith three separate trips to California to meet with HP executives. Reynaud Aveleyra then received the bribe payments in California. The bribe payments were falsely recorded in books and records in California. Moreover, Defendants' deficient system of internal controls was devised in, and promulgated and implemented from, California. Defendant HP directed the affairs of the criminal enterprise from its offices in the United States.

176202. Defendants' UCL violations directly and proximately caused injuries to

Plaintiffs, as described herein.

**COUNT SIX**
**(Aiding and Abetting Unfair Competition)**

~~177~~203. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

~~178~~204. HP Mexico knew that the internal controls promulgated by HP were unlawfully deficient under the FCPA and could not provide reasonable assurances that its transactions are properly carried out and recorded, as described above. 15 U.S.C. §§ 78m(b)(2)(B), 78m(b)(5), 78ff(a). As demonstrated by the bribery scheme itself, HP Mexico knew that it could add unnecessary parties to transactions and request overweight "influencer fees," receive immediate approval for those fees, and then funnel bribes to employees of another company, without being prevented or detected by HP's controls regime.

~~179~~205. HP Mexico substantially assisted or encouraged HP in failing to devise and maintain a sufficient system of internal accounting controls. HP Mexico implemented the purported internal controls system promulgated by HP, knowing that it was deficient. HP Mexico also failed to implement any other adequate system of internal controls over its operations. HP Mexico further substantially assisted and encouraged HP to violate the FCPA internal controls provision by falsely causing ~~the Pass Through Partner~~ZettingBiz to enter the BTO transaction, which enabled the Defendants to proceed with the bribery scheme while avoiding due diligence and other requirements. HP Mexico further assisted with recording ~~the Pass Through Partner~~ZettingBiz as the deal partner in HP's internal tracking system. HP Mexico also requested and encouraged HP to approve the increased "influencer fee" without conducting a review that could provide reasonable assurances that the fee was appropriate or lawful.

~~180~~206. HP Mexico likewise knew that HP was failing to make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflect the transactions and dispositions of their assets, in violation of the accounting provisions of the FCPA, as described above. 15 U.S.C. § 78m(b)(2)(A). HP Mexico knew that the "influencer fee" was not a legitimate commission, but a means to corrupt Reynaud Aveleyra and the Chief Operating Officer and to reward Intellego and ~~the Pass Through Partner~~ZettingBiz for their roles in the criminal enterprise. HP Mexico further knew that creating a false record of these transactions in its own books and records would falsify the books and records of HP, as HP Mexico's books and records

56

are consolidated into HP's.

~~181~~207. HP Mexico substantially assisted or encouraged HP to create a false entry, or false entries, in its books and records. HP Mexico falsely recorded that ~~the Pass Through Partner~~ZettingBiz was due a commission on the BTO contracts and failed to record $1.41 million in payments to Intellego. These failures directly caused HP's books and records to fail to reflect that approximately $125,000 had been paid to a Pemex official.

~~182~~208. Some or all of the profits that HP Mexico secured from the BTO transaction were ultimately received by HP. This financial incentive further encouraged HP to continue its internal controls and books and records violations.

~~183~~209. HP Mexico was aware of the requirements of the FCPA's internal controls and books and records provisions through HP's SBC program.

~~184~~210. Accordingly, HP Mexico acted unlawfully under the UCL by aiding and abetting HP's dual violations of the accounting provisions of the FCPA.

~~185~~211. As a direct and proximate result of HP promulgating deficient internal controls and maintaining inaccurate books and records and by HP Mexico aiding and abetting those violations, HP Mexico directly and proximately caused injuries to Plaintiffs, as described herein.

## COUNT SEVEN
### (Fraudulent Concealment)

~~186~~212. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

~~187~~213. Defendants actively concealed from Plaintiffs that they had corrupted Reynaud Aveleyra and the Chief Operating Officer in order to secure the BTO contracts with both Petróleos Mexicanos and PEP. At all relevant times, Defendants knew that the BTO contract negotiation had been corrupted and HP Mexico and other enterprise members went to great lengths to escape detection, including the involvement of Intellego and ~~the Pass Through Partner~~ZettingBiz to funnel secret bribe payments. In fact, after obtaining approval from HP, HP Mexico wired approximately $125,000 from an account in the United States, through this web of intermediaries, to Reynaud Aveleyra, without the knowledge or consent of Plaintiffs, in exchange for his assistance with securing the BTO contracts for HP, with the intent to defraud Plaintiffs by depriving them of a fair negotiation process.

~~188~~214. Plaintiffs, including their representatives and the signatories on the BTO

contracts (with the exception of enterprise members ~~Reynauld~~Reynaud Aveleyra and the Chief Operating Officer), were unaware of the Defendants' bribery scheme.

~~189~~215. The Defendants' corruption of Reynaud Aveleyra and the Chief Operating Officer or their affiliated entities is a material fact, which Defendants were obligated to, and could have, disclosed to Plaintiffs throughout the negotiation and implementation of the BTO contracts. Had Plaintiffs been aware of the true nature of Defendants' corrupt activities, the uncorrupted signatories on the BTO contracts would have refused to sign the agreements and Plaintiffs would not have entered into the improper BTO deals.

~~190~~216. Defendants had a duty to disclose their corruption of Reynaud Aveleyra and the Chief Operating Officer or their affiliated entities to Pemex as Defendants exerted control over these material facts, which were not readily available to Plaintiffs. As described herein, throughout the relevant period the Chief Operating Officer and Reynaud Aveleyra had abandoned their relationship with Pemex and were not acting within the scope of their employment, but instead were acting solely for their own personal benefit and the benefit of the criminal enterprise. No one loyal to Pemex was aware of the bribery payments or the Defendant's scheme prior to April 9, 2014.

~~191~~217. Defendants also had a duty to disclose the bribery scheme to Plaintiffs because Defendants actively concealed from Plaintiffs these facts regarding the scheme and the agreement to enter into the BTO contracts in exchange for payments of $1.41 million to Intellego and the $125,000 to Reynaud Aveleyra.

~~192~~218. Defendants intended to deceive Plaintiffs and cause Plaintiffs to enter into the BTO contracts by knowingly concealing material facts in order to secure more than $2.5 million in profits generated by the BTO contracts.

~~193~~219. Plaintiffs reasonably relied upon Defendants' deception in the good faith belief that the BTO contracts had been properly negotiated and represented fair market terms.

~~194~~220. As a direct and proximate result of Defendants' concealment of their corruption of Reynaud Aveleyra and the Chief Operating Officer, Plaintiffs suffered injuries as described herein. That Defendants procured a greater than 40% profit margin on this transaction is by itself substantial evidence that Pemex was overcharged.

## COUNT EIGHT
### (Common Law Tortious Interference with Contracts – by Petróleos Mexicanos only)

~~195~~221. Plaintiffs repeat and reallege, as if set forth herein, the allegations of all of the preceding paragraphs.

~~196~~222. Petróleos Mexicanos had valid employment contracts with the Chief Operating Officer and Manuel Reynaud Aveleyra during the relevant period.

~~197~~223. Defendants knew that the Chief Operating Officer and Reynaud Aveleyra were employed by Petróleos Mexicanos and targeted them for that reason.

~~198~~224. Defendants intentionally induced the breach or disruption of Petróleos Mexicanos's contractual relationships with these two officials through a series of wrongful acts that corrupted ~~Reynauld~~Reynaud Aveleyra and the Chief Operating Officer. These corruption efforts were intended to, and did, cause Reynaud Aveleyra and the Chief Operating Officer to forgo their duties to Petróleos Mexicanos to secure favorable terms from an appropriate supplier on the BTO contracts in favor of ensuring that HP Mexico secured these valuable contracts for HP at inflated prices.

~~199~~225. The Chief Operating Officer and Reynaud Aveleyra failed to perform their responsibilities under the contracts solely because of the bribes paid by the Defendants.

~~200~~226. Defendants' bribe payments were approved in California and paid from a bank account in California.

~~201~~227. Defendant HP directed this scheme from its offices in the United States.

~~202~~228. Defendants' bribery scheme succeeded. Petróleos Mexicanos's contractual relationship with the Chief Operating Officer and Reynaud Aveleyra was breached or disrupted by the $1.41 million paid to Intellego and the $125,000 paid to the entity controlled by Reynaud Aveleyra, according to the SEC Order. These payments caused the two Pemex officials to act contrary to their employment contracts and directly adverse to ~~it's~~its interests.

~~203~~229. The employment agreement for Reynaud Aveleyra, dated January 16, 2008, states: "The employee shall perform the services under the direction of the employer representatives or, as it may be, by the Board of Directors, to whose authority shall be subordinated in every respect related to the occupation, and it is expressly agreed that while performing his services he will abide by all the orders and rules from them, as long as they are related to the contracted services, as well as the internal rules and the applicable laws."

~~204~~230. The employment agreement for Reynaud Aveleyra further states: "Among others, he will be in charge of the following functions:

- Direct processes, functions and areas under his responsibility, defined strategic objectives and the initiates within the scope of his responsibility.
- Promote and supervise and oversee the compliance with the applicable policies and regulations.
- Oversee the compliance of the strategic objectives and initiatives within the scope of his competence.
- Oversee the correct application of the Budget of Expenditures of the Federation for the applicable term within the scope of his competence.
- Oversee the maximize exploitations of the resources of Petróleos Mexicanos and its Subsidiary Entities, within the scope of his responsibilities."

~~205~~231. The Chief Operating Officer similarly entered into an employment agreement on March 5, 2007.

~~206~~232. As a direct and proximate result of Defendants' interference, the Chief Operating Officer and Reynaud Aveleyra breached the duties required by their employment contracts and caused Petróleos Mexicanos and its subsidiary PEP to enter into the over-priced BTO contracts with Defendants rather than entering into contracts at lower prices.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court enter an Order:

(a)      awarding the Plaintiffs relief on all the claims set forth herein;

(b)      for disgorgement and/or restitution of all revenues, proceeds, earnings, profits, compensation, and benefits, including reduced costs, which may have been obtained by any Defendant as a result of unlawful business acts or practices;

(c)      for an injunction permanently enjoining Defendants and Defendants' agents and employees, and all persons acting under, in concert with, or for Defendants, from directly or indirectly, to the detriment of Plaintiffs, (i) committing or causing any violations of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1, *et seq.*, including the control provisions contained in Section 13(b)(2)(A) and Section 13(b)(2)(B) of the Securities Exchange Act, or any other act of bribery; (ii) engaging in "unfair competition" in California in violation of the California Business and Professions Code § 17200, *et seq.*; (iii) engaging in fraudulent concealment against Plaintiffs; and (iv) tortiously interfering with Plaintiffs' contracts or business opportunities;

(d)        for injunctive relief requiring Defendants and Defendants' agents and employees, and all persons acting under, in concert with, or for Defendants, to investigate: (i) whether any other contracts with Plaintiffs not mentioned in the NPA have been impacted in any way by Defendants' illegal conduct; and (ii) whether Defendants or any of Defendants; agents, employees, subsidiaries, divisions, or affiliates has made any other improper or illegal payments not mentioned in the NPA to Plaintiffs or any of Plaintiffs' employees or agents, and to report the results of such investigation to Plaintiffs;

(e)        awarding damages and punitive damages in an amount to be determined at trial;

(f)        awarding statutory trebling of damages;

(g)        awarding interest, including pre and post judgment interest, in the maximum amount allowed by law;

(h)        awarding attorneys' fees and costs; and

(i)        awarding such other or further relief as the Court deems appropriate.

DATED: July 31, 2015
DATED: December 2, 2014                    /s/ *Melinda M. Morton*
                                           Melinda M. Morton
                                           PROCOPIO, CORY, HARGREAVES AND
                                           SAVITCH LLP

                                           Richard D. Bernstein, *pro hac vice* to be filed
                                           Frank M. Scaduto, SBN 271451
                                           WILLKIE FARR & GALLAGHER LLP
                                           1875 K Street, NW
                                           Washington, DC 20006
                                           Telephone: 202.303.1000
                                           Facsimile: 202.303.2000

                                           *Attorneys for Plaintiffs*
                                           PETRÓLEOS MEXICANOS, and
                                           PEMEX EXPLORACIÓN Y PRODUCCIÓN

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand trial by jury as to all issues in this action triable by a jury.


DATED: July 31, 2015
DATED: December 2, 2014                    /s/ *Melinda M. Morton*
                                           Melinda M. Morton
                                           PROCOPIO, CORY, HARGREAVES AND
                                           SAVITCH LLP

                                           Richard D. Bernstein, *pro hac vice* to be filed
                                           Frank M. Scaduto, SBN 271451
                                           WILLKIE FARR & GALLAGHER LLP
                                           1875 K Street, NW
                                           Washington, DC 20006
                                           Telephone: 202.303.1000
                                           Facsimile: 202.303.2000

                                           *Attorneys for Plaintiffs*
                                           PETRÓLEOS MEXICANOS, and
                                           PEMEX EXPLORACIÓN Y PRODUCCIÓN